*attachment # 3*

*16-CV-02547*

# Calendar No. 324

| 96TH CONGRESS 1st Session | } | SENATE | { | REPORT No. 96-304 |
|---|---|---|---|---|

## FEDERAL COURTS IMPROVEMENT ACT OF 1979

AUGUST 3 (legislative day, JUNE 21), 1979.—Ordered to be printed

Mr. KENNEDY, from the Committee on the Judiciary, submitted the following

# REPORT

### [To accompany S. 1477]

The Committee on the Judiciary, to which was referred the bill (S. 1477) to provide for improvements in the structure and administration of the Federal courts, and for other purposes, having considered the same, reports favorably thereon, with amendments, and recommends that the bill as amended do pass.

#### PURPOSE OF THE AMENDMENT

The amendments were technical and clarifying in nature. The purpose of the bill as amended is identical to the purpose of the bill as introduced.

#### PURPOSE OF THE BILL

The purpose of S. 1477 is to resolve some of the myriad structural administrative and procedural problems that have impaired the ability of our Federal courts to deal with the vast range of controversies among our citizens and to respond promptly and meaningfully to their demands for justice. Those problems—which include the inability of our present system to provide a prompt, definitive answer to legal questions of nationwide significance—have been long debated by judges, lawyers, legal scholars, and those members of the general public concerned with the administration of the Federal justice system.

The Courts Improvement Act is one of a series of court reform bills that the committee will consider during the 96th Congress as part of a comprehensive program designed to improve the quality of our Federal court system and to enhance citizen access to justice.

#### EXPLANATION OF THE BILL

On March 15, 1979, Senate bills S. 677, the Judicial Improvement Act of 1979, and S. 678, the Federal Courts Improvement Act of 1979,

39–010 O

Attachment 3 - page 1 of 42

825


SCANNED
JUL 2 4 2018
U.S. DISTRICT COURT MPLS

2

were introduced and subsequently referred to the Committee on the Judiciary. The two bills were substantially identical except that S. 678 included some additional reforms absent from S. 677. Seven days of hearings were held on the bills and as a result the original bills were significantly revised. To avoid confusion, the committee decided to take the revised bills and introduce them as a new bill. S. 1477, is the product of the evolution of S. 677 and S. 678.

## TITLE I—GOVERNANCE AND ADMINISTRATION

Title I recognizes that our courts must be properly governed and administered if the goals of fairness and efficiency in the administration of justice are to be achieved.

*Chief judge tenure.*—Under existing law, the chief judge of each Federal court of appeals or district court is the judge who is most senior in commission and under age 70. Depending on the relative ages and seniority of the judges in a given circuit or district, a court may have a single chief judge for many years, or it may have a rapid turnover in the chief judge's position if several judges on the court reach age 70 within a relatively short period. Either extreme may result in administrative inefficiencies that are a needless additional burden on the already overworked courts. Part A of title I retains seniority as the basis for the appointment of a chief judge but avoids the extreme of either too lengthy or too short a term by fixing seven years as the maximum term of service and by precluding appointment of a chief judge who is 65 or older at the time of his appointment. Thus, both a minimum and maximum term is established, thereby striking a sound balance between continuity and rotation. As a transitional measure, these changes will not take effect until one year after the date of enactment and will not apply to anyone serving as a chief judge on that effective date.

*Precedence and composition of panel.*—Part B of title I requires that Federal appellate panels be composed of at least three judges, at least a majority of whom shall be judges of the circuit court, and that the presiding judge be a judge of that court in regular active service. Current law seems to permit appellate courts to sit in panels of less than three judges, and some courts have used panels of two judges for motions and for disposition of cases in which no oral argument is permitted because the case is classified as insubstantial. In order for the Federal system to preserve both the appearance and the reality of justice, such a practice should not become institutionalized. The disposition of an appeal should be the collective product of at least three minds. Moreover, this section would permit the courts of appeals to sit in panels of three or more judges but less than a full en banc court for cases in which authoritativeness of opinion is particularly useful or in which the issues are especially difficult or important. The circuit courts could continue to adopt local rules permitting the disposition of an appeal in situations in which one of the three judges dies or becomes disabled and the remaining two agree on the disposition; but, in the first instance, all cases would be assigned to panels of at least three judges.

With a substantial number of judges from outside the circuit sitting by designation, and with district judges sitting regularly on the courts of appeals, it is not infrequent that there will be only one circuit judge

**Attachment 3 - page 2 of 42**

3

on a panel or that the presiding judge will be a senior judge or a judge from another circuit. Such situations lead to doctrinal instability and unpredictability in the law of the circuit because district court and court of appeals judges from outside the circuit may not know or may not feel bound by the law of that circuit. In addition, a strong argument can be made that the law of a particular circuit should be determined by an appellate court, the majority of which should be judges of that circuit. The Bill discourages any unnecessary borrowing of judges and promotes stability and predictability by requiring a majority of each panel to be composed of judges of the circuit court.

*Judicial Councils.*—Established over forty years ago to help administer and manage the court within each circuit,[1] the judicial councils have a mixed record of success. Each judicial council is currently composed of the active circuit judges of the circuit. It is presided over by the chief judge of the circuit and is required to meet at least twice annually. Its duties are to consider reports from the Administrative Office and "make all necessary orders for the effective and expeditious administration of the business of the courts within its circuit."[2] The district judges of the circuit are directed to "promptly carry into effect all orders" of the judicial council.[3]

To numerous observers, these regional councils have never succeeded to the degree originally intended.[4] In 1959, for example, the Senate Appropriations Committee concluded that there existed "a grave lack of administrative direction in the operation of the business of the United States courts" and that this defect resulted in "serious and, in some cases, shocking conditions of delay and neglect of cases on court dockets."[5] The committee laid a major share of the blame on the judicial councils.[6]

The ongoing controversy over the nature and functions of the judicial councils has raised important issues meriting examination by the committee. S. 1477 addresses council problems relating to organization and responsibilities. These responsibilities, in theory, are numerous: assigning judges to congested districts and to particular types of cases, directing judges to assist infirm judges, ordering judges to decide cases long held under advisement, urging judges to clear congested court dockets, and setting standards of judicial ethics and behavior.

With the creation of 152 new judgeships, the sponsors of S. 1477 recognize the need to once again reexamine the basis for judicial council organization. S. 1477 is designed to make councils more effective and efficient by changing their membership and structure. The bills, as originally introduced as S. 677 and S. 678, limited the size of such councils to a maximum of seven appellate judges and provided—for the first time—membership of up to four district judges. By reducing their size, increasing their administrative responsibilities (in the area of judicial discipline) and mandating district

[1] The Administrative Office Act of 1939, 28 U.S.C. §§ 601, 603, 606, 608 (1964). (53 Stat. 1223.)
[2] 28 U.S.C. § 332(4) (1976).
[3] *Id.*
[4] See, e.g., P. Fish, "The Circuit Councils: Rusty Hinges of Federal Judicial Administration," 37 Univ. of Chi. L. Rev. 203 (1970); J. Wallace, "Judicial Administration in a System of Independents: A Tribe With Only Chiefs," 1 Brigham Young Univ. L. Rev. 39 (1978); see also, Administrative Office of the United States Courts, Survey of the Legal Profession Containing Critical Comments on the Judicial Councils and Judicial Conferences of the Circuits in the Federal System, Memorandum No. 3, Mar. 15, 1955.
[5] Staff of Senate Committee on Appropriations, 86th Cong., 2d sess., Field Study of the Operations of United States Courts, p. 1 (Committee Print 1959).
[6] *Id.* at 84–84b.

**Attachment 3 - page 3 of 42**

4

court representations, S. 1477 makes a concerted effort to give the councils a more important role in court administration and management.

As a result of extensive testimony, the committee is now of the view that the bills should be modified. Although S. 1477 will continue to mandate that the councils permanently include district court judges for the first time, the committee believes that the size and nature of the councils, as well as the method of selecting council members, should better be left to the judges themselves. Specifically, the committee has decided to conform S. 1477 to reflect the March, 1979 Judicial Conference Resolution of the Court Administration Committee calling for modifications in the structure and governance of the councils. This Resolution has been adopted almost verbatim by the committee which is of the opinion that such modifications should best be left to the judges themselves. Thus, the judges should be given the opportunity to determine, in their best judgment, what the optimum size of the council should be and what percentage of council membership should consist of district court judges (within limits set out in the statute). Accordingly, S. 1477 mandates that the district judges be given permanent membership status on the councils but leaves most other questions for individual judicial council resolution based on the needs of the particular circuit.

This is not to say that the committee has not formulated strong views as to the best approach to be taken concerning these problems; rather, the committee would first give the judiciary—a coequal branch of government—the first opportunity to deal with the important issues raised during Senate hearings. For example:

1. *Representation by circuit judges and district judges.*—Although the bill requires that district judges be members of the council, it does not state the nature and scope of that membership. Rather it leaves the issue to the councils themselves in accordance with the Judicial Conference Resolution. Hearing witnesses were divided on this point. Judge Clifford Wallace of the ninth circuit called for councils composed equally of district and circuit judges; Chief Judge John Brown of the fifth circuit urged that all circuit judges occupy a place on the council, with district judges having some form of symbolic representation. The committee is of the view that since the councils have important administrative responsibilities in areas such as judicial discipline, it is important that district court judges be given a strong voice in council deliberations. The committee concluded that it is unwise to provide for district judge membership only when the matter at issue involves the district courts. District judges should be members of the council for all purposes; not only is it often difficult to distinguish district court matters from other matters affecting the administration of the entire circuit, but the committee is convinced that the district judges could bring an additional perspective and understanding which is lacking today. It is important to bear in mind that the role of the judicial council is to administer the business of the circuit as a whole; it is not to administer the courts of appeals.

2. *The size of the councils.*—The committee decided that S. 677 and S. 678, as introduced, placed an arbitrary limitation on the size of the circuit councils by permitting no more than seven circuit judges and four district court judges. The committee reaffirms

**Attachment 3 - page 4 of 42**

5

S. 677 and S. 678 insofar as they provided that a reduction in the overall size of the council is imperative because of the recent unprecedented growth of the Federal judiciary. With the mandated addition of district court judges, the committee is also of the view that continuing the current practice of including all circuit judges as members of the council is likely to result in the creation of an ungovernable, unwieldy council body. This is so, particularly in the fifth and ninth circuits which each have more than twenty appellate judges. The committee is mindful, however, of the testimony of Chief Judge Brown, who testified that all of the circuit judges should continue to serve on the council. Accordingly, the committee leaves to the judges themselves the ultimate responsibility for deciding this issue in accordance with the Judicial Conference Resolution. Questions pertaining to the size of the council should be dealt with in the context of deciding the nature and extent of district court representation and the method of selecting council members. The goal must be the development of a body that has both district and circuit judges as members but that is not so large and unwieldy as to become ineffective.

3. *Method of selection.*—As introduced, S. 677 and S. 678 mandated that membership on the circuit councils would be determined on the basis of seniority of commission. Committee hearings have convinced the members that election of council members is the preferable course to take; however, once again, the committee is of the view that the judges should first be given the opportunity to resolve this issue. A distinguished group of witnesses—for example, Judge Wallace, Judge Newman, and Judge Friendly—were of the opinion that election of members was to be preferred over mere seniority. Recognizing the concern of some that election of members would unwisely interject politicking into the selection of council members, the witnesses concluded that this danger is outweighed by the need to place the most interested, informed and dedicated judges on the councils. The witnesses pointed out that the administration of the circuit workload is a time-consuming, important task better left to those eager to shoulder the responsibility. There can be no question that the judges of the circuit are in the best position to know those most qualified to serve in an administrative capacity. The committee acknowledges the risk of an election procedure but concludes that it is overstated; the judges of the circuit are likely to recognize that it is in their own best interest to choose as their representatives on the council those who have demonstrated administrative ability and temperament. In any event, the committee does not believe that the risks accompanying election compare with those of ineffective administration—and likely congressional intervention—which are inherent in a system which leaves the selection process completely to chance. Once again, however, the committee gives the judges themselves the first opportunity to resolve this difficult issue.

*Retirement and pensions.*—Part D of title I addresses the issue of judicial resignation and retirement and also the pension of a government employee who leaves judicial office to serve in other government service.

Section 131 conforms paragraphs (a) and (b) of section 371 of title 28, United States Code, by providing that in order to retain full salary

**Attachment 3 - page 5 of 42**

6

after either resignation or retirement, a judge must serve at least fifteen years and attain the age of 65, or serve ten years and attain the age of 70. Existing law permits the continuation of full salary after resignation only if a judge has served ten years and attained the age of 70.

Section 182 requires the Administrative Office of the United States Courts to pay a deposit into the civil service retirement fund for article III judges who resign to accept executive branch positions. Such Federal judges give up a lifetime salary mandated by the Constitution, even though they have not been able to accrue pension benefits for their years of Federal service under the civil service retirement program. Under existing law, such judges are credited for their years of service on the Federal bench but receive a sharply reduced retirement annuity since contributions to the fund were not made during those years. The Act requires the Administrative Office to deposit into the fund an amount sufficient to provide a full retirement annuity for former Federal judges who have foregone their lifetime salaries to accept other employment by the Federal Government.

This amendment is designed to prevent injustice and to avoid penalizing judges who leave the bench to accept Executive appointments.

*Temporary assignment of judges to administrative positions.*—Part E of title I authorizes an active or retired justice or judge of the United States to be assigned temporarily to the position of Administrative Assistant to the Chief Justice, Director of the Administrative Office of the United States Courts, or Director of the Federal Judicial Center. Such service would be without additional compensation.

This provision makes available to the judiciary the talents of administratively able judges and thereby strengthens the administration of the Federal judiciary. Presently, the Office of the Chief Justice is administratively overloaded; this proposal makes it possible for the Chief Justice to delegate a larger array of his routine administrative duties. This section was first proposed by the Chief Justice of the United States almost a decade ago; the committee is of the opinion that the appropriate appointing bodies should have the flexibility and authority to staff these positions with especially competent and talented members of the Federal judiciary.

The committee is, of course, aware that it may not be necessary to invoke this section in filling the various vacancies. Certainly, the Federal Judicial Center, Administrative Office and Administrative Assistant positions have not suffered in the past from the failure of a sitting judge to be appointed. But the committee is of the view that there should be the option of filling these vacancies with competent appointments from the Federal judiciary. Although the committee considers this Part to be a very useful measure, it is not designed to provide the ultimate solution to the problems of administering a greatly enlarged Federal judiciary. As the Chief Justice has continuously pointed out, those problems require further study and legislative attention.

*Publication of rules.*—Part F of title I amends chapter 131 of title 28 of the United States Code by adding a new section 2077.

Paragraph (a) calls for the publication of rules governing conduct of the business of the court.

Paragraph (b) requires each court of appeals to create an advisory committee to make recommendations to the judges in formulat-

**Attachment 3 - page 6 of 42**

7

ing rules of practice and of internal operating procedures. This would provide valuable assistance to the judges in developing sound rules and would provide practitioners with useful information and a better understanding concerning the court's business.

## TITLE II—JURISDICTION AND PROCEDURE

*Interlocutory appeals.*—Part A of title II amends 28 U.S.C. section 1292(b) to permit the courts of appeals to entertain appeals from interlocutory orders in civil actions, if, after a refusal by a district judge to certify the matter for appeal in accordance with the provisions of existing law, the court of appeals determines that an appeal "is required in the interests of justice and because of the extraordinary importance of the case." This eliminates the possibility of a recurrence of the unseemly situation in the *Socialist Workers* case, *In re United States*, 565 F. 2d 19 (2d Cir. 1977), *cert. denied*, 436 U.S. 962 (1978) ; cf. *In re Attorney General of the United States*, 596 F. 2d 58 (2d Cir. 1979) in which the Attorney General was compelled to incur a civil contempt citation before bringing a matter of this nature before the court of appeals.

The committee is aware that this section undercuts to some extent the prevailing "rule of finality," which encourages litigants to complete trials in the district courts before appealing to a Federal circuit court. Some witnesses expressed the fear that amending section 1292(b) would lead to a flood of increased, piecemeal appeals causing unnecessary delay.

Nevertheless, the committee has approved this section, noting particularly the language found in existing law prohibiting a stay in the district court proceedings "unless the district judge or the court of appeals or a judge thereof shall so order." This helps to insure that frivolous appeals taken to the appellate court will not result in unnecessary delay in the completion of the trial below. It should also be pointed out that the committee is of the opinion that most of the applications made pursuant to this new section could easily and quickly be resolved by a member of the court of appeals without requiring the type of full-blown hearing that would likely delay the work of the district and circuit courts alike.

Nor should the "rule of finality" be used to undercut the argument that this new section—while, perhaps, increasing the initial burden on the courts of appeals—will result in economies for judicial administration. Trials might be greatly expedited, rather than delayed, by preliminary final determinations of one or more issues of law. Often, extended pretrial discovery proceedings and trials themselves can be made unnecessary by preliminary determinations of issues which district court judges refused to certify under existing section 1292(b). The committee believes that this new section can, in the long run, foster not inhibit judicial efficiency.

*Transfer of cases.*—In recent years, much confusion has been engendered by provisions of existing law that leave unclear which of two or more Federal courts have subject matter jurisdiction over certain categories of civil actions. The problem has been particularly acute in the area of environmental law where misfilings and dual filings have become commonplace. Part B of Title II cures this problem by au-

8

thorizing any court of the United States that finds it lacks subject matter jurisdiction in a civil action to transfer the case to any Federal court in which the case could have been brought if the transferor court finds that the interests of justice warrant such a transfer.

*Interest.*—Under current law, the interest rate on judgments in the Federal courts is based on varying State laws and frequently falls below the contemporary cost of money. Part C of title II sets a realistic and nationally uniform rate of interest on judgments in the Federal courts that would be keyed to the prime interest rate as determined by the Internal Revenue Service. This eliminates an economic incentive which exists today for a losing defendant to appeal a judgment and accumulate interest on the judgment award at the commercial rate during the pendency of the appeal.

There are presently no generally applicable guidelines concerning the award of prejudgment interest in Federal courts. Yet such interest may be essential in order to compensate the plaintiff or to avoid unjust enrichment of the defendant. For instance, a plaintiff who is unlawfully deprived of the use of $20,000 in 1976, and who does not receive a judgment until 1979, could have obtained $4,500 in those three years by investing the money at seven percent compounded interest. The bill provides that, where a defendant knew of his liability, interest be awarded for the prejudgment period at a rate that is keyed to the prime interest rate, where this is necessary to compensate the plaintiff. The imposition of such interest would be left to the discretion of the district judge in each case.

Finally, the Committee took this opportunity to consolidate into one statute the three provisions of Title 28 of the United States Code dealing with the award of interest on judgments. Consequently the provisions of this bill for prejudgment interest and a new interest rate on judgments will apply uniformly to suits between private litigants and to suits against the government.

### TITLE III—TRIAL AND APPELLATE STRUCTURE FOR GOVERNMENT CLAIMS, PATENTS, AND OTHER MATTERS

Title III has three purposes: to fill a void in the judicial system by creating an appellate forum capable of exercising nationwide jurisdiction over appeals in areas of the law where Congress determines there is a special need for nationwide uniformity; to improve the administration of the patent law by centralizing appeals in patent cases; and to provide an upgraded and better organized trial forum for government claims cases. To achieve these goals, the bill establishes a new Federal court of appeals, to be called the United States Court of Appeals for the Federal Circuit. This is accomplished by merging the Court of Claims and the Court of Customs and Patent Appeals. The bill also creates a new article I trial forum known as the United States Claims Court, which would inherit the trial jurisdiction of the Court of Claims.

*Court of Appeals for the Federal Circuit.*—The bill creates an article III court that is similar in structure to the eleven other courts of appeals. It is composed of the twelve judgeships of the Court of Claims and the Court of Customs and Patent Appeals, which become United States circuit judgeships; those courts are abolished by the

There is it in plain English folks.  Comment Ralph

g

merger. The new court is on line with other Federal courts of appeals; that is, it is not a new tier in the judicial structure.

The Court of Appeals for the Federal Circuit differs from other Federal courts of appeals, however, in that its jurisdiction is defined in terms of subject matter rather than geography. The new court inherits, in appellate form, substantially all of the jurisdiction of the two courts abolished in the merger. This includes appeals in suits against the government and appeals from the Customs Court, the Patent and Trademark Office, and other statutorily defined agencies. One major exception is in the area of civil tax refund suits; under the act, these appeals will be within the exclusive jurisdiction of the new United States Court of Tax Appeals. However, the federal circuit also has expanded and exclusive jurisdiction of patent appeals from district courts throughout the Nation.

Contemporary observers recognize that there are certain areas of Federal law in which the appellate system is malfunctioning. A decision in any one of the eleven regional circuits is not binding on any of the others. As a result, our Federal judicial system lacks the capacity, short of the Supreme Court, to provide reasonably quick and definitive answers to legal questions of nationwide significance. The Supreme Court now appears to be operating at—or close to—full capacity; therefore, in the future the Court cannot be expected to provide much more guidance in legal issues than it now does. Yet the number and complexity of unsettled controversies in the law continues to grow.

Consequently, there are areas of the law in which the appellate courts reach inconsistent decisions on the same issue, or in which—although the rule of law may be fairly clear—courts apply the law unevenly when faced with the facts of individual cases. The difficulty here is structural. Since the Supreme Court's capacity to review cases cannot be enlarged significantly, the remedy lies in some reorganization at the intermediate appellate level. This matter has been the subject of intense study over the last decade.[7] Although enactment of the Omnibus Judgeship Act of 1978,[8] which authorized 152 new federal judgeships, meets some compelling problems of the judicial system, it fails to cure the basic weaknesses that have arisen in judicial structure.

The creation of a new Court of Appeals for the Federal Circuit through a merger of the Court of Claims and the Court of Customs and Patent Appeals (CCPA) addresses these structural problems. The Act provides a new forum for the definitive adjudication of selected categories of cases. At the same time, it improves the administration of the system by reducing the number of decision-making entities within the federal appellate system.

Testimony on S. 677 and S. 678 supported the premise that the capacity of the federal appellate courts to provide a nationwide answer to legal questions could be expanded through the establishment

---

[7] To increase the capacity of the federal judicial system for definitive adjudication of issues of national law, various proposals for restructuring the federal appellate courts have been considered in recent years by lawyers, jurists, and academicians. Detailed recommendations have been developed by the Study Group on the Caseload of the Supreme Court (the Freund Committee), the Committee on Revision of the Federal Court Appellate System (the Hruska Commission), and the Advisory Council for Appellate Justice chaired by Professor Maurice Rosenberg. See Federal Judicial Center, Report of the Study Group on the Caseload of the Supreme Court (1972); Commission on Revision of the Federal Court Appellate System, Structure and Internal Procedures: Recommendations for Change, reprinted in 67 F.R.D. 195 (1975); and Advisory Council for Appellate Justice, Recommendations for Improving the Federal Intermediate Appellate System (1975).

[8] Pub. L. No. 95-486.

**Attachment 3 - page 9 of 42**

of new courts of appeals whose jurisdiction is defined on a topical rather than a geographical basis." The creation of the Court of Appeals for the Federal Circuit provides such a forum for appeals from throughout the country in areas of the law where Congress determines that there is special need for national uniformity. The absence of such a court in the present Federal judicial system has compelled Congress from time to time in the past to create special courts to handle a narrow category of cases.[10] Although the jurisdiction of the federal circuit is presently delineated in the manner outlined above, the creation of a Federal appellate court with jurisdiction that is defined in terms of subject matter rather than territory provides an institutional structure which the Federal judicial system, as it is presently constituted, lacks. The committee has determined that an adequate showing has been made for nationwide subject matter jurisdiction in the areas of patent and claims court appeals. It must be understood, however, that it is not the committee's judgment that broader subject matter jurisdiction is intended for this court. A proposal that would provide just such broader jurisdiction—a National Court of Appeals—has been expressly considered by the committee, and rejected. It must therefore be noted that any additional subject matter, or geographic jurisdiction, for the United States Court of Appeals for the Federal Circuit will require not only serious future evaluation, but new legislation."

Although the committee desires to make any changes in the judicial structure that are necessary to help the system function well, it is mindful of the need to avoid doing things that do not need doing. Originally, S. 677 and 678 included trademark appeals within the jurisdiction of the new court. However, the United States Trademark Association and other witnesses who appeared on this subject indicated there was no need for centralization of trademark appeals from the district courts.[11] The committee has accepted this judgment.

Throughout the development of this legislation, the committee and its staff have worked closely with the Department of Justice and the judges of the Court of Claims and the Court of Customs and Patent Appeals to assure that the merger of these two courts is both desirable and feasible. The committee is indebted to the judges of these courts, and particularly to Chief Judge Friedman and to Chief Judge Markey, for their testimony and assistance in understanding the impact of the proposal on their courts. The committee is satisfied that the merger of these courts would, in fact, produce significant improvements in the federal judicial structure. Testimony on S. 677 and S. 678 supported this proposition. Chief Judge Friedman of the Court of Claims testified at some length as to the substantial benefits that would result from the consolidation of these two courts into a new court of appeals.[12] Furthermore, the proposal was expressly endorsed by President Carter in a message to the Congress on February 17, 1979.[13]

From a practical standpoint, a merger of the Court of Claims and the CCPA can be accomplished with virtually no disruption to the

---

[9] Written statement of Erwin N. Griswold, former Solicitor General (May 7, 1979) 7; written statement of Professor Paul D. Carrington (May 9, 1979) 2.
[10] For example, the Temporary Emergency Court of Appeals, Pub. L. No. 92–210, and the United States Foreign Intelligence Surveillance Court, 50 U.S.C. 1801 et seq.
[11] Written statement of Marie Driscoll on behalf of the United States Trademark Association (May 7, 1979) 2–5; written statement of Judge Henry J. Friendly (June 18, 1979) 35.
[12] Oral statement of Chief Judge Daniel M. Friedman (May 7, 1979).
[13] 125 Cong. Rec. H911 (daily ed., Feb. 27, 1979).

11

people involved. The existing courts already jointly occupy almost all of the Courts Building at Lafayette Square in Washington, D.C. They already share the same library, and court personnel share the same dining facilities. The Court of Claims trial judges (who become judges of the new United States Claims Court) are also located in this building. Furthermore, there is already a standing order of the Judicial Conference allowing the interchange of judges between the two courts.[14]

Indeed, the creation of a single new appellate entity through a merger of these courts has considerable advantages in terms of basic efficiencies and economics. The Court of Claims and the Court of Customs and Patent Appeals were historically justified at the time they were created, and those courts have performed well with the cases that have been assigned to them through the years. But the merger of these two courts reduces overlapping functions and provides for more efficient court administration. For example, there should be considerable savings through the maintenance of one clerk's office instead of two.

At the same time, the consolidation of the two courts brings them administratively into the mainstream of the federal judiciary and upgrades the status of their judges and functions. Although both courts participate in the Judicial Conference[15] and are among the courts within the jurisdiction of the Administrative Office of the United States Courts,[16] their integration into the judicial budgetary and administrative process has been far from total. On budgetary matters, for example, the proposed budgets for the two courts are routed to the Office of Management and Budget through the Administrative Office, along with the proposed budgets for the district and circuit courts; but, unlike the other courts that are serviced by the Administrative Office, representatives of each of these courts appear directly before the appropriation committees of the Congress to justify their budget requests, in much the same fashion as the Supreme Court. Whatever the historical reason for this practice, there is little justification today for having two courts (other than the Supreme Court) out of the entire Federal judiciary appear separately to explain their budgetary submissions. The merger of the two courts would permit them to be fully integrated into the budgetary process. Thus, merging these two courts into a single court, as a regularized part of the intermediate appellate tier, would assure more effective and rational administration of the Federal judiciary as a whole.

The establishment of the Court of Appeals for the Federal Circuit also provides a forum that will increase doctrinal stability in the field of patent law. Based on the evidence it had compiled, the Hruska Commission singled out patent law as an area in which the application of the law to the facts of a case often produces different outcomes in different courtrooms in substantially similar cases.[17] Furthermore, in a Commission survey of practitioners, the patent bar indicated that uncertainty created by the lack of national law precedent

[14] See, Report of the Proceedings of the Judicial Conference of the United States, September 23-24, 1976, at 53.
[15] 28 U.S.C. 331.
[16] 28 U.S.C. 610.
[17] Commission on Revision of the Federal Court Appellate System, Structure and Internal Procedures: Recommendations for Change, 15, 144-57, reprinted at 67 F.R.D. 195, 214, 361-76 (1975) [hereinafter cited as Commission].

**Attachment 3 - page 11 of 42**

12

was a significant problem, and the Commission singled out patent law as an area in which widespread forum-shopping is particularly acute.[28]

Although the proposal to centralize patent appeals in a single court is not without its critics, the issue was amply addressed in the hearings held earlier this year on S. 677 and S. 678. The great weight of the testimony, which included statements from distinguished jurists, patent practitioners, and representatives of major technologically-oriented business enterprises, confirmed the findings of the Hruska Commission that patent cases are inconsistently adjudicated. The testimony received by the committee also supported the basic objective of providing for uniformity of doctrinal development in the patent area. The committee found particularly persuasive the testimony of the users of the patent system. For example, Industrial Research Institute is a private, non-profit corporation with a membership of approximately 250 industrial companies that conduct a major portion of the industrial research and development carried on in the United States. It polled its membership and found them overwhelmingly in favor of centralizing patent appeals in a single court.[19]

The creation of the Court of Appeals for the Federal Circuit will produce desirable uniformity in this area of the law. Such uniformity will reduce the forum-shopping that is common to patent litigation. The Hruska Commission's patent law consultants, James B. Gambrell and Donald R. Dunner, concluded that forum-shopping on the scale that occurs in patent law increases the cost of litigation and "demeans the entire judicial process and the patent system as well."[20] Removing the incentive to forum-shop thus will reduce costs to litigants and will also be a positive improvement from the standpoint of the judicial system. Moreover, as the new court brings uniformity to this field of law, the number of appeals resulting from attempts to obtain different rulings on disputed legal points can be expected to decrease.

Likewise, uniformity in the law will be a significant improvement from the standpoint of the businesses that rely on the patent system. Business planning will become easier as more stable and predictable law is introduced. This can have important ramifications upon our economy as a whole. For example, Harry F. Manbeck, Jr., General Patent Counsel of the General Electric Company, testified that stability in the patent law has an effect on technological innovation:

> Patents, in my judgment, are a stimulus to the innovative process, which includes not only investment in research and development but also a far greater investment in facilities for producing and distributing the goods. Certainly, it is important to those who must make these investment decisions that we decrease unnecessary uncertainties in the patent system.[21]

While the suggestion has been made that this objective might be accomplished simply by expanding the jurisdiction of the CCPA, the

[18] Id. at 144–157, 67 F.R.D. at 351–76.
[19] Written statement of Richard C. Witte, Chief Patent Counsel for the Procter and Gamble Company, on behalf of the Industrial Research Institute, Inc. (May 7, 1979).
[20] Commission, supra, at 152, 67 F.R.D. at 370. Mr. Dunner, who is now in private practice, testified in favor of the Court of Appeals for the Federal Circuit. See written statement of Donald R. Dunner (May 7, 1979).
[21] Written statement of Harry F. Manbeck, Jr., General Patent Counsel of the General Electric Company (May 7, 1979) 2; see also, written statement of Donald R. Dunner (May 7, 1979) 7–9.

13

committee rejected such an approach as being inconsistent with the imperative of avoiding undue specialization within the Federal judicial system. Consequently, the Act adheres to the original philosophy of S. 677 and S. 678 which, in the words of Judge Jon O. Newman, represents "a sensible accommodation of the usual preference for generalist judges and the selective benefit of expertise in highly specialized and technical areas." [22]

The Court of Appeals for the Federal Circuit will not be a "specialized court," as that term is normally used. The court's jurisdiction will not be limited to one type of case, or even to two or three types of cases. Rather, it will have a varied docket spanning a broad range of legal issues and types of cases. It will handle all patent appeals, plus government claims cases and all other appellate matters that are now considered by the CCPA or the Court of Claims—cases which contain a wide variety of issues.

This rich docket assures that the work of the proposed court will be broad and diverse and not narrowly specialized. The judges will have no lack of exposure to a broad variety of legal problems. Moreover, the subject matter of the new court will be sufficiently mixed to prevent any special interest from dominating it.

It is important that the docket of the new court be not only varied but also manageable. An analysis of the proposed workload discloses that a merger of the courts will produce a reasonable caseload. The dockets of both existing courts are current. Set out below are tables showing the sources of cases for the proposed court.

CASELOAD IN THE COURT OF CUSTOMS AND PATENT APPEALS, FISCAL YEAR 1978

| Type of case | Filed | Terminated |
|---|---|---|
| Customs, commerce, and international trade | 20 | 26 |
| Patent and trademarks | 133 | 173 |
| Total CCPA cases | 153 | 199 |

The docketing of cases in the Court of Claims presents a confusing statistical picture to the uninitiated. Some cases appear on the trial judges' docket and others' appear on the docket of the article III judges, while some cases are placed on both dockets. For purposes of projecting the new court's caseload, the relevant statistics are not those that reveal the total caseload of the Court of Claims but rather those that reflect the caseload of the article III judges on the Court. The following table contains those figures.

*Appellate caseload in the Court of Claims, fiscal year 1978*

| Total dispositions by article III judges: | |
|---|---|
| In chambers: | |
| Calendar | 150 |
| Requests for review | 151 |
| | 50 |
| Total article III judge workload | 351 |

In addition to inheriting the jurisdiction of the CCPA and of the Court of Claims, the new appellate court will also receive all patent appeals and all appeals in federal contract cases brought against the United States that are presently heard in the regional courts of ap-

[22] Written statement of Judge Jon O. Newman (March 20, 1979) 8.

**Attachment 3 - page 13 of 42**

14

peals. On the basis of 1978 figures, the new court will handle approximately 153 cases that otherwise would have been heard by the CCPA, 351 cases that would have been heard by the Court of Claims, and 372 patent or federal contract cases coming directly from the district courts that would have been heard by the regional courts of appeals. This will provide an adequate but not burdensome workload for a court of twelve judges.

Although the workload per judgeship will be lighter here than in the other circuits, a reduced number of appeals is desirable for this court. The Court of Appeals for the Federal Circuit will be considering cases that are unusually complex and technical. Consequently, its cases will be extraordinarily time-consuming, and fewer of them will be appropriate for summary disposition than is true of the cases that make up the dockets of the regional courts of appeals. In addition, for at least two reasons, it is important that a newly created court with nationwide jurisdiction not be initially overloaded. First, because decisions of this court will have precedential effect throughout the country, it is important for the judges of the court to have adequate time for thorough discussion and deliberation. Second, because a major purpose of this bill is to create a forum to which Congress can route cases where there is a felt need for uniformity in the national law, it is important for the new court to retain some flexibility in its docket so that there is capacity available when the Congress seeks to use it in the future.

In summary, the consolidation of the Court of Claims and the Court of Customs and Patent Appeals is desirable. It is logistically feasible. Indeed, it makes maximum use of facilities and personnel that are already a part of the federal system. As Chief Judge Frank M. Coffin noted, the proposal "has the merit of avoiding any net increase in courts."[25] Thus, the bill makes only a modest change in federal appellate court structure. It does, however, create a permanent forum that is capable of exercising nationwide jurisdiction of appeals in categories of cases where there have been special problems of inconsistency in the law. It also provides for increased stability in the patent law by channelling appeals in those cases to a single forum.

*United States Claims Court.*—The bill also creates a new article I trial forum known as the United States Claims Court. The Claims Court inherits substantially all the trial jurisdiction of the Court of Claims, which under present practice is exercised largely by the commissioners of that court. The Court is composed of sixteen article I judges who will be appointed by the President, with the advice and consent of the Senate, for a term of fifteen years. As a transitional measure, persons who were in active service as trial judges of the Court of Claims on the effective date of the Act become article I judges of the Claims Court. Like the present Court of Claims and the Tax Court, the Claims Court is authorized to sit nationwide. In organization and procedure it resembles the United States Tax Court.

Changes in the existing structure of the Court of Claims have been advocated by practitioners with extensive experience before the court

---

[25] Written statement of Judge Frank M. Coffin (March 20, 1979) 9.

**Attachment 3 - page 14 of 42**

15

and by the commissioners themselves.[24] The establishment of the Claims Court accomplishes a much needed reorganization of the current system by assigning the trial function of the court to trial judges whose status is upgraded and who are truly independent. Presently, the commissioners of the Court of Claims are appointed by the article III judges of that court and do not have the power to enter dispositive orders; final judgment in a case must be made by the article III judges after reviewing findings of fact and recommendations of law submitted by a commissioner. The creation of the United States Claims Court will reduce delay in individual cases and will produce greater efficiencies in the handling of the court's docket by eliminating some of the overlapping work that has occurred as a result of this process.

## TITLE IV—TAX APPELLATE STRUCTURE

COMMITTEE NOTE: S. 1477, as reported by the Committee on the Judiciary, contains provisions creating a new tax appellate structure. Since it is anticipated that these provisions will be sequentially referred in a separate bill to the Senate Finance Committee, they are retained in S. 1477, as reported, solely for the purpose of providing a comprehensive overview of the entire court reform package.

S. 1477 provides for the creation of a new United States Court of Tax Appeals, a tribunal at the same level as the existing Federal circuit courts of appeals. This new court would have exclusive intermediate appellate jurisdiction over all civil tax appeals.

As introduced, the bill provided for a court of twelve judges to be designated by the Chief Justice for staggered three-year terms from among the current courts of appeals judges. The bill also provided that the judges would normally hear argument in panels of three and would sit throughout the various circuits; when any six judges of the court agreed that it was warranted, the court would sit en banc. S. 678 would have also eliminated all tax jurisdiction from the existing Court of Claims.

For more than forty years the inadequacies of the present civil tax appellate system have been criticized and debated.[25] Yet, until now, little has been done to deal with these inadequacies. Under the present system, a taxpayer usually has a choice of three trial forums in which to litigate a tax issue—the United States Tax Court, the United States Court of Claims, or the appropriate United States district court. Decisions of the Tax Court and district courts can then be appealed to one of the eleven United States circuit courts of appeals. There is then the possibility—rather remote—that the case will be heard by the United States Supreme Court. Court of Claims decisions are appealable only to the Supreme Court itself.

[24] Written statement of Thomas M. Gittings, Jr., Chairman, Court of Claims Committee of the Bar Association of the District of Columbia (May 9, 1979); written statement of Chief Judge Daniel M. Friedman (May 9, 1979) 14–16.
[25] See, e.g., Traynor, "Administrative and Judicial Procedure for Federal Income, Estate and Gift Taxes—a Criticism and a Proposal," 38 Colum. L. Rev. 1393 (1938); Surrey, "Some Suggested Topics in the Field of Tax Administration," 25 Wash. U.L.Q. 399 (1940); Griswold, "The Need for a Court of Tax Appeals," 57 Harv. L. Rev. 1153 (1944). The debate has not diminished in recent years. See e.g. Miller, "A Court of Tax Appeals Revisited," 85 Yale L. J. 228" (1975); Caplin and Brown, "A New United States Court of Tax Appeals: S. 678," 57 Taxes: The Tax Magazine, 380 (June 1979).

**Attachment 3 - page 15 of 42**

16

The committee recognizes that the real problem in today's system of tax litigation is the long period of uncertainty engendered by delay in getting a final decision on a particular tax issue. Current law—determined in various forums and subject to disparate appellate consideration—lacks a practical and reliable method of authoritatively resolving tax questions. In addition, as Judge Friendly and others pointed out during the hearings, current tax law is so complex and requires such special understanding that resolution of tax issues should be better left to a central tribunal established for that purpose alone. To Judge Friendly and other authorities tax cases are a luxury which the existing Federal appellate courts—already confronted with mushrooming dockets—can no longer afford.[26] Under the current system the likelihood of unfairness and delay is obvious: not only may the taxpayer wait many years without a final determination of the issue in question, but taxpayers whose circumstances are in all other respects identical may lawfully pay different amounts of tax solely because they are residents of different circuits. The overall logic and fairness of our tax system is brought into question. Inconsistency and lack of certainty place a heavy burden on the administrative process through which the vast majority of tax disputes are settled.

To solve the problems surrounding the resolution of civil tax issues, S. 1477 proposes two major changes in present law:

    1. The creation of a United States Court of Tax Appeals with exclusive jurisdiction over civil tax appeals from the district court and the Tax Court; and

    2. The elimination of Court of Claims jurisdiction over tax cases.

By virtue of these changes, all civil tax cases would be initiated in either the United States Tax Court or district courts and all civil tax appeals would be heard by the newly created Court of Tax Appeals. Although the decisions of the new court would be subject to review by the Supreme Court on certiorari, it is anticipated that such review would be a rare occurrence.[27] For all practical purposes, the new Court of Tax Appeals would become the final authority in the judicial interpretation of the Federal internal revenue laws.

In endorsing this new court, the committee has concluded that the following benefits will result from the proposal:

    1. Speedier, more definitive resolution of complex tax issues.

    2. A small but important reduction in the existing caseload of the Federal courts of appeals.

    3. Less burden on the Supreme Court to resolve tax conflicts among the circuits.

---

[26] H. Friendly, *Federal Jurisdiction: A General View*, 153 et seq. (1973).
[27] U.S. Supreme Court review of tax cases is a rare occurrence under existing law. The following Supreme Court statistics were obtained from the Appellate Section of the Tax Division of the Department of Justice. The term "petitions" likely includes a very small number of direct appeals:

                                                (Continued)

**17**

4. A reduction in trial level litigation and IRS administrative proceedings as the new, centralized court issues definitive decisions binding on all the trial courts.

5. Creation of a new court well versed in the complexities of tax law.

During the course of committee hearings various witnesses testified concerning the strengths and limitations of the tax court proposal. Wide ranging support for the new court was voiced throughout the hearings. Former Solicitor General Erwin Griswold—considered by many the father of the concept of a centralized court of tax appeals—was joined by members of the Federal judiciary, representatives of the Internal Revenue Service and Department of the Treasury, and, perhaps most importantly, private tax practitioners, in supporting the need for a centralized court of tax appeals. Indeed, with very few exceptions, the witnesses were enthusiastic in their support of the proposal. The committee notes that, because of the structure and organization of the proposed new court, it enjoys the type of broad, bipartisan support that previous tax court proposals often lacked.

The committee hastens to add that the proposal needed further improvement. A panel of former IRS Commissioners, while endorsing

(Continued)

|  | October term | |
|---|---|---|
|  | 1976 | 1977 |
| 1. Cases on merits pending at close of prior term | 8 | 5 |
| 2. Petitions pending at close of prior term | 27 | 17 |
| (a) Taxpayer | 24 | 14 |
| (b) Government | 3 | 3 |
| 3. Petitions filed during term | 111 | 100 |
| (a) Taxpayer | 107 | 98 |
| (b) Government | 4 | 2 |
| 4. Petitions: | | |
| (a) Denied | 113 | 80 |
| (i) Taxpayer | 113 | 80 |
| (ii) Government | 0 | 0 |
| (b) Granted | 8 | 11 |
| (i) Taxpayer | 4 | 6 |
| (ii) Government | 4 | 5 |
| 5. Cases decided | 10 | 11 |
| (a) Taxpayer | 6 | 3 |
| (b) Government | 4 | 8 |
| 6. Cases pending on merits at end of term | 5 | 5 |
| 7. Petitions pending at end of term | 17 | 28 |
| (a) Taxpayer | 14 | 28 |
| (b) Government | 3 | 0 |

**Attachment 3 - page 17 of 42**

18

the proposal, urged that certain modifications be made. Similarly, the tax section of the New York State Bar Association and the Bar Association of the City of New York—representing the practicing tax bar—endorsed the proposal but also expressed reservations with certain sections. The committee took into account the suggestions of these and other witnesses and modified the bill accordingly.

The major issues raised during the course of Senate hearings concerned the composition of the proposed court and the selection of its members. S. 678, as introduced, would have established an article III court to be composed of twelve judges chosen by the Chief Justice from among those circuit judges already sitting on other Federal courts of appeals. After a transitional period designed to stagger vacancies, the twelve judges would have served for three-year terms. The Chief Justice would also have been empowered to designate judges currently sitting on the district courts or the Tax Court to serve temporarily on the new court. Sessions of the court would have been held in each of the circuits at least once a year and more often as the court's workload required. Current estimates are that, initially, between 400 and 500 cases a year would be handled by the new court.[25]

---

[25] The following statistics demonstrate the number and nature of tax appeals during the past four years:

*Tax cases filed and opinions issued 1975 to present—Court of Claims*

I. New tax cases filed:

| | |
|---|---:|
| July 1, 1974 to June 30, 1975 | 140 |
| July 1, 1975 to June 30, 1976 | 157 |
| July 1, 1976 to Sept. 30, 1976 | 30 |
| Oct. 1, 1976 to Sept. 30, 1977 | 329 |
| Oct. 1, 1977 to Sept. 30, 1978 | 205 |
| Oct. 1, 1978 to Apr. 1, 1979 | 62 |

II. Opinions in tax cases (does not include dispositive orders):

| | |
|---|---:|
| 1975 | 19 |
| 1976 | 35 |
| 1977 | 23 |
| 1978 | 33 |
| Jan. 1 to Apr. 18, 1979 | 11 |

*Appeals from a judgment of a district court*

| Fiscal year[26] | Government appeals | Taxpayer appeals | Total | Adjusted total[27] |
|---|---:|---:|---:|---:|
| 1975 | 117 | 227 | 344 | 299 |
| 1976 | 109 | 220 | 329 | 283 |
| Transitional quarter | 0 | 5 | 5 | 4 |
| 1977 | 111 | 242 | 353 | 307 |
| 1978 | 205 | 302 | 507 | 519 |
| (6 mo) 1979 | 111 | 134 | 245 | 213 |

*Appeals from a decision of the tax court*

| Fiscal year[26] | Government appeals | Taxpayer appeals | Total | Adjusted total[27] |
|---|---:|---:|---:|---:|
| 1975 | 25 | 262 | 287 | 250 |
| 1976 | 33 | 276 | 309 | 269 |
| Transitional quarter | 0 | 9 | 9 | 8 |
| 1977 | 44 | 300 | 334 | 299 |
| 1978 | 23 | 227 | 250 | 217 |
| 1979 (6 mo) | 19 | 137 | 156 | 136 |

[26] July 1 to June 30 for 1975–76; Oct. 1 to Sept. 30 for 1977 and thereafter.

[27] The statistical source for the figures in this report reflects taxpayer-litigants rather than an actual case load. Since a court case may involve several such taxpayer-litigants, the committee has provided this adjusted total which converts taxpayers to cases, based on a conversion factor of 87 percent arrived at by a small sampling on an actual count. It is at best a rough adjustment and may well be wide of the mark but the result is probably a more accurate picture of actual caseload than the raw statistical figures.

**Attachment 3 - page 18 of 42**

19

The committee notes that the scheme underlying the structure and composition of the new court was designed with two purposes in mind—to assure that the new court would not be viewed as a "tax specialty" court headquartered in Washington and that the court would not be labeled a permanent court requiring the nomination and confirmation of additional article III judges just one year after the passage of the Omnibus Judgeship Act creating 152 new Federal judgeship vacancies. The bill is designed to provide for the reassignment of judges already sitting and focuses on the need to avoid the creation of a new "specialist" court out of touch with other general areas of law. The committee further notes that these two concerns—a permanent Washington-based court and a specialty court consisting solely of tax experts—have largely been responsible for the failure of previous proposals. The proposal to assign sitting circuit court judges to the new court for terms of three years is, in the view of the committee, a wise attempt to avoid the passions and pitfalls of past debate. By virtue of their concurrent service on the Federal circuit courts, each judge selected will have a generalist background. Moreover, depending on the new court's workload, the judges may be able to continue to participate in other types of cases in their home circuits during the three-year period they serve on the new tax court. At the same time, judges appointed to the new court will have the opportunity to develop a special understanding and appreciation of tax law issues. The committee views the tax court proposal in S. 1477 as a balanced proposal designed to deal with the problems which plague the development of a consistent body of tax law while assuring that the problems' will be dealt with by a truly national court consisting of generalist judges.

The committee has heard extensive, detailed testimony on all aspects of the S. 1477 proposal. In an effort to assure that the new court meets the intent of the drafters and effectively deals with problems raised during the course of the hearings, certain modifications have been made to the original proposal:

1. *Geographic distribution of appointments.*—The committee adopts the recommendation of the Tax Section of the New York State Bar Association urging that the bill be amended to reduce the number of judges comprising the new tax court from twelve to eleven and providing that at least one judge from each of the eleven judicial circuits be a member of the Court of Tax Appeals at all times. This amendment is designed to assure that the new court will truly be national in scope. In the event that the Chief Justice is unable to designate a circuit judge for the new court—such as in the case where no circuit judge desires to serve on the tax court—the bill has been amended to allow for the designation of a district court judge of that circuit.

2. *Concurrent appointments.*—To make clear that judges of the new tax court need not relinquish their current status as Federal circuit court judges, the bill is amended expressly to provide that a judge appointed to the Court of Tax Appeals will continue to remain a judge of the circuit from which he was appointed. The judge's primary duties will be to the Court of Tax Appeals but workload requirements will determine

20

precisely how much time can realistically be spent on each court.

3. *Location of the court.*—Again, to assure a truly national Court of Tax Appeals, S. 1477 is amended to provide that any appeal from a lower court decision in a civil tax case will normally be heard by the Court of Tax Appeals in the judicial circuit in which the taxpayer is domiciled or, if the taxpayer is a corporation or other association, has its principal place of business or, in the case of a cooperative or an organization claiming tax exemption, its principal place of activity.

4. *Selection of judges.*—Designation of judges to get on the new tax court will be made by the Chief Justice. The bill would mandate that one judge be chosen from each of the eleven circuits, thus reducing the number of judges on the new tax court from twelve to eleven. S. 678, as introduced, provided that the Chief Justice of the United States would appoint the circuit judges. The subcommittee, however, when considering this provision, concluded that a more pluralistic court, representing various views and opinions, would be assured if the chief judge of each circuit designated a circuit judge for the tax court. Upon further reflection, the full committee has opted for the original approach of allowing the Chief Justice to select the members of the new court. Recognizing that the issue can be resolved either way, it is the view of the committee that designation by the Chief Justice will assure that the most competent and capable judges will be chosen for this important assignment.

5. *Judges sitting by designation.*—Although the committee believes that the provision of S. 678 allowing for the temporary designation of district judges to sit on the new tax court is sound, the same cannot be said for the designation of Tax Court judges. The latter designation raises serious constitutional questions since the Tax Court has been established under article I of the Constitution rather than under article III. In order to eliminate the possibility of any controversy surrounding designation, the committee has struck the provision in S. 1477 permitting judges of the Tax Court to sit by designation on the Court of Tax Appeals.

6. *En Banc Rehearing.*—The most frequent criticism leveled at the proposed new court during the hearings concerned the fear by some witnesses that a central court of tax appeals would stifle the benefits flowing from successive consideration of the same tax issue by different circuits. For example, during the course of the committee hearings, Assistant Attorney General M. Carr Ferguson noted that:

> Part of the genius of our system of circuit appellate courts is the opportunity for reconsideration of an issue already decided by one circuit by another appellate court free of the constraints of the doctrine of *stare decisis*. This opportunity for an issue to be ventilated in more than one circuit seems to me espe-

cially important in tax cases. The first appellate review of a tax issue may be shortsighted, distorted by the particular record or omission of an argument, or simply mistaken.[31]

According to this argument, such "ventilation" of tax issues is a valuable benefit of the current system—to be preserved even at the price of some interim uncertainty. Although the committee respects this view, it is inclined to agree with the majority of witnesses who testified during the hearings that such a consideration pales before the needs of certainty and finality. For example, former Solicitor General Griswold noted that:

> The result is continuing uncertainty, encouragement to litigation, and a premium on continued litigation. I am sure that the burden on the courts in this country would be considerably reduced if we only had a system which would enable lawyers, both private and public, and judges of the lower courts, to know somewhat more definitely than is now the case what the law is.[32]

And Mortimer Caplin, a former Commissioner of the Internal Revenue Service, testified that:

> To increase the likelihood of reaching correct decisions, an appellate system which provides for particularly well-qualified judges to decide the issues at hand seems preferable to one which relies mainly upon successive decisions by different panels.[33]

Nevertheless, the committee believes that steps should be taken to assure that the first decision of the new tax court concerning a particular tax matter not preclude further evolution and modification of the issue at hand. Accordingly, the committee believes that S. 1477 should encourage the practice of *en banc* rehearing by providing specific machinery for initiating such rehearing. The bill specifically provides some of the factors to be taken into account in deciding whether or not to endorse a petition for rehearing in a particular case. These factors—which are not exhaustive—include:

> . . . whether the question presented in the case was thought to be novel and unlikely to recur or was likely to apply to many taxpayers;
> . . . whether there has or has not been unanimity in the panel which decided the case;
> . . . whether any of the judges who composed the panel which heard the case have suggested that it be reheard;
> . . . whether the case presents issues of first impression.

[31] Written Statement of M. Carr Ferguson, Assistant Attorney General, Tax Division (May 7, 1979), p. 8.
[32] Written statement of Erwin N. Griswold (May 7, 1979), p. 5.
[33] Written Statement of Mortimer Caplin (May 10, 1979), p. 18.

22

## TITLES V AND VI

Title V of the bill makes technical and conforming amendments outside of title 28 relating to the United States Court of Appeals for the Federal Circuit and the United States Court of Tax Appeals.

Title VI contains two sections, the first of which sets the general effective date of the bill as two years after the enactment date. The second provision addresses the issue of the effect of this bill on pending cases.

## REGULATORY IMPACT EVALUATION

In compliance with Rule 29.5 of the Standing Rules of the Senate, the Committee finds that no significant regulatory impact as defined by that subsection will result from the enactment of S. 1477.

## CHANGES IN EXISTING LAW

In the opinion of the Committee on the Judiciary, it is necessary in order to expedite the business of the Senate to dispense with the requirements of subsection 4 of rule XXIX of the Standing Rules of the Senate (relating to the showing of changes in existing laws made by the bill, as reported).

### COST ESTIMATE OF CONGRESSIONAL BUDGET OFFICE

A cost estimate of the Congressional Budget Office is on request but was not available at the time of this report.

## SECTION-BY-SECTION ANALYSIS

### TITLE I—GOVERNANCE AND ADMINISTRATION OF THE FEDERAL COURTS

#### CHIEF JUDGE TENURE

*Sections 101–103*

Under current law, the person who serves as chief judge of a Federal court of appeals or a district court is the judge who is most senior in commission. The chief judge may hold office until age 70. As a result, a judge who becomes chief judge of a Federal court at age 50 may serve as chief judge for twenty years, while a judge who becomes chief judge at age 69 will serve for only one year.

A statute that bases the chief judgeship position solely on seniority, without a minimum or maximum term, produces two potential difficulties: it may require the retention for decades of a chief judge who may or may not have the interest or ability to be an enthusiastic administrator; at the same time, it requires rapid rotation among chief judges when the consecutive incumbents take office at an advanced age, thereby creating instability in the chief administrative office of the court. In recent history, this provision has resulted in the anomalous situation that one Federal court had a chief judge who served for seventeen years, while another Federal court had three chief judges within two years.

Sections 101–103 resolve this problem by amending 28 U.S.C. 45 and 136 to set a maximum term of office for chief judges of seven years

23

and to permit no one to become a chief judge of a district or circuit court after reaching age 65. However, once becoming a chief judge prior to age 65, a chief judge could serve for seven years, or until reaching the age of 70. These provisions insure a constant seven year term for the chief judge unless death, resignation or retirement shortens the term. These amendments also provide for the continuation of a judge's service as chief judge after the expiration of his seven year term until another judge is qualified to serve in that capacity.

The sections also provide for the situation in which no judge meets the statutory requirements for the chief judgeship. In such a case, the most senior active judge would preside until some other judge became eligible.

As a transitional measure, the section also contains a provision that continues the present system for one year after the effective date of the bill. Moreover, the bill would not apply to anyone who was a chief judge on the date it becomes effective.

### PRECEDENCE AND COMPOSITION OF PANEL

*Section 111*

Under current law the presiding judge of a three-judge panel of a court of appeals is the judge who is senior in commission, unless the chief judge or a circuit justice is a member of the panel. This policy permits senior judges and judges from other circuits to be the presiding judge of a panel and to assign opinions. In order to insure greater stability in the law of the circuit, section 111 amends 28 U.S.C. 45(b) to require that the presiding judge be a judge of that circuit in regular active service.

*Section 112*

Current law permits a panel of a Federal appellate court to be composed of any combination of active, senior, designated, or district court Federal judges. With a substantial number of judges sitting by designation from outside the circuit, and with district judges sitting regularly on the courts of appeals, it is not infrequent that there is only one active circuit judge on a panel. Such a situation leads to instability in circuit law because district court and court of appeals judges from outside the circuit may not know or may not feel bound by the law of that circuit. This section amends 28 U.S.C. 46(b) to require that each appellate panel have a majority of judges from the circuit court of that circuit. This provision would provide greater stability and predictability in the law being applied in any given area of the country. However, the bill does provide for an exception from the majority requirement when it is impossible to constitute a panel of a court of appeals composed of a majority of judges of that court because of judicial recusal or disqualification. For example, if all the judges of a court of appeals were disqualified under 28 U.S.C. § 455 (1976), it is essential that the chief justice retain the authority to designate and assign judges from other circuits in accordance with 28 U.S.C. § 291(a) (1976) or 28 U.S.C. § 292(e) (1976) to hear the case.

Current law permits appellate courts to sit in panels of less than three. As a result, some Federal appellate courts have used panels of two judges for motions and for disposition in cases in which no oral

24

argument is permitted because the case is classified as insubstantial. Because of apprehensions that decisions at the appellate level by fewer than three judges carry the risk of being less sound or less balanced, there is a widespread belief that every decision of an appeal should be the collective product of at least three minds. The bill amends 28 U.S.C. 46 (b) and (c) to require that all decisions be reached by at least three judges. Moreover, the bill provides the appellate courts with the flexibility to experiment with panels of more than three judges but less than a full en banc court when larger panels are deemed desirable.

## JUDICIAL COUNCILS

### Section 121

Section 121(a) governs the makeup of judicial councils. For the first time, it is provided that district court judges will be members of the council. The exact number of members and their method of selection is left to the judges of the various circuits. However, it is specifically provided that if the number of court of appeals judges is six or less, then the number of district court judges shall be no less than two. If the number of court of appeals judges is six or more, the number of district court judges may be no less than three. Members will serve for terms established by a majority vote of all judges of the circuit in regular active status.

The council is officially designated as the Judicial Council of the circuit.

The chief judge is required to submit the semiannual reports of the Director of the Administrative Office of the United States Courts to the council for such action as it may take.

The judicial council is empowered to make all necessary and appropriate orders for the effective and expeditious administration of justice within a circuit, hold hearings, take sworn testimony and issue subpoenas.

Subsection (b) adds a new subsection (g) to 28 U.S.C. 332 providing that the judicial council of the newly created Federal Circuit shall consist of all judges of the Court of Appeals for the Federal Circuit in regular active service and the chief judges of the United State Customs Court and the United States Claims Court. Subsection (g) also provides that there will be no circuit executive in the newly created Federal judicial circuit. The committee anticipates that in this small circuit the appointment of a circuit executive would be unnecessary. The court of appeals for the Federal judicial circuit can rely on its clerk of court and the Director of the Administrative Office for any necessary services. Neither the Court of Claims nor the Court of Customs and Patent Appeals has a circuit executive. Finally, this subsection clarifies that sections 332 and 333, concerning judicial conferences of the circuits, judicial councils of the circuits, and the appointment of circuit executives, do not apply to the United States Court of Tax Appeals. Each judge of this court will continue to be a judge of a court of appeals for a geographical circuit. The committee believes it would be unwise to burden these judges with additional and unnecessary administrative responsibilities.

Section 122 amends section 3006A(h)(2)(A) of title 18 of the United States Code by providing for the appointment of Federal

**Attachment 3 - page 24 of 42**

Public Defenders by the Court of Appeals rather than the judicial council. This is a technical amendment necessitated by the addition of district court judges to the judicial council, thus foreclosing the use of the legal fiction that councils are just the administrative extension of the court of appeals. Clause 2 in section 2 of United States Constitution Article II provides that Congress can vest the power to appoint inferior officers only in the President alone, the heads of [Executive] Departments, and the Courts of Law. Since Federal Public Defenders possess significant authority and exercise that authority generally without review by other officers of the Federal Government, it is essential that each defender be an "inferior officer" as distinguished from an "employee." *See* 5 U.S.C. §§ 2104, 2105 (1976).

## RETIREMENT AND PENSIONS

### Section 131

Section 131 conforms sections (a) and (b) of 28 U.S.C. 371 to provide the same standard for judicial resignation or retirement. A judge must now meet the criteria of having attained age 65 with fifteen years of service or age 70 with ten years of service, to be entitled to retire or resign at the salary of the office.

### Section 132

The Federal judiciary includes a large number of capable and talented people whose skills, from time to time, may be needed in the executive branch. During recent years, several Federal judges have left the bench to serve in significant positions in the executive branch. Article III judges who resign or retire before the time limitations described in current 28 U.S.C. 371 give up a lifetime salary mandated by the Constitution, even though they had not been able to accrue funded pension benefits for these years of Federal service under the civil service program. As a result, for these former Federal judges, the acceptance of an executive branch position leaves them with potentially serious financial consequences.

Section 132 amends 5 U.S.C. 8332 to restate existing law that permits years of service on the Federal bench to be counted in computing civil service retirement benefits and amends 5 U.S.C. 8334 to allow the Administrative Office of the United States Courts to pay a deposit into the civil service retirement fund for Federal judges who resign to accept executive branch positions. These deposits will insure that these employees receive civil service pensions that take account of the years that such persons had served as Federal judges. The resulting pensions will still be considerably less than the salaries the judges would have received by remaining on the bench; nonetheless, this provision should help alleviate financial distress and would recognize the value of their years of judicial service. Although the annuity the Gov-will pay to the resigned judge after his executive branch service will constitute taxable income to him, the amendments this section makes ensure that the lump-sum deposit the Administrative Office makes to the Civil Service Retirement and Disability Fund will not constitute income in the year the deposit is paid. Such a consequence would distort the official's income and potentially subject him to unnecessary adverse income tax consequences.

26

#### TEMPORARY ASSIGNMENT OF JUSTICES AND JUDGES

*Section 141*

Section 141 authorizes an active or retired justice or judge of the United States to be assigned temporarily to the position of Administrative Assistant to the Chief Justice, Director of the Administrative Office of the United States Courts, or Director of the Federal Judicial Center, such service to be without any additional compensation.

Upon the appointment of an active judge to one of these positions, the President, by and with the advice and consent of the Senate, shall appoint a successor to fill the vacancy created by the temporary assignment. After the appointment of a successor, any further vacancy created by the death, resignation, or retirement of the judge who is temporarily assigned shall not be filled. If the judge temporarily assigned resumes active service, the first vacancy created on such court after his return to active service shall not be filled if a successor had been appointed and confirmed to fill the vacancy created by the temporary assignment.

The official station of any judge assigned a temporary position is the District of Columbia for the duration of his temporary assignment.

A judge who was in active service at the time of his temporary assignment may either resume his active service upon vacating his temporary assignment or assume active service as a judge in the circuit of the District of Columbia. For purposes of seniority and precedence, a judge who resumes active service on the original court shall be considered to have been in continuous active service as a judge of that court.

#### RULES OF PRACTICE

*Section 151*

Section 151(a) adds a new section 2077 to title 28 providing that rules for the conduct of business of each court of appeals, including the operating procedures of such court, shall be published.

Subsection (b) also requires that advisory committees be appointed to make recommendations to each court of appeals concerning its rules and internal operating procedures. It also requires the publication of these rules. The composition of these advisory committees is left for each court of appeals to determine. The use of these committees to assist the courts in developing their rules provides a means for the court to take into account the concerns of the bar and the public. Such committees will also provide a useful means of increasing the understanding of the bar and the public concerning the functioning of the courts. Although persons who serve on the advisory committees will receive no compensation for their services, except an individual who is otherwise an employee of the Government of the United States, the Director of the Administrative Office, in accordance with his travel regulations, may pay such persons travel expenses. In accordance with 5 U.S.C. § 5703 (1976), these expenses will include transportation expenses and a per diem in lieu of subsistence, or actual subsistence expenses under 5 U.S.C. § 5702(c), whenever the person is away from his home or regular place of business. Such committees will not require charters inasmuch as the Federal Advisory Committee Act, Pub. L. No. 92-463, 86 Stat. 770 (1972), applies only to the executive branch.

## TITLE II—JURISDICTION AND PROCEDURE

### INTERLOCUTORY APPEALS

*Section 201*

Section 201 amends 28 U.S.C. 1292(b) to permit the circuit courts of appeals to entertain appeals from interlocutory orders in civil actions if, after a refusal by a district judge to certify the matter in accordance with the provisions of existing law, the court of appeals determines that an appeal "is required in the interests of justice and because of the extraordinary importance of the case."

### TRANSFER OF CASES

*Section 211*

Because of the complexity of the Federal court system and of special jurisdictional provisions, a civil case may on occasion be mistakenly filed in a court that does not have jurisdiction. By the time the error is discovered, the statute of limitations or a filing period may have expired. Moreover, additional expense is occasioned by having to file the case anew in the proper court.

Section 211 adds a new chapter to title 28 that would authorize the court in which a case is improperly filed to transfer it to a court where subject matter jurisdiction is proper. The case would be treated by the transferee court as though it had been initially filed there on the date on which it was filed in the transferor court. The plaintiff will not have to pay any additional filing fees.

### INTEREST

*Section 221*

Under current law, the interest rate granted on judgments during appeal is based on varying State laws and frequently falls below the contemporary cost of money. As a consequence, a losing defendant may have an economic incentive to appeal a judgment solely in order to retain his money and accumulate interest on it at the commercial rate during the pendency of the appeal.

Section 221 amends 28 U.S.C. 1961 by setting a realistic and nationally uniform rate of interest on judgments in the Federal courts. The provision would tie the postjudgment interest rate to the rate used by the Internal Revenue Service for delinquent taxes under 26 U.S.C. 6621. That rate is a composite of prime rates from throughout the country that is reviewed and revised periodically. Furthermore, by consolidating all the provisions for interest on judgments of Title 28 into this section, this rate becomes uniformly applicable to all litigation in the Federal courts.

There are presently no generally applicable guidelines concerning the award of prejudgment interest by Federal courts. Yet such interest may be essential in order to compensate the plaintiff or to avoid unjust enrichment of the defendant. For instance, a plaintiff who was unlawfully deprived of the use of $20,000 in 1976, and who did not receive a judgment until 1979, could have obtained $4,500 in the three-year intervening period by investing the money at seven percent compounded interest.

Section 221 amends 28 U.S.C. 1961 to permit interest for the pre-judgment period to be awarded in cases in which it is necessary to compensate the plaintiff for his losses or to avoid unjust enrichment of the defendant. The award of such interest would be in the discretion of the district judge where the facts of the controversy and the manner in which the case was litigated indicate such an award would be appropriate. It is the view of the Committee that these qualifications on the discretion of the judge will afford the judge adequate flexibility in the award of prejudgment interest while ensuring that prejudgment interest will not be awarded automatically, but only where justified.

The section provides that interest be awarded from the time that the defendant became aware of his liability; if the defendant avoided formal knowledge of his liability, interest would run from the time of avoidance. In no case, however, would prejudgment interest run for more than five years, since even with current civil case backlogs, a delay of more than five years to judgment implies some delay on the part of the plaintiff which should not be rewarded with interest payments. The legislation also provides that interest on losses that do not occur until after judgment (for example, loss of future wages) and interest that would be duplicative of some other award would not be permitted. These provisions for prejudgment interest will serve not only to compensate plaintiffs more fairly but also to provide positive incentives to defendants to settle meritorious claims without delay.

## TITLE III—APPELLATE STRUCTURE FOR PATENT, TRADEMARK, CUSTOMS, AND TRADE APPEALS

### COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### Section 301

Section 301(a) amends section 41 of title 28 of the United States Code by creating a twelfth judicial circuit of the United States, the United States Court of Appeals for the Federal Circuit, to review orders and judgments in selected categories of cases. The Federal Judicial Circuit comprehends all 95 judicial districts, including those of courts in the territories created by Act of Congress which are invested with any jurisdiction of a district court of the United States.

Section 301(b) amends section 44(a) of title 28, United States Code, by authorizing the President, with the advice and consent of the Senate, to appoint twelve judges for the United States Court of Appeals for the Federal Circuit. Tenure, residence, and salary provisions of section 44 that apply to Federal courts of appeals judges apply also to the judges of the Federal circuit, except that judges of that court must reside within fifty miles of the District of Columbia while in active service.

Section 301(c)(1) clarifies the language setting out where regular sessions of the courts of appeals may be held. Subsection (c)(2) designates the District of Columbia as the statutorily-prescribed place where regular sessions of the court of appeals for the Federal circuit shall be held. Subsection (c)(3) allows a court of appeals to hold special sessions at any place within its circuit as the nature of the business may require.

### Attachment 3 - page 28 of 42

### Section 302

As a transitional provision, section 302(a) provides that the judges of the United States Court of Claims and the United States Court of Customs and Patent Appeals on the effective date of the Act will continue in office as judges of the United States Court of Appeals for the Federal Circuit. Senior judges of the present Court of Claims and of the Court of Customs and Patent Appeals will be deemed for all purposes to be senior judges of the Court of Appeals for the Federal Circuit.

As a further transitional provision, section 302(b) provides that the first chief judge of the United States Court of Appeals for the Federal Circuit will be the chief judge of the Court of Claims or the chief judge of the Court of Customs and Patent Appeals, whoever has served longer as chief judge of the respective court. After the first chief judge of the Federal circuit vacates that position, the chief judge will be chosen by seniority of commission, in the manner prescribed for other United States courts of appeals under section 45 of title 28, United States Code.

Sections 302(c), 302(d), and 302(e) are technical amendments providing for the consistent usage of the term "panel" throughout 28 U.S.C. 46.

### ESTABLISHMENT OF UNITED STATES CLAIMS COURT

### Section 311

Under existing law, chapter 7 of title 28, United States Code, pertains to judges of the Court of Claims. Section 311 of the bill amends this chapter to apply instead to the judges of a newly constituted trial court, which will assume the functions of the trial division of the current Court of Claims. The current trial judges are much like magistrates and are appointed by the Court of Claims. The amended chapter is titled "United States Claims Court," and it provides as follows:

Subsection (a) of section 171 of title 28 authorizes the President to appoint, by and with the advice and consent of the Senate, sixteen judges who will constitute a court of record known as the United States Claims Court. The court will be established under article I of the Constitution of the United States. Because 28 U.S.C. 2509 of existing law gives the trial judges of the Court of Claims jurisdiction to hear congressional reference cases, which are not "cases and controversies" in the constitutional sense, and because the cases heard by the Claims Court are in many ways essentially similar to the limited jurisdiction cases considered by the tax court, judges of the Claims Court are made article I judges rather than article III judges.

Subsection (b) of section 171 of title 28 requires the Claims Court, at least biennially, to designate a judge to act as chief judge. This provision parallels procedure in the United States Tax Court. See 26 U.S.C. 7444(b).

Section 172 of title 28 fixes the tenure of the judges of the United States Claims Court as a term of fifteen years. The section also provides that the salary of the judges be determined under section 225 of the Federal Salary Act of 1967, subject to an annual cost of living adjustment in accordance with the Executive Salary Cost-of-Living Adjustment Act, 28 U.S.C. 461. Salaries of the current Court of Claims

commissioners and judges are determined under the Federal Salary Act of 1967.

Section 173 of title 28 authorizes the Claims Court to hold court anywhere within the jurisdiction of the United States, but it requires the court to establish the times and places of its sessions with a view toward minimizing inconveniences and expense to citizens. This latter provision is similar to the statutory requirement that the United States Tax Court set the times and places of its sessions in such a way as to expedite citizen access. See 26 U.S.C. 7446.

Section 174 of title 28 permits the judicial power of the Claims Court to be exercised by a single judge and requires the decisions of the Claims Court to be preserved and open for inspection. These provisions are identical to requirements governing the Customs Court. See 28 U.S.C. 254, 257. Although these will no longer be a published official reporter series, the committee anticipates that legal publishers who currently publish commercially the decisions of the Court of Claims will continue to publish the decisions of the new Claims Court.

Section 175 of title 28 sets the duty station of a judge of the United States Claims Court as the District of Columbia and provides that while in active service judges shall live within fifty miles of the District of Columbia.

Section 176 provides for removal from office of a judge of the Claims Court by a majority of the judges of the judicial council of the Federal judicial circuit.

Section 177 provides that a judge removed from office in this manner may not later practice law before the Claims Court. This provision parallels a similar section in the statute governing the tax court. See 26 U.S.C. 7443(g).

*Section 312*

Section 312 provides that, as a transitional measure, the persons who on the effective date of the Act are serving as commissioners of the United States Court of Claims will be judges of the United States Claims Court. Their initial terms of office will expire on September 30, 1985, at which time the President shall make appointments to such vacancies as exist in the court, by and with the advice and consent of the Senate. Currently, Congress has invested the United States Claims Court with the power to appoint 16 trial commissioners. 28 U.S.C. 792. Currently, there are 17 trial commissioners, including one re-employed annuitant. Although this one commissioner may be an annuitant, the committee intends that only the 16 commissioners in regular active service be folded in as judges of the Claims Court.

*Section 313*

Under existing law, chapter 9 of title 28, United States Code, concerns the Court of Customs and Patent Appeals (CCPA). As provided in section 302 of this Act, the judges and functions of the CCPA are transferred to the United States Court of Appeals for the Federal Circuit. The provisions of chapter 9 of title 28 will be no longer necessary since similar provisions found in chapter 3 of title 28 are applicable to the new court. Section 313 of the Act therefore repeals chapter 9 of title 28.

31

*Section 314*

Under existing law, section 256(b) of title 28, United States Code, permits the chief judge of the Customs Court to authorize a judge of the court to preside in an evidentiary hearing in a foreign country. The subsection also permits an interlocutory appeal to be taken from such an order, subject to the discretion of the Court of Customs and Patent Appeals. Section 314(a) of the Act provides that the United States Court of Appeals for the Federal Circuit may, in its discretion, consider an interlocutory appeal from such an order.

Under existing law, section 219(b) of title 28, United States Code, authorizes the Chief Justice of the United States to designate and assign temporarily any circuit judge to serve as a judge of the Court of Claims or the Court of Customs and Patent Appeals, if the need arises. Because the Act transfers the judges and functions of these courts to the U.S. Court of Appeals for the Federal Circuit and the United States Claims Court, section 314(b) deletes existing subsection (b). Because the Court of Appeals for the Federal Circuit will be in all respects a United States court of appeals, the Chief Justice will be authorized under section 291(a) to designate a judge of that court to sit temporarily as a circuit judge in another circuit, or to assign temporarily a judge of another circuit to the Court of Appeals for the Federal Circuit.

Section 292(e) of title 28, United States Code, currently authorizes the Chief Justice of the United States to designate and assign temporarily any district judge to serve as a judge of the Court of Claims, the Court of Customs and Patent Appeals, or the Customs Court. Section 314(c) of the bill conforms this section to the other changes made by the bill.

Section 293 of title 28, United States Code, currently provides for temporary assignment of a judge from the Court of Claims to the Court of Customs and Patent Appeals or vice versa, and from the Court of Customs and Patent Appeals to the Customs Court or vice versa, and from the Customs Court to a district court. Section 314(d) amends section 293 of title 28 by deleting subsections (a), (c), and (d) which deal with the interchange of judges between the Court of Claims and the Court of Customs and Patent Appeals and between the Customs Court and the Court of Customs and Patent Appeals. The Act retains the provisions of subsections (b) and (e).

Section 314(e) amends section 331 of title 28. United States Code, which deals with the Judicial Conference of the United States, by deleting references to the Court of Claims and the Court of Customs and Patent Appeals. The Court of Appeals for the Federal Circuit is structurally similar to the regional courts of appeals, and, as such, becomes part of the Judicial Conference.

Section 372 of title 28, United States Code, concerns retirement of judges for disability and appointment of a substitute judge upon failure of a disabled judge to retire. Section 314(f) amends this section of the Code by deleting all references to the Court of Claims and the Court of Customs and Patent Appeals. The new appellate court is covered by the retained language.

32

Section 314(g) repeals section 415 of title 28, United States Code, which concerns distribution of copies of Court of Claims decisions, and amends the analysis at the beginning of chapter 19 of title 28, United States Code, to conform with the changes made by the previous sections. The committee believes that the dissemination of opinions in the publications of "quasi-official" publishers results in adequate distribution of decisions. The discontinuance of the nonessential "official reporter" will result in substantial cost savings to the Government.

Section 314(h) amends section 451 of title 28, United States Code, which defines certain terms used in title 28, by deleting all references to the Court of Claims and the Court of Customs and Patent Appeals. The retained language would cover the Court of Appeals for the Federal Circuit but not the article I Claims Court.

Section 314(i) amends section 456 of title 28, United States Code, concerning travel expenses of justices and judges, to clarify the provisions relating to official duty stations and to update references to obsolete laws. The clarification establishes our official duty stations for Article III judges and ensures that the official duty station will be that place where the Director provides chambers for the judge.

Section 314(j)(1) of the bill adds a new section 460 that makes sections 452 through 459 and section 462 of title 28, United States Code, applicable to the United States Claims Court and to certain territorial courts. These sections deal with general matters and provide that courts shall be deemed always open for certain procedural purposes; judges must take a prescribed oath before performing the duties of office; judges are prohibited from engaging in the practice of law; judges may be disqualified from participation in a proceeding in certain circumstances; records of the courts must be kept in a prescribed manner; relatives of a judge are ineligible for appointment to any office in the court in which the relative is a judge; and judges may administer oaths. Claims Court judges also will receive the same travel allowances as Article III judges.

"460. Application to other courts."

Section 314(k) amends chapter 21 of title 28, U.S.C., by adding a new section 462 concerning court accommodations and providing for necessary space for the Claims Court and the Court of Appeals for the Federal Circuit.

*Section 315*

Under existing law, suits in the Supreme Court and the Court of Claims are conducted and argued by the Attorney General and the Solicitor General, unless in a particular case the Attorney General directs otherwise. See 28 U.S.A. 518(a). Section 351(a) of the bill amends section 518(a) of title 28, United States Code, by deleting the reference to the Court of Claims and providing for argument by the Attorney General and Solicitor General in suits against the United States in the United States Court of Appeals for the Federal Circuit or in the United States Claims Court, unless the Attorney General directs otherwise.

Under current law, section 520 of title 28, United States Code, concerns transmission of copies of petitions in suits against the United States in the Court of Claims to the affected government department or

33

agency by the Attorney General. Section 315(b)(1) of the Act amends this section by deleting references to the Court of Claims and substituting a reference to suits against the United States in the United States Claims Court or in the United States Court of Appeals for the Federal Circuit. Section 315(b)(2) amends the section heading of section 520 of title 28 to reflect this change.

*Section 316*

Section 316(a) amends section 610 of title 28, United States Code, which defines "courts" for purposes of chapter 41 of title 28 concerning the Administrative Office of the United States Courts, by deleting references to the Court of Claims and the Court of Customs and Patent Appeals. The section inserts a reference to the United States Claims Court, thereby providing, among other things, that the budget of the Claims Court, its financial transactions, and its needs for personal property will be handled by the Administrative Office.

Section 316(b) amends 28 U.S.C. 713 to the appointive authority for librarians and their assistants for each court of appeals, including methods of removal.

Section 316(c) amends chapter 47 of title 28 by clarifying the language used to employ criers, messengers, and bailiffs. It also provides for the appointment of staff attorneys and technical assistants in a new section 715. In recent years, many of the regional courts of appeals have found it necessary to utilize central staff attorneys, but they have done so without specific statutory authorization. Similarly, despite a lack of explicit statutory authorizations, the judges of the present Court of Customs and Patent Appeals have found it necessary to hire technical advisers to assist them in resolving cases. These advisers are lawyers who have technical degrees and experience in a scientific or engineering field or in patent law in addition to their legal training. The service of these advisers is identical to that of a law clerk, except that they confer with the judges on technical as well as legal matters. Judges of the United States Court of Appeals for the Federal Circuit need a similar system of technical advisers when they review patent cases, and judges of other United States courts of appeals could frequently benefit from the use of technical advisers. It is anticipated that the judges of the Court of Appeals for the Federal Circuit will receive technical assistance at least as great as the type and quality currently being given to the Court of Customs and Patent Appeals.

For several years, annual appropriation acts have invested the chief judge of each court of appeals with the authority to appoint a senior law clerk. *See, e.g.,* Judiciary Appropriation Act, 1979, Pub. L. No. 95-431, title IV, 92 Stat. 1037. However, Congress has not invested the Courts of Appeals with authority to appoint additional staff attorneys. Unlike the executive branch, there is no general statute granting courts appointive authority. *Cf.* 5 U.S.C. 3101. The Committee notes that the courts continue to make appointments in the absence of a Congressional grant of authority. See 5 U.S.C. 5502(a). While the Committee proposes to invest the officers of the court with the authority to appoint staff attorneys and technical assistants subject to certain restrictions, it is not its intent to ratify the actions of the courts in purporting to appoint employees in the absence of the requisite statutory authority not found in an appropriation act.

**Attachment 3 - page 33 of 42**

34

*Section 317*

Section 317 provides a retirement system for judges of the United States Claims Court. It is modeled after the bankruptcy judges' retirement provisions and would provide an annuity for a Claims Court judge with respect to his service as a judge of the United States Claims Court, and his military service not exceeding five years, by multiplying 2½ percent of his average pay by years of that service. This represents a substantial increase over existing civil service retirement provided to Commissioners of the Court of Claims, but falls below the retirement provisions accorded article III, life tenure judges.

### COURT OFFICERS AND EMPLOYEES OF THE UNITED STATES CLAIMS COURT

*Section 321*

Under existing law, chapter 51 of title 28, United States Code, concerns Court of Claims staff and reporting procedures. Section 321 of the Bill amends chapter 51 to establish staff and reporting procedures for the United States Claims Court. Chapter 51 of title 28 provides as follows:

Section 791 of title 28 would authorize the Claims Court to appoint a clerk, deputy clerk, and such other employees as may be necessary for the effective conduct of the business of the court. Each of these employees would be subject to removal by the court.

Section 792 of existing 28 U.S.C. relates to the appointment of commissioners by the Court of Claims. As a corollary to the abolishment of the Court of Claims, section 792 is repealed.

Section 794 of title 28 would authorize the judges of the Claims Court to appoint necessary law clerks, subject to any aggregate salary ceilings imposed by law and the regulations of the Judicial Conference of the United States. This provision is similar to section 752 of title 28 which concerns law clerks and secretaries for district court judges.

Section 795 of title 28 concerns the appointment and duties of bailiffs and messengers for the Claims Court and is similar to existing law concerning the Court of Claims.

Section 796 of title 28 concerns the reporting of Claims Court proceedings and is identical to existing law concerning the reporting of Court of Claims proceedings.

Section 797 of existing 28 U.S.C. relates to the recall of retired commissioners of the Court of Claims. Because the Court of Claims is abolished, section 797 is repealed.

*Section 322*

Section 322 (a) of the Bill repeals chapter 53 of title 28 which, under existing law, concerns appointment and duties of employees of the Court of Customs and Patent Appeals.

Section 957 of title 28, United States Code, provides that certain employees of the district court are not eligible for certain offices in the court's administrative structure. Section 322(b) amends this section by deleting subsection (b), which concerns the clerk or assistant clerks of the Court of Customs and Patent Appeals, and by striking subsection designation "(a)".

35

*Section 323*

Section 323 repeals sections 1255 and 1256 of title 28, United States Code, which under existing law provide for Supreme Court review of cases in the Court of Claims and the Court of Customs and Patent Appeals. Review of cases in the new appellate court is covered by 28 U.S.C. 1254, which establishes procedures for Supreme Court review of cases in the circuit courts of appeals.

Section 323 also amends the analysis at the beginning of chapter 81 of title 28, United States Code, to conform with the repeal of sections 1255 and 1256, and conforms 28 U.S.C. section 1336 relating to Interstate Commerce Commission orders.

*Section 324*

Section 1291 of title 28, United States Code, is amended to make explicit that the jurisdiction of the Court of Appeals for the Federal Circuit and of the United States Court of Tax Appeals is limited to the jurisdiction set forth in sections 1295 and 1296, respectively.

Section 1294 of title 28, United States Code, sets forth the regional courts of appeals to which appeals from reviewable decisions of the district and territorial courts are to be taken. Section 324(b) of the Act amends this section by providing an exception from these provisions for the cases covered by new sections 1295 and 1296; those appeals will be assigned exclusively to the Court of Appeals for the Federal Circuit and the United States Court of Tax Appeals, respectively.

*Section 325*

Section 1292 of title 28, United States Code, currently gives the regional courts of appeals jurisdiction of interlocutory orders of the district courts concerning injunctions and of judgments in civil actions for patent infringement which are final except for an accounting. Section 325 of the Bill amends this section to give the Court of Appeals of the Federal Circuit jurisdiction of interlocutory appeals in cases that will otherwise come to it on appeal.

*Section 326*

Section 326(a) of the Act adds a new section 1295 to chapter 83 of title 28, United States Code. Section 1295 establishes the jurisdiction of the United States Court of Appeals for the Federal Circuit as follows:

Subsection (1) of new section 1295 of title 28 gives the Court of Appeals for the Federal Circuit jurisdiction of any appeal in which district court jurisdiction was based, in whole or in part, on section 1338 of title 28 (which confers on the district court original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks), except that appeals of district court decisions in cases involving copyrights or trademarks and none of the other issues will continue to go to the regional appellate courts. pursuant to section 1294 of title 28.

Subsection (2) of section 1295 of title 28 gives the Court of Appeals for the Federal Circuit jurisdiction of any appeal from a district court

where the jurisdiction of the district court was based, in whole or in part, on section 1346 of title 28, United States Code, except that an appeal in a case brought in a district court under sections 1346(a) and (f) (tax appeals) will go to the new Court of Tax Appeals, and an appeal in a case brought under section 1346(c) (Tort Claims Act) will continue to go to the regional courts of appeals. The Bill modifies section 1346 to bring all other civil cases in which the United States is a defendant under centralized appellate review. Because cases brought under the Federal Tort Claims Act frequently involve the application of State law, those appeals will continue to be brought to the regional courts of appeals.

Subsection (3) of section 1295 of title 28 gives the United States Court of Appeals for the Federal Circuit jurisdiction of any appeal from the United States Claims Court. As provided in the Bill, the jurisdiction of the claims court would be identical to the trial jurisdiction of the existing court of claims, except that it would no longer have authority to handle tax refund cases or cases brought under the Federal Tort Claims Act. Only one case under the Federal Tort Claims Act has ever been filed in the Court of Claims, and that case was dismissed pursuant to 28 U.S.C. 1504 because the appellees failed to consent to the filing of the suit in the Court of Claims.

Subsection (4) of section 1295 of title 28 gives the United States Court of Appeals for the Federal Circuit jurisdiction of appeals from decisions of the Board of Appeals and the Board of Patent Interferences of the Patent and Trademark Office as to patent applications and interferences; from decisions of the Commissioner of Patents and Trademarks as to trademark applications and proceedings; and of appeals in patent and trademark cases brought in a Federal district court under 35 U.S.C. 145 or 146. Under existing law, jurisdiction of appeals from these decisions is in the Court of Customs and Patent Appeals. See 28 U.S.C. 1542. The purpose of placing jurisdiction of these appeals in the United States Court of Appeals for the Federal Circuit is to centralize patent appeals in a single forum and, as a result, to promote uniformity in the application of the law. The provisions of existing law entitling litigants in trademark and patent matters to de novo review in the district court remain unchanged.

Subsection (5) of section 1295 would transfer jurisdiction of appeals from decisions of the United States Customs Court to the new court. Currently, jurisdiction of such appeals is in the Court of Customs and Patent Appeals, pursuant to section 1541 of title 28, United States Code.

Subsection (6) of section 1295 of title 28, gives the United States Court of Appeals for the Federal Circuit jurisdiction to review, by appeal on questions of law only, findings of the United States International Trade Commission as to unfair trade practices in import trade. Jurisdiction of these appeals is in the Court of Customs and Patent Appeals under existing law. See 28 U.S.C. 1543.

Subsection (7) of section 1295 of title 28 gives the United States Court of Appeals for the Federal Circuit jurisdiction to review, by appeal on questions of law only, certain findings of the Secretary of Commerce. Currently, jurisdiction of these appeals is in the Court of Customs and Patent Appeals, pursuant to section 1544 of title 28, United States Code.

37

Subsection (8) of section 1295 of title 28 gives the Court of Appeals for the Federal Circuit jurisdiction of appeals under section 71 of the Plant Variety Protection Act (7 U.S.C. 2461). Under existing law, the Court of Customs and Patent Appeals has jurisdiction of these appeals, pursuant to section 1545 of title 28, United States Code.

Subsection (9) of section 1295 of title 28 gives the Court of Appeals for the Federal Circuit jurisdiction of any appeal from a final order or final decision of the Merit Systems Protection Board. Currently, jurisdiction of these appeals is in the Court of Claims or a United States court of appeals, pursuant to sections 7703(b)(1) and 7703(d) of title 5, United States Code.

### UNITED STATES AS DEFENDANT

*Section 331*

Under existing law, section 1346 of title 28, United States Code, gives the district courts original jurisdiction, concurrent with the court of claims, of civil tax refund cases and of other civil actions or claims against the United States, under $10,000 in amount, and founded on the Constitution, an Act of Congress, a regulation of an executive department, an express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. Section 331 of the bill eliminates the jurisdiction over civil tax refund cases, but otherwise continues this concurrent jurisdiction over other matters, while changing the reference to the Court of Claims to a reference to the United States Claims Court.

*Section 332*

Section 1398(b) of current title 28 provides that a civil action to enforce, enjoin, or suspend any order of the Interstate Commerce Commission made pursuant to a referral of a question or issue by a district court to the Court of Claims must be brought in the court which referred the question or issue. Section 332(a) of the Bill amends this subsection by deleting the reference to the Court of Claims and substituting a reference to the Claims Court.

Section 1406(b) of title 28, United States Code, provides that if a case within the exclusive jurisdiction of the Court of Claims is filed in a district court, the district court shall transfer the case to the Court of Claims. Section 332(b) of the Bill amends this provision by removing references in the section to the Court of Claims and substituting references to the claims court, thereby permitting similar transfers from the district courts to the newly constituted trial court.

### UNITED STATES CLAIMS COURT; JURISDICTION AND VENUE

*Section 341*

Section 341 of the Act amends chapter 91 of title 28, United States Code. Under existing law, this chapter sets forth the jurisdiction of the Court of Claims. With the exception of civil tax refund cases noted above and Federal Tort Claims Act cases noted below, claims court jurisdiction is identical to Court of Claims jurisdiction.

One provision of existing law has not been included in amended chapter 91. Under current section 1504 of title 28, United States Code, the Court of Claims has jurisdiction to review Federal Tort Claims

38

Act cases with the consent of both parties. According to the Administrative Office of the United States Courts, the only such appeal ever filed was summarily dismissed because the appellee had not consented to have the appeal heard in the Court of Claims. Section 1504 was therefore omitted.

In addition, section 341 gives the new Claims Court the power to grant declaratory judgments and give equitable relief in controversies within its jurisdiction. This provision will for the first time give the court specializing in certain claims against the Federal Government the ability to grant litigants complete relief. The committee concluded that this provision will avoid the costly duplication in litigation presently required when a citizen seeks both damages and equitable relief against the Government.

## Section 342

Under existing law, chapter 93 of title 28, United States Code, establishes the jurisdiction of the Court of Customs and Patent Appeals. Because these functions are being transferred to the United States Court of Appeals for the Federal Circuit, section 342 of the Act repeals chapter 93 of title 28 and amends the analysis at the beginning of Part IV of title 28 so that it is conformed accordingly.

## Section 343

Section 343 of the Bill repeals section 1926 of title 28, United States Code, which deals with fees and costs in the Court of Customs and Patent Appeals, and amends the analysis at the beginning of chapter 123 of title 28 so that it is conformed accordingly.

## Section 344

Section 344 of the Bill repeals section 2110 of title 28, United States Code, which deals with the time for appeal to the Court of Claims in tort claims cases, because of the omission from amended chapter 91 of current section 1504 of title 28. The analysis at the beginning of chapter 133 of title 28 is amended to reflect this repeal.

## Section 345

Section 345 repeals 28 U.S.C. 2353 since jurisdiction over such appeals is vested exclusively in the Court of Appeals for the Federal Circuit.

### UNITED STATES CLAIMS COURT PROCEDURE

## Section 351

Under existing law, chapter 165 of title 28 establishes procedures for the Court of Claims. Section 351 amends this chapter to make the provisions applicable to the United States Claims Court. With the exception of technical changes made to convert the name of the court from the Court of Claims to the Claims Court and to eliminate references to the trial commissioners of the Court of Claims, these provisions are identical to existing law.

## Section 352

Section 352 of the bill repeals chapter 167 of title 28, United States Code, which under existing law establishes procedures for the Court of Customs and Patent Appeals. The repeal of this chapter will re-

**Attachment 3 - page 38 of 42**

quire certain changes in the procedure of taking an appeal from decisions of the Customs Court. Under current practice, pursuant to section 2601 of chapter 167 of title 28, an appeal is made by filing a notice of appeal in the Court of Customs and Patent Appeals. On the other hand, appeals from a decision of the district courts is made by filing a notice of appeal in the district court. Upon the repeal of chapter 167 of title 28, appeal from a decision of the Customs Court will be made by filing a notice of appeal in the Customs Court. The clerk of the Customs Court will then be required to transmit to the United States Court of Appeals for the Federal Circuit the record of the case and evidence taken, together with either the findings of fact and the conclusions of law or the opinion.

*Section 353*

Under existing law, section 2638(b) of title 28, United States Code, states that decisions of the Customs Court are to be appealed to the Court of Customs and Patent Appeals within the time and in the manner prescribed by section 2601 of title 28, which deals with procedures in the Court of Customs and Patent Appeals. Section 353 of the Bill amends section 2638(b) of title 28 to provide that appeal of a decision of the Customs Court is to be made to the United States Court of Appeals for the Federal Circuit within sixty days after entry of the judgment or order. Further procedures governing appeals from decisions of the Customs Court will be determined by the Court of Appeals for the Federal Circuit by rule of court.

*Section 354*

Section 354 conforms the Federal Rules of Evidence to refer to the Claims Court.

## TITLE IV—TAX APPELLATE STRUCTURE

*Section 401*

Section 401(a) creates the United States Court of Tax Appeals and declares that such court should be national, encompassing all eleven Federal judicial circuits.

Section 401(b) provides the procedure by which the members of the new tax court will be chosen. The bill provides that the new court shall consist of eleven Federal circuit judges, with one judge being designated from each circuit. The Chief Justice of the United States designates one of the circuit judges from each circuit court. In any case where the Chief Justice is unsuccessful in designating a circuit judge, this section provides the option of designating a district court judge from the circuit. The bill also provides—in express terms—that a circuit judge who serves on the new tax court continues to remain a judge of the circuit court from which he was designated. The committee intends that each judge designated to serve on the Court of Tax Appeals will maintain his chambers and his official duty station in his home circuit or district. The committee also anticipates that each designated judge will continue to carry such caseload from his court of appeals or district court as he is capable of doing, consistent with his caseload from the Court of Tax Appeals.

Section 401(c) provides that the new tax court shall hold at least one term or session per year in each of the circuits. The bill also pro-

40

vides that the court should hear appeals in the judicial circuit where the tax payer is domiciled, or, in the case of corporations, in the circuit where the corporation has its principal place of business, or, in the case of a cooperative or organization claiming a tax exemption, in the circuit which constitutes its principal place of activity.

*Section 402*

Section 402(a) provides that the first chief judge of the new Tax Court shall be appointed by the Chief Justice of the United States from the eleven members of the new court. Thereafter, seniority of commission will determine subsequent chief judges of the new tax court.

Section 402(b) provides that tax court panels shall consist of at least three judges but that the court may decide on panels of more than three. In addition, six of the eleven judges of the court can call for an en banc rehearing if they determine "that it is in the interest of justice." At least nine judges are required to hear a case en banc. In considering whether or not to hear a case en banc, the bill provides that the judges should consider—but need not limit their consideration to—

1. whether the question presented in the case was thought to be novel and unlikely to recur or was likely to apply to many taxpayers;

2. whether there was unanimity in the panel which decided the case;

3. whether any of the judges who composed the panel which heard the case suggested that it be reheard; and

4. whether the case presented issues of first impression.

Section 402(c) provides that the Chief Justice of the United States may—in a particular case—designate and temporarily assign a Federal district judge to serve on the United States Court of Tax Appeals. This section also provides that the Director of the Administrative Office of the United States Courts shall file a report with the President and the two Judiciary Committees of the Senate and the House of Representatives "concerning the implementation and effectiveness of the United States Court of Tax Appeals." Such report shall be filed on or about January 1, 1985, and is designed to provide the President and the Congress with an update as to the effectiveness and success of the new tax court structure.

*Section 403*

Section 403 provides that appeals from the Court of Tax Appeals may be reviewed by the Supreme Court of the United States by writ of certiorari.

*Section 404*

Section 404 provides that the jurisdiction of the United States Court of Tax Appeals is exclusive over any civil tax appeal from a district court or the United States Tax Court.

*Section 405*

Section 405 precludes the United States Court of Tax Appeals from exercising any appellate jurisdiction over orders of Federal agencies.

Section 406 amends chapter 47 of title 28 of the United States Code by adding a new section 716 enumerating the officers and employees of the Court of Tax Appeals.

**Attachment 3 - page 40 of 42**

**41**

Section 407 amends section 462 of title 28, U.S.C., by adding a new subsection instructing the Director of the Administrative Office of the United States Courts to provide permanent accommodations for the United States Court of Tax Appeals in the District of Columbia. Inasmuch as the judges of the Court of Tax Appeals will be maintaining their chambers and official duty stations in their home circuits and districts, the need for new accommodations will be mineral. However, section 407 provides that any permanent accommodations will be in the District of Columbia, which is the location of the court's clerk.

TITLE V—TECHNICAL AND CONFORMING AMENDMENTS OUTSIDE OF TITLE 28 RELATING TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT AND THE UNITED STATES COURT OF TAX APPEALS

*Section 501*

Section 501 amends section 356(c) of title 2, United States Code, which concerns salaries for judges under the Federal Salary Act of 1967, by including the judges of the United States Claims Court within the provisions of that subsection.

*Sections 502 through 508 and 510 through 514—Technical amendments*

Sections 502 through 508 and 510 through 514 of the Act amend sections of the United States Code outside title 28 by changing references to the Court of Claims, the Court of Customs and Patent Appeals, or the courts of appeals of the United States to references to the United States Claims Court, the United States Court of Appeals for the Federal Circuit, or the United States Court of Tax Appeals, whichever is appropriate in a specific context. The sections also delete references to the Court of Claims, the Court of Customs and Patent Appeals, or the trial commissioners or chief judge of the Court of Claims, wherever that is appropriate. Among other things, these amendments make clear that cases coming previously to the former Indian Claims Commission will be heard by the Claims Court, in accord with recent congressional action.

Section 7456(c) of the Internal Revenue Code of 1954 (26 U.S.C. section 7456(c)) under existing law provides that commissioners of the tax court receive the same compensation and travel and subsistence allowances as that provided by law for commissioners of the court of claims. Because the Bill abolishes the position of commissioner of the Court of Claims, section 508(c) amends this section to provide that each Tax Court commissioner receives pay at an annual rate determined under section 225 of the Federal Salary Act of 1967 (2 U.S.C. sections 351-361), as adjusted, and be reimbursed for all necessary traveling expenses in accordance with chapter 57 of title 5, United States Code.

*Section 509—Amendment conforming section 713 of title 44*

Section 713 of title 44, United States Code, concerns the printing and distribution of Journals of the Senate and House of Representatives. Under present law, 822 copies of the Journals are printed, and two copies of the Journals are distributed to the Court of Claims. Section 514 of the Bill reduces the number of Journals printed to 820 and deletes the reference to the court of claims.

**Attachment 3 - page 41 of 42**

42

## TITLE VI—MISCELLANEOUS PROVISIONS

*Section 601—Effective date*

This section provides that the Bill—other than the provisions of title I, parts A and D—shall take effect two years after enactment. The delay is intended to provide time for planning the transition and for permitting the bar to become familiar with the provisions.

*Section 602—Effect on pending cases*

This section provides for the orderly disposition of cases pending on the effective date of the Bill.

O

**Attachment 3 - page 42 of 42**