at what expense per month; is the Federal Government paying the expenses and salary of said Akin?

3. Did Representative Cayce Williams, of Weakley County, vote for the disfranchisement bill after expressing himself as being opposed to it; a short time after the adjournment of the extraordinary session was he appointed to a place in the Social Security set-up in Tennessee; at what salary; is he now drawing pay from the Federal Government?

4. Was Elijah Tollett, a representative from Cumberland County, promised a position in the unemployment division of the Social Security set-up in Tennessee; did he vote for the disfranchisement measure; was it reported in the public press that he had been appointed to a Social Security position; did it then occur that Representative Tollett was under indictment in the Federal court; after that did his sister receive an increase in salary of $50 per month?

5. Did James Vines, a Republican representative from Washington County, vote for the disfranchisement bill recommended by the Governor; after he voted for it was a brother of his put to work in the Social Security set-up; at what salary; is he drawing a salary from the Federal Treasury?

6. Did a young son, some 18 or 19 years of age, of Mrs. Caroline O'Dell, of Newport, Republican representative from Cocke County, receive a place in said Social Security set-up; on what date did he receive it; on what date did Mrs. O'Dell vote for the Browning disfranchisement bill; is her son on the pay roll of the Federal Government in this set-up?

7. Please have the question of the three young ladies who were discharged and others put in their places examined into, and kindly report who recommended dismissal of those already in and who recommended the employment of those who took their places, giving their names.

(You will note that Mr. Hale states that the above-mentioned five members of the legislature were bribed to vote and are being paid for their votes out of the Federal funds allotted to social-security work.)

8. Please ascertain and report specifically whether any examination was held prior to the appointment of these three members of the legislature, and the brother and son of the other two members of the legislature referred to in this communication.

9. Please advise me if your Board does not believe that the following provision of the Social Security law should be repealed:

"(1) Such methods of administration (other than those relating to selection, tenure of office, and compensation of personnel) as are found by the Board to be reasonably calculated to insure full payment of unemployment compensation when due; * * *."

My own judgment is that where Federal money is expended it should be expended by Federal officials, not by the State officials or any other organization.

These alleged acts have so recently occurred that I know you will not have the slightest difficulty in getting the information and in answering categorically the facts.

Of course, I could have a Senate investigation of the matter, but such is my great respect, admiration, and esteem for you, and in confidence in your honesty, that I am writing you first so that you can have the matter examined into and advise me as early in January as you can.

I feel that I should also tell you that I have made an independent examination of these facts, and that information leads me to believe that these facts are true.

Thanking you for your early consideration of this matter, I am,
Sincerely your friend,
KENNETH McKELLAR.

AMENDMENT OF TARIFF ACT OF 1930—AMENDMENT

Mr. GUFFEY submitted an amendment intended to be proposed by him to the bill (H. R. 8099) to amend certain administrative provisions of the Tariff Act of 1930, and for other purposes, which was referred to the Committee on Finance and ordered to be printed.

JACKSON DAY DINNER SPEECH BY SENATOR PEPPER

[Mr. BARKLEY asked and obtained leave to have printed in the RECORD a Jackson Day dinner address delivered by Senator PEPPER at Miami, Fla., on January 8, 1938, which appears in the Appendix.]

RESTRICTED IMMIGRATION AND MANDATORY DEPORTATION—ADDRESS BY SENATOR REYNOLDS

[Mr. REYNOLDS asked and obtained leave to have printed in the RECORD a letter signed by residents of 12 different States and the District of Columbia, relative to a radio address delivered by him on January 10, and the text of a radio address delivered by him on January 12, 1938, on the subject "Restricted Immigration and Mandatory Deportation," which appear in the Appendix.]

MINUTES OF THIRTY-FOURTH ANNUAL MEETING OF THE UNITED STATES GROUP—THE INTERPARLIAMENTARY UNION

[Mr. BARKLEY asked and obtained leave to have printed in the RECORD the minutes of the Interparliamentary Union, the thirty-fourth annual meeting of the United States group, held in Washington, D. C., on Monday, January 18, 1937, which appears in the Appendix.]

EQUAL RIGHTS FOR WOMEN—SPEECH OF VERA BRITTAIN

[Mr. BURKE asked and obtained leave to have printed in the RECORD a speech delivered by Vera Brittain, British author and lecturer, on the subject "Equal Rights for Women," before the national conference of the National Women's Party, meeting in Washington, D. C., December 14, 1937, which appears in the Appendix.]

AIRPORT SITE FOR THE DISTRICT OF COLUMBIA

[Mr. GIBSON asked and obtained leave to have printed in the RECORD an article from the Washington Evening Star of January 11, 1938, relative to an airport site for the District of Columbia, which appears in the Appendix.]

PREVENTION OF AND PUNISHMENT FOR LYNCHING

The Senate resumed the consideration of the bill (H. R. 1507) to assure to persons within the jurisdiction of every State the equal protection of the laws, and to punish the crime of lynching.

The VICE PRESIDENT. When the Senate took a recess yesterday the RECORD indicates that the Senator from North Carolina [Mr. BAILEY] had the floor and desired to continue his address this morning. The Senator from North Carolina, therefore, is recognized.

Mr. REYNOLDS. Mr. President, will my colleague yield to me?

The VICE PRESIDENT. Does the senior Senator from North Carolina yield to his colleague?

Mr. BAILEY. I yield.

Mr. REYNOLDS. Mr. President, yesterday I made mention of a number of eminent colored people in North Carolina, and I stated the fact that Dr. Miller, colored, a physician of the city of Asheville, was looked up to and respected and had provided inspiration for other colored physicians of the South. I likewise mentioned Dr. Shepherd, who is president of the North Carolina College for Negroes. I referred to this matter because of an article which I observed in the columns of the press of North Carolina, making mention of the fact that North Carolina had named three roadways or highways for eminent colored educators, and I introduced in the RECORD that article.

I recall the other day that my colleague from Tennessee [Mr. McKELLAR] read into the RECORD a list in numbers of colored dentists, doctors, educators, writers, physicians, and so forth. I was wondering if the Senator from Tennessee had that list divided into States.

Mr. McKELLAR. No; I have not.

Mr. REYNOLDS. My reason for making the inquiry was that I wanted, if possible, to contribute to the remarks of my colleague from North Carolina [Mr. BAILEY], who is addressing the Senate on this subject. I shall be glad to have later a list of the number of colored dentists, doctors, educators, school teachers, and so forth, in Tennessee, if my colleague from Tennessee has not that list at the present time.

Mr. McKELLAR. I will look up the data I have; and if I have the information by States, I shall be delighted to furnish it.

Mr. REYNOLDS. If the Senator has that information, I shall appreciate very much his providing me with it, in order that I may turn it over to my colleague [Mr. BAILEY] while he is addressing the body at this time.

Mr. JOHNSON of California. Mr. President, I desire to ask the Senator from North Carolina a question. I heard him speak of a list of colored gentlemen. Does he mean the list of those who were brought here at the expense of the Government by the Agricultural Department? Was it a list of those who ran colored newspapers in the United States?

Mr. REYNOLDS. Oh, no! I was only making mention of a list of colored doctors, dentists, lawyers, educators, and writers. I made mention of that for the reason that several days ago the Senator from Tennessee [Mr. McKELLAR] introduced into the RECORD, in conjunction with his remarks, a

statement of the number of colored lawyers, doctors, and educators to be found in the United States.

Mr. JOHNSON of California. I did not fully catch what the Senator said, and I thought probably he referred to the list of distinguished colored editors who were brought here at the expense of the United States by the Agricultural Department.

Mr. REYNOLDS. No, Mr. President.

Mr. McKELLAR. Mr. President, if I may interrupt for just a moment, if the Senator from California has that list, I wish he would furnish it to the Senate. As a member of the Appropriations Committee I should like to have that list, if possible.

Mr. JOHNSON of California. I am sure the Senator would; but the Senator from Ohio [Mr. BULKLEY], I think, put in the RECORD a letter furnished by Mr. Tolley, of the Agricultural Department, justifying it. The Senator will find the list in the RECORD.

Mr. McKELLAR. I shall be glad to look it up.

Mr. BAILEY. Mr. President, yesterday afternoon I had reached the stage in my argument in which I was about to bring forward the farewell address of President Andrew Jackson in support of my contention that not only is this bill unconstitutional, but its unconstitutionality is such as to reach into the vitals of the structure of our Government. I hope I may proceed with that address today. I have been informed, however, that the distinguished senior Senator from Arkansas [Mrs. CARAWAY], for whom we all have a very high and warm regard and whom we delight to hear, desires to be heard at this time. I should like, therefore, to have leave to yield the floor to her without yielding my right to proceed at the conclusion of her remarks. I ask unanimous consent to that effect.

Mr. CONNALLY. Mr. President, a parliamentary inquiry.

The VICE PRESIDENT. The Senator from Texas will state it.

Mr. CONNALLY. Is unanimous consent required to enable the Senator to yield, inasmuch as his remarks today are a mere continuation of the speech he began yesterday?

The VICE PRESIDENT. Unanimous consent is not required. In all good faith, however, if the Senator from North Carolina should yield the floor to the Senator from Arkansas, the Chair would hold that the Senator's remarks up to this time constituted one speech, if that is what the Senator from Texas is inquiring about.

Mr. CONNALLY. The inquiry was, if the Senator from North Carolina yields to the Senator from Arkansas, may he not resume his speech at the end of her remarks?

The VICE PRESIDENT. If the present occupant of the chair is in the chair at the time, the Senator from North Carolina will be recognized; and the Chair hopes the same course will be followed by any Senator who may be in the chair at the time.

Mrs. CARAWAY. Mr. President, for a long time I have refrained, for a number of reasons, from having anything to say on this so-called antilynching bill. The fact that it is so called has made it embarrassing for those who must oppose it on the grounds of unconstitutionality and its effect upon the rights of the States to self-government.

I have never approved or condoned lynchings. I have always been sick at heart when I have read of anyone being executed without a trial in the courts. Most of my life I have been an employer of colored men and women as helpers in running my household. I have been considerate of their health and their feelings. I have sought to establish a mutual understanding of what each race owes to the other. In other words, this relationship has been placed upon a basis of mutual respect, which fosters self-respect and regard for the rights of others. I have been most successful and happy in retaining their services. In fact, my present maid, whom I brought with me from Arkansas, has been in my employ as laundress since 1905, and has been with me in Washington for 10 years or more as general housekeeper. Another woman, with two children, reared her children while in my employ, living in a house on our grounds. She unfortunately developed a cancerous condition in her wrist, and the arm had to be amputated. I took her to Memphis and had the operation performed. We went to a Memphis doctor because she wished to go there, even though it was more expensive for us. We kept her in our home, paying her wages, and making her feel she was still self-supporting, hoping to prolong her life. She went to her daughter in Ohio for a visit and died there, and I lost a friend.

I am not trying to give myself a halo or anything like that. I am only trying to show that the Negro question does not enter into my opposition to this bill. I am sure my attitude is the attitude of most of the people of the South. I am a bit resentful and fearful that bad feelings engendered by such legislation as this may retard the good work being done to help and uplift a people who have always had my sympathy.

Official matters coming to my office from Negroes are handled the same way as are others. Everything I can do to see that they get justice is done. I have assisted in hundreds of worthy cases of this kind.

We hear much criticism of the so-called filibuster on this measure. I do not think this is a filibuster. This is a debate which has placed the issue before the people in such a way that the whole country now knows there is more involved than the mere prevention of lynchings. The very title of the bill is misleading, as I have found to be the case with many measures brought before the Congress. It is called an antilynching bill. Is not the first reaction to that by everyone who reads it "Why, of course, I am for that. How could one oppose it?" For lynchings are naturally obnoxious to everyone.

The great majority of the people do not stop to think of what may be contained in the bill itself. I doubt if even a small percentage of the citizens of the United States, despite the propaganda which has been carried on for years in behalf of the bill, have ever read it or realize the purpose back of the fight to have it enacted.

As have other Senators, I have been bombarded with propaganda urging me to support the bill. I received one communication from an organization in a large city which was particularly strong in its demand for the enactment of this bill. I sent the authors of the communication a copy of the bill and asked them to write me fully the sections which they favored or disliked. I never had a reply.

I may be in error, Mr. President, but I firmly believe that if the people of the United States knew what was really in this measure and all of the purposes behind it the percentage of those who favor it would be relatively small.

I have no desire to discuss the obvious unconstitutionality of the bill or its other legal features. This has been so ably done by the senior Senator from Idaho [Mr. BORAH] and other great lawyers in this body that I should only be painted the lily. I seriously doubt that many lawyers in the Senate or out of it who know constitutional law will argue that the measure is constitutional.

For a while I may have had some doubt that this bill was aimed at the South. I have none now. It is a gratuitous insult to our section. It is just another blow in furtherance of a desire to reduce to a minimum, if possible, the influence of a group and section that have always believed in a democratic form of government. These people—my people—have always clung with undying fealty to the tenets of the States' rights doctrine in the face of continued assaults of the Republican Party; and now Democrats themselves, or self-styled Democrats, are making the attack.

We of the South have stood much, Mr. President. We have surrendered much. This effort is just one of the many which would seek to take away from our section some of the influence we have had.

When the Democratic national convention met in Philadelphia in 1936 there had been a preconvention campaign for the abolishment of the two-thirds rule. What the South was thinking of when it let that rule be abolished is more than I can understand. My voice was raised in protest against the abrogation of the two-thirds rule when we had a meeting of

our State delegation on the subject. The abrogation of this rule will cost the South much in the days to come.

Since then various things have happened which lead me to believe that there are certain groups who would destroy the South not only as a political entity but as a business threat in competition with other sections.

As an illustration of a part of this plan let us consider the feverish desire to pass the pending bill. Why force consideration of it at the present time?

Ever since the Civil War we have had periodically a bill of this sort introduced. This has been done despite the fact that the records show an ever-increasing decline in lynchings.

The figures from the Tuskegee Institute which were placed in the RECORD by my colleague [Mr. MILLER] and others show that there was never less need of a bill of this sort than at this time. An editorial from the Arkansas Democrat, which I placed in the RECORD a few days ago, also bears on this point.

When there happens to be a lynching, it is given great publicity. We seldom, if ever, hear of the great number of cases where the orderly processes of the law are carried out, even in the face of extremely revolting crimes. It is seldom that we hear of the prevention of lynchings by brave public officials who risk their lives in protecting their prisoners from mobs, although it has been read into the RECORD several times that in 1937 there were only 8 lynchings, while 56 were prevented.

Let me repeat, there never was a time when there was less need of forcing through a bill of the character of the one now before the Senate.

There was no lynching in my State during the past year. The orderly processes of the courts were carried through time and again. Let me bring to the attention of the Senate an occurrence which has happened since the debate on this measure has begun.

I desire to have printed in the RECORD at this point as part of my remarks a letter from a prosecuting attorney of my State describing a most revolting crime in Crittenden County, Ark., and the way in which the case was handled. Notwithstanding the terrible offense committed, there was no talk of lynching.

The PRESIDING OFFICER (Mr. MILLER in the chair). Is there objection to the request of the Senator from Arkansas?

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

OSCEOLA, ARK., *January 10, 1938.*

Re: Antilynching bill.
Senator HATTIE CARAWAY,
*Senate Building, Washington, D. C.*

DEAR MRS. CARAWAY: I notice that the antilynching measure is before the Senate for consideration. Naturally we people of this section of the country are opposed to a law of this kind. I certainly feel that all serious cases, where lynching usually follows, can be handled in a lawful and orderly manner.

No doubt you have read from the papers an account of the trial of two Negroes at Marion, Ark., in this district, and by reading the papers it would be sufficient to convince anyone that Negroes, although charged with assaulting a white girl, can have a fair and impartial trial.

On the night of December 25, 1937, two Negroes, Theo Thomas and Frank Buster Carter, residents of Memphis, Tenn., assaulted Miss Maple Wilson, a white girl 18 years old, also a resident of Memphis. The crime was committed on the night of December 25. On the morning of December 26 these two defendants were arrested. On December 27, as prosecuting attorney of this district, I filed information against these defendants, charging them with the crime of rape. A certified copy of the information was served on the defendants, together with a bench warrant that was issued by the clerk of the court. On the afternoon of December 30 these defendants were arraigned on these charges. They were advised of the charges placed against them. Attorneys were appointed by the court to represent them and make whatever defense they had. One of the defendants indicated that his people would be able to raise money to pay these attorneys, and I am advised that they have been paid some money as a fee to represent the defendants. Mr. W. B. Scott, of Marion, a veteran of the bar, together with Mr. Cecil Nance, a very capable young lawyer, also of the Marion bar, were appointed to represent these defendants. The case was set for trial on January 6, 1938, a special term of court being called. The defendants were advised a week before the trial of the time and place of trial. They were given every opportunity possible to get witnesses and to arrange their defense. On January 6 court convened and all parties announced ready for trial. Great care was taken in selecting a jury.

About 10 challenges were exercised by the defendants. In order to be very precautious that they would get a fair trial and that they could not complain that they were tried by white jurors who were prejudiced against Negroes, two Negroes were placed on the regular panel, and about three other Negroes were called as special jurors. The two Negroes on the regular panel were accepted by the State. One of them was excused by the defendants. The jury was completed, consisting of 11 white men and 1 Negro. The case went to trial, and at the conclusion of all the testimony, and instructions given by the court, and argument of counsel, the jury retired to consider its verdict, and after about 7 minutes they returned in open court and rendered a verdict, finding the defendants guilty and fixing their punishment at death by electrocution. A few hours later they were sentenced to be electrocuted on the 8th day of February. The defendants filed a motion for new trial, which was overruled by the court. They indicated that they might appeal from the verdict. They were told then that they would be given every opportunity they wanted in order to perfect their appeal.

Briefly, the testimony showed that these defendants approached a young man by the name of F. E. Brading and the young lady, Miss Wilson, who had parked in a car just off Highway 61 near the Government fleet in Crittenden County, Ark.; they first indicated that they intended to rob the two; they both got in the car with Miss Wilson and Mr. Brading, drew knives and threatened to kill them; they forced the two to get in the back seat with one of the Negroes; the other Negro got in the front seat and started to drive off with the car, then stopped and forced Miss Wilson to get in the front seat with the other Negro. Then they began to threaten Miss Wilson and let her know that they intended to assault her. They drove for about a quarter of a mile, stopped the car, and one of the Negroes drew a knife on young Brading, and he ran to the Government station, which was about 100 yards from where the car was parked to get help. While he was gone both the Negroes drug Miss Wilson out of the car, across a field into the woods, and one of the Negroes assaulted her and brutally mistreated her. After he had finished he turned her over to the other Negro and told him that after he had finished with her to kill her and throw her in the river. The other Negro took her and kept her out in the woods and fields for about 4 hours; during which time he assaulted the young lady at least two times. She remembered the two times positively and was hazy about other times that occurred, because she lapsed into unconsciousness at times.

The Negroes were positively identified as being the Negroes who went to the car. They were seen by some other people on the highway near the scene where the car was parked. They were arrested and positively identified as being the Negroes who committed the crime. They were placed in jail and kept under guard, and it was generally understood that no one could be allowed to interfere with the trial of these Negroes. The officers were very cautious in handling the whole affair. The Negroes took the stand in the trial of this case, and both of them admitted that they were the two Negroes who approached Miss Wilson and Mr. Brading; that they drove the car down the road until it stuck in the mud, and that they took Miss Wilson and Mr. Brading out of the car. They admitted practically all of the testimony given by Miss Wilson, as to the time and place that they were with her. The only thing they denied was the assault. Miss Wilson was taken to the St. Joseph's Hospital after she was found, which was about 2:20 in the morning of December 26. The two Negroes were with her about an hour. One of them left and the other stayed with her the rest of the time, about 3½ hours, or maybe 4. In all they had her out in the woods and in the fields about 5 hours.

When she was found practically all of her clothes were torn off of her. She was a pitiful sight. She was bruised, lacerated, and bleeding. Miss Wilson, after being assaulted and after being found by the officers, was taken to the hospital, was examined and treated. The doctors who treated her stated that she had been assaulted. One of the doctors testified in the trial that she had been assaulted; that she was lacerated and bleeding; that she was bruised about her breasts; that she had bruises and contusions about her body and limbs. She was required to stay in the hospital about 10 days. She was in a very nervous condition, and at the time of the trial it was plain that she was suffering physically and mentally. In fact she still presents a very pitiful sight. It seems that her future is very dark. In face of all of this testimony and the circumstances surrounding the case, these Negroes were protected by the officers. They were given a fair trial. They were allowed to have any witnesses that they wanted. They were tried by a jury on which at least one of their own color served. This trial happened in Crittenden County, Ark.

This should be sufficient evidence that the officials and citizens of the South are ready and willing to give people who commit the most heinous crimes a fair and impartial trial.

Judge Neil Killough was the presiding judge. Sheriff Howard Curlin and his deputies arrested these defendants, and he, together with some of the State police, kept them in custody and protected them against any demonstration of mob violence; and I am glad to say that the people were reconciled with the proceedings, and no offer or attempt was made to mob or lynch these Negroes. As prosecuting attorney, I informed them of every step that was being taken against them. In presenting the case they were given every consideration that any defendant on trial is given. No effort was made on my part to prejudice the minds of the jurors against the Negroes on trial. I only argued the law and evidence as introduced in the case and told the jury to give them the benefit of the doubt allowed them under the law.

CASE 0:16-cv-02547-SRN-LIB   Document 183   Filed 03/04/19   Page 4 of 19

I am giving you this information, Mrs. CARAWAY, because it may be possible that this will be of some assistance to you in your opposition to the antilynching bill. If I can be of further service to you in this cause or any other cause, I shall be glad to have you call on me. If you think it advisable, or even worth while for me to appear before the committee or any committee in connection with this matter, I shall be glad to do so and would be willing to make the trip to Washington on short notice.

Sincerely,

BRUCE IVY.

Mrs. CARAWAY. Mr. President, I am proud of the actions of the officials of Crittenden County and my State in their handling of this case. I will now read an editorial from the Arkansas Gazette regarding the way in which this case was conducted:

THE TRIUMPH OF THE LAW IN CRITTENDEN COUNTY

Crittenden County and Arkansas have given the country a demonstration of respect for law. Justice moved swiftly in the trial at Marion of two Negroes on a charge of raping a white woman. The proceedings lasted only 1 day. The verdict, carrying the death penalty, came only 7 minutes after the jury began its deliberations. Among the jurors who returned that verdict was a member of the defendants' own race, and six other Negroes had been in the special venire summoned to try the case. If justice was swift, it was also scrupulous in observing every right of the men on trial. In the crowded courtroom there was no demonstration against the prisoners.

In the whole conduct of this case the Crittenden County courts and the people of Crittenden County have done an invaluable service to Arkansas and to the South. The orderly way the law dealt with two Negroes guilty of a terrible crime, the crime most provocative of resort to lynching, is the most impressive answer that could be made to the ill-advised if not futile legislation now in Congress, the so-called antilynching bill.

I agree with the Gazette that that is the most impressive answer that could be made to the ill-advised, if not futile legislation, now being considered.

I am convinced that the people who are sponsoring this bill and fighting for its passage are, at least in part, inspired to do so for political reasons.

I am also forced to the conclusion that a part of this plan is an attempt to change the Constitution without having to refer an amendment to the people. Those sponsoring the bill want the Federal Government to have all of the power of a Nazi or Fascist state before the people are aware of what is happening.

Our Government was founded on the principle of States' rights, and has, because of that, achieved and maintained a leading position among nations which could have come no other way. Shall we take this backward step?

Some Senators, from whom we expected a better understanding of the needs of Government, want to take away the last vestige of States' rights, they would sweep away the jurisdiction of our courts, and camouflage this purpose by saying that it is to prevent a crime which has all but passed into the limbo of things that were.

I feel that should the bill be enacted, it might be unenforceable. Prohibition certainly was not enforced. There are times when law will not prohibit. All will agree that at the present time lynching is not as serious a problem as is kidnaping. I should like to quote a paragraph from a recent editorial in the Washington Post, calling attention to this fact:

At present lynching is not as serious a problem as kidnaping. Twenty persons were kidnaped in the United States last year. If State officials, including Governors, are to be prosecuted for negligence in bringing lynchers to justice, the Government should also crack down when kidnaping and murder cases are bungled. Following the theory of the antilynching bill to its logical conclusion, therefore, law enforcement would soon be a Federal problem and local self-government would be on the road to extinction.

I firmly believe that should the bill become a law and be perpetrated upon the American people, it would in itself be a greater crime against our Government and our people than any that has ever been committed in our whole history.

Mr. President, I ask unanimous consent that the clerk read the views of the minority of the Committee on the Judiciary of the Senate, Forty-ninth Congress, second session, on a bill similar to the one before the Senate.

The PRESIDING OFFICER. Is there objection?

There being no objection, the matter referred to was read, as follows:

[Senate. Views of the minority, No. 1956. 49th Cong., 2d sess.] In the Senate of the United States. February 25, 1887. Ordered to be printed

Mr. George, from the Committee on the Judiciary, submitted the following views of the minority (to accompany bill S. 2171):

The undersigned, a minority of the Committee on the Judiciary, are unable to agree with the majority either as to the expediency or the constitutionality of Senate bill No. 2171, "to provide for inquests under national authority."

Sanctioned as the bill is by a majority of the members of this committee, it comes before the Senate with the prestige of the high character and eminent abilities of its framers and supporters. In opposing it on constitutional grounds we admit that it is incumbent on us to show by the clearest reasoning and the highest judicial authority that this bill is, as we believe it to be, unwarranted by the Constitution, and, if enacted, would be a grave and serious usurpation by Congress of essential powers reserved to the States, and that the means by which the inquest is to be made are equally in violation of that instrument.

This must be our apology for that elaboration of argument necessary to make due and proper inquiry into and examination of the questions involved in the bill.

The bill provides that on the application of any three citizens of the State in which the injury shall be committed the United States circuit judge shall order a special term of his court to be held, and shall then summon witnesses and inquire into facts connected with any alleged homicide committed, or serious bodily harm, or serious injury in person or estate, perpetrated or threatened, where such offense has been committed: "(1) Because of the race or color of such person so killed, injured, or threatened; (2) or because of any political opinion which such person so killed, injured, or threatened may have held in regard to matters affecting the general welfare of the United States; (3) or with design to prevent such person so killed, injured, or threatened, or others, from expressing fully such opinion; (4) or from voting as he or they may see fit at any election of officers whose election is provided for by the Constitution and laws of the United States; (5) or to affect the votes of such person or others at such elections."

And the bill further requires the judge to report the evidence thus by him taken, and his conclusion of facts thereon, to the President of the United States, to be by him laid before Congress.

No other action by the judge or court is required or even contemplated.

The theory of the bill, however, must necessarily assume that Congress may, when the report is submitted to it, make it the basis of legislative action in respect to all the matters named in it. That is, the bill asserts a power in Congress to legislate for the protection of the rights and for the punishment of the wrongs specified in it. These alleged rights, except in the two last clauses, which refer alone to voting at Federal elections, are the right to security in person and estate against assaults made or threatened by the wrongful acts of private individuals, if such assaults were made because of race or color or of holding or expressing political opinions. Or, in other words, jurisdiction is asserted in the Federal Government over all injuries to person or property, committed or threatened, where the perpetrator and the victim are not both of the same race and also of the same political party. For it is manifest that where they are of different races and of different political parties it will be impossible, as to the former at all times, and as to the latter in times (very frequent and prolonged) of high political excitement, to eliminate these circumstances from such transactions.

But the bill even goes further than this. If three men can be found in a State who will make oath according to their belief that any conflict, either actual or apprehended, any injury to person or estate, consummated or threatened, had for its basis any of the reasons and the causes mentioned in the bill, the court must undertake the investigation "into the circumstances" of such killing, injury, or threatening, and report the evidence taken and the conclusions of fact to the President, notwithstanding it may be established that the transaction, whatever it may be, had no such cause or basis, and was in fact between persons of the same race and color and of the same political party, and was the result of causes wholly different from those mentioned in the bill, and even of causes which rendered the conduct of the actor entirely justifiable.

The bill contains so serious an attack on the power, jurisdiction, and dignity of the States, is so harmful in its effects, so utterly at variance with the Constitution and being directed in the main, as this avowedly is, against the Southern States exclusively, that we feel that we are not only warranted, but required, to make such examination into the powers, jurisdictions, and rights of the States, and the powers of Congress, as may be necessary to defeat it.

We shall therefore inquire as to the depository nature and extent under our system of the governmental powers to protect the rights of persons and property against assaults and violations by private individuals, when such wrongs are committed or threatened within the limits or jurisdiction of a State. To make this examination full and perfect it is necessary to consider somewhat carefully the nature, purposes, and objects, as well as the powers of the Government of the United States, in connection with the powers and duties of the States; and also the scheme of government which the two combined have formed.

| 1938 | CONGRESSIONAL RECORD—SENATE | 433 |

### STATE AND FEDERAL GOVERNMENTS BOTH PARTS OF A WHOLE

The Federal and State Governments are complements of each other; both are essential parts of a whole. To conceive a government having sole jurisdiction over a people, but with no other powers than those granted to the Federal Government by the Constitution of the United States, would be to conceive an anomaly as well as an impotent abortion. Such a government would possess no power over contracts, over marriage and divorce, the civil relations of husband and wife over descents, inheritances, and testaments, over titles and tenures to property, over the great fundamental rights of life, liberty, and property, and the pursuit and acquisition of happiness. On the other hand, a government considered as a whole and not as a complement of another which possessed no other powers than those now belonging to the States would be utterly powerless outside its own territorial domain and without essential powers within it. It could possess no army, no navy, grant no patents or copyrights, coin no money, emit no bills of credit, fix no standard of weights and measures, levy no tonnage, duties, or taxes on imports or exports, receive or send no ambassadors, ministers, or consuls, enter into no treaties or alliances, nor regulate in any way commerce between itself and other States or foreign nations. It could neither make war nor conclude peace.

"We have in our political system," says Chief Justice Waite in *United States v. Cruikshank* (92 U. S., p. 549), "a Government of the United States and a government of each of the several States." And Judge Miller, in the *Slaughterhouse Cases* (16 Wall., p. 82), said that "the existence of the States was essential to the perfect working of our complex form of government"; complex in this, that we have two distinct governments, operating on and regulating the rights and duties of the same people, each having distinct and separate powers and charged with distinct and separate duties. No citizen of a State can look to either government for the measure of his allegiance or as the sole protector of his rights. The system is that the people of each State may with exact truth be said to have two constitutions—one their own separate constitution under which they exercise State powers and perform State duties solely, and according to their own judgment as to what is best for the common weal; the other, the Constitution of the United States, which is the common Constitution of each and of all the States, and under which each discharges Federal functions in connection with its sister States. Both are essential to perform the full measure of governmental functions and protect and secure the people in all their rights. Chief Justice Waite, in *United States v. Cruikshank* (92 U. S., p. 550), speaking for the Supreme Court, used this expressive language:

"The people of the United States resident within any State are subject to two governments—one State, one National. The powers which one possesses the other does not. They were established for different purposes and have separate jurisdictions. Together they make one whole, and furnish the people of the United States with a complete government, ample for the protection of all their rights at home and abroad."

This great and fundamental truth is so often obscured and neglected in practice that we deem it our duty to endeavor to recall it to attention of the Senate and of the country.

### THE UNITED STATES THE FINAL JUDGES OF THEIR OWN POWERS

It is no part of our purpose to reopen the question of State rights, as settled by the late war.. Whatever of power was lost to the States by that conflict we acknowledge is lost irrevocably; whatever was gained in it by the United States is an acquisition that we shall not attempt to disturb. Whatever may be the mere historical truth as to the mode of the formation of the Federal Constitution—whether it was created by the people of the several States or by the people of the United States aggregated in one mass—it is now no longer a matter of dispute that the powers granted to the Federal Government by the Constitution of the United States are irrevocable except by successful revolution. It is also now established that the Government created by it is, through its judicial department, the final judge of the extent of all its granted powers which can by their nature come under review in a case in a court, and that the political departments of the Government are the final judges of the extent of all the other granted powers. The right of State interposition to arrest usurpation by the Federal Government, whether by nullification or secession, if it ever existed, has now gone forever. We concede this fully and unreservedly.

This great power of final arbitrament carries with it the highest and most solemn duty to judge carefully—impartially—not to usurp on the one hand powers not granted nor, on the other, to abdicate duties imposed on the Government by the Constitution. The people have a right to demand that the agents and officers of the Federal Government, which, though limited in the number of its powers, is supreme wherever its powers extend, shall be careful not to disturb or disarrange the scheme of government which they ordained nor alter the divisions of powers between the two governments which they have established.

### THE STATES, ESSENTIAL BASES OF OUR SYSTEM

The Federal Constitution, whether framed by the people of the several States—the people of each State acting for their State—and as a political organization known as a State or not, came after the formation of the States. It is based on the previous existence and on the subsequently continued life of the States. Without States then existing it could not have been created. It had no force as a constitution till ratified by nine States and then only "between the States ratifying" it. After its ratification it

LXXXIII——28

could not have gone into operation except by and through the active agency and cooperation of the States existing as separate political entities, and acting as separate and distinct political organisms. No President could then have been, nor can now be, constitutionally elected except by electors whom, by the terms of the Constitution itself, "each State shall appoint in such manner as the legislature thereof may direct." No Representative could be elected, nor can now be, except by voters whose qualifications are to be fixed by the State from which he comes. Representatives are "apportioned among the several States," and Senators, "two from each State," are "chosen by the legislature thereof"; and each Senator and Representative must be "an inhabitant of that State in which (or for which) he shall be chosen." The words "State" and "United States" appear everywhere in the Constitution, in every article, and almost in every clause and sentence. Strike them from the Constitution and the Government would be without a name among the nations of the earth and the whole instrument would be unmeaning jargon, with no intelligent ideas left in it. The name of the Government itself created by the Constitution is "United States." The Constitution, as itself declares, was ordained and established "for the United States of America." The legislative power is vested not in a legislature or parliament or national assembly, but in "the Congress (that is, the meeting or assembling) of the United States." The executive power is vested not in a king or emperor or consul but in a "President of the United States"; all other officers are "officers of the United States." The "militia of the several States" are "called into the service of the United States," and not into the service of the Government, or the President, or the Congress. The judicial power of "the United States," not of the Government or Congress, is "vested" in courts provided for in the Constitution. These courts have jurisdiction "in controversies to which the United States shall be a party"; and between "two or more States"; and "between citizens of different States." Trials of crimes "shall be in the State" where committed. And "treason against the United States," not against Congress, the President, or the Government, or the Union, is committed only "by levying war against them or in adhering to their enemies." Essential powers are recognized in the States, and equally important powers prohibited to them by that name, and duties are imposed on them as "States."

In the attestation clause of the Constitution it is said: "Done in convention, by the unanimous consent of the States present," and his attestation is signed by George Washington, as President, "and deputy from Virginia," and by the deputies from each of the 12 States present, each being separately named, Rhode Island not being present. And in the tenth amendment it is declared that all the powers granted by the Constitution are "delegated to the United States," not to Congress, the President, the Government, or the Union. And in the fourteenth amendment the public debt is declared to be the debt "of the United States," and the "United States" are prohibited from assuming any debt incurred in aid of "rebellion or insurrection against the United States," and in the fifteenth amendment "the United States" and the several "States" are prohibited from denying or abridging the right to vote in certain cases.

Whilst it is true that the scheme of the Constitution was ."to make us one people, with one common country, for all the great purposes for which it was established," as was said by Chief Justice Taney, it is also true, as declared by Chief Justice Marshall, in *McCulloch v. Maryland* (4 Wheat. 403), that "no political dreamer was ever wild enough to think of breaking down the lines which separate the States and compounding the American people into one common mass." And it is also true that the American people, considered as one common mass, and not as the people of the several States, cannot perform any single function or exercise any single political power without in effect revolutionizing our whole system.

We recall these familiar truths, found on the face of the Constitution and expressed in its very words, because their import and effect seem to have lost their significance in some quarters.

### STATES ARE FREE, EQUAL, AND SOVEREIGN

It is undisputed that the States were free, equal, sovereign, and independent at the time of the formation of the Constitution; that each possessed all the powers which any government might rightfully possess. In the language of the Declaration of Independence, "they had full power to levy war, conclude peace, contract alliances, establish commerce, and to do all other acts and things which independent states may of right do."

As such States they formed a Union under the Articles of Confederation, and as such they withdrew from that Union, each for itself, by a separate ratification of the Constitution of the United States, and contrary to the will of at least two of their number. As we have said, it is probably immaterial whether we regard the historical truth—that the States formed the Federal Constitution—as a constitutional truth or not, for the main questions which depended upon that are settled. The truth is undeniable that each State, or the people of each State in their separate capacity as organized political communities, organized into States, possessed at the adoption of the Constitution all governmental power. It is equally true that, possessing these powers, they had the right to alter their governments, "and to institute a new government, organizing its powers in such form as to them shall [should] seem most likely to effect their safety and happiness." They did so alter and organize it, delegating each separate State, a part of its own

powers, to be exercised by the whole, i. e., the United States, and reserving each to itself separately; or to its people, the great mass of powers not delegated. The government thus formed was a government of each of the States, having jurisdiction to the fullest extent of the undelegated and unprohibited powers, and a Government of the United States. The Government of the United States meant no more than, and means no more now, than the common or general government of the States of Massachusetts, New York, Virginia, and the others united. The phrase "United States" means no more nor less than the 13 States then and the 38 States now, united for the purposes mentioned in the instrument of Union—the Constitution of the United States of America.

### POWERS CONFERRED ON UNITED STATES SUPREME

The common or general powers thus conferred on the whole (not any power usurped) are necessarily supreme as against any adverse separate State action. This resulted logically from the mere fact of the establishment of a common constitution, since the surrender by each State, or by the people of each, of powers to a common agency to be exercised by such agency for the good of all the States, necessarily implied an engagement on the part of each and all to submit to the exercise of the powers so surrendered by the agency appointed for all and by all. A lawful refusal to do this would be in itself a disruption of the common government thus formed, since it would leave this common government without authority to do the very thing for which it was established. The declaration in article 6, that "this Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land; * * * anything in the constitution or laws of any State to the contrary notwithstanding," is nothing more than the expression of what, without it, was an undoubted truth.

Speaking of the supremacy of the Government of the Union in *McCulloch v. Maryland* (4 Wheat. 405) Chief Justice Marshall said:

"This would seem to result necessarily from its nature. It is the Government of all; its powers are delegated by all, it represents all, and acts for all."

But whilst this is true, it is also true that this supremacy of the Constitution and of the laws and treaties authorized by it is expressly limited within the line which bounds the delegated powers. Beyond this the Government of the United States has no power whatever, and its acts outside of and beyond these powers are in law simply null, mere nothing. We quote on this point the expressive words of Chief Justice Waite, speaking for the Supreme Court in *United States v. Cruikshank* (92 U. S., p. 550):

"The Government thus established and defined is to some extent a Government of the States in their political capacity. It is also for certain purposes a Government of the people. Its powers are limited in number, but not in degree. Within the scope of its powers, as enumerated and defined, it is supreme and above the State; but beyond it has no existence."

Mark the expression—beyond its enumerated and defined powers "it has no existence."

### THE UNION IS VOLUNTARY AND OF EQUAL STATES

Another great truth lies at the foundation of the Constitution and which must never be forgotten or obscured in considering the relations of the several States under it with each other and with their common Government—the Government of the United States. It is that this Constitution under its formation the voluntary association of free and equal States, each free to go in or to stay out; each equal in its Federal and in its reserved rights; equal in dignity; equal in all political capacities. Each State acceding to it (or the people of each State, if that expression be preferred) claimed the capacity to discharge all its Federal duties arising under the Constitution, as well as its capacity to exercise all the powers of government reserved to it. This claim was acknowledged by each and by all, and was, in fact, the very basis of the Union as it was formed. If any one of the then existing 13 States had contrary convictions which rendered association and union with any of the others undesirable, it had the undoubted right to refuse accession to the Union. It had the undoubted power to decide this question for itself, and did decide it irrevocably when it ratified the Constitution. That decision involved and solemnly adjudged the essential truth that its co-States were such as it claimed itself to be, capable and willing to perform both their Federal and their separate State functions without the supervision or interference of others. As to new States, each original State which had acceded to the Union agreed by the Constitution itself—the supreme law of the land—to abide by the decision of the Congress of all the States, and each new State in accepting admission into the Union made the same concessions and admissions as to all the other States.

This great and fundamental truth, if it needed further support, has it in the terms of the Constitution itself. That they all agreed should be the supreme law of the land. That instrument not only owes its existence to the action of the people of the several States, but the continuous operation of the Government it established could come only from their voluntary action. The Constitution imposed duties on them the continued performance of which was essential to the Government, as has been shown. It contained no provision for a failure of any State to discharge its Federal functions, but it assumed that all would, and it left to each as a matter for its sole concern the discharge of its own separate State functions. It contained no provision for disfranchising States for a neglect of their duties, nor for compelling the States to perform them. It recognized no inequality and no incapacity, no contumacy in States, and made no provision and conferred no powers for such cases.

It imposed no restrictions or limitations upon the rights and power of one State that were not equally imposed on all the others. It prescribed no duties to the States with reference to their undoubted rights and powers over their own citizens. It secured no rights to citizens against adverse action or adverse nonaction of their State, except in the imposition of prohibitions on the exercise of a few arbitrary and despotic powers of government, which by the common consent of free people were deemed unsafe and unfit to be exercised by any government; and which we shall notice more particularly hereafter.

In the performance of this grand work—the creation of the Constitution of the United States, and of the Union under it—the grandest ever performed by any of the human race, there was, in the processes of its formation, in its express or implied provisions, no arrogated superiority, no assumed mastery on the part of any State, or the people of any State, over any other, and no distrust in the ability and good faith of any State or its people.

Massachusetts did not say to Virginia, "We distrust your ability or willingness to perform your Federal duties, or to govern in all that has not been surrendered by you to the common Government, nor prohibited to you and all other States alike;" nor did Virginia doubt Massachusetts in any of these things. There was mutual trust and confidence all around and on all sides. Without these the Constitution could not have been formed, and without them cannot be preserved. This confidence and trust were manifested in all that was done, and were attested and sealed by the declaration in the Constitution that it was the supreme law of the land, binding on all States, all magistrates, and all persons, and binding also on the agencies, the magistrates; the officers of the common Government.

This supremacy of the Constitution is universal, all-pervading, binding equally as to its negations, the reservations to the States as to the powers delegated to the Union, the things granted and the things not granted; binding as well to destroy, to make null, all that might be done or assumed to be done by the General Government outside of and beyond its powers, as to invalidate any State action within this exclusive domain. It was a double guaranty, as strong and as explicit against Federal usurpation of powers not granted as against State aggression on the delegated sovereignty of the Union.

We have now seen how the Constitution was formed, the spirit which animates its every clause and letter, the temper, the good faith of men and States, their confidence in their fellow men and co-States, the concession by each and all the States of the capacity and willingness of the people of each to discharge their Federal and National duties, and to exercise justly and fairly their reserved powers, and the entire absence of any provisions giving either to the common Government or to any of the States power to interfere in or control the administration in any State, of its reserved powers or jurisdiction. We may pause a moment to contrast this with the provisions of the present bill, which repudiates all this and seeks to establish an inquisition under national authority into the exercise by some of the States of their exclusive internal domestic jurisdiction. This inquisition is degrading to the States in which it is expected to be carried on; it impeaches their capacity and willingness to perform their separate and exclusive functions; it asserts, in the shape of a law, a supercilious and arrogant superiority on the part of some States over other States; it usurps a jurisdiction unwarranted by the Constitution.

### POWERS OF THE UNITED STATES ARE DELEGATED

Looking to the whole scheme of our complex system of Federal and State governments, we find that its primal, fundamental principle, the key to its exposition is, that the powers possessed by the United States are "delegated"—that is, given or granted to them—by some political organism or organisms and are in no sense inherent or original. Before any of these powers were thus granted there were no powers in the United States; in fact, no United States existed. The United States, as they now exist as a Government, were created by the Constitution. That instrument, in the act of making the States united under it, dissolved their union under the Articles of Confederation.

The tenth amendment, adopted almost contemporaneously with the Constitution, and designed to put into constitutional form a great truth, then recognized by all, so as to prevent mistake or misconception in all after-times, expressly declares that the powers possessed by the United States are "delegated," and all other powers not "prohibited" to the States are "reserved," not granted not given," but "reserved" to the "States respectively," not to the States in a mass, or aggregated, or united, but to the States "respectively," or to the people. The powers are not even said to be "vested" in the United States, when reference is made to their origin. They are only "delegated," and then they are said to be "vested" in the Government, and in its various departments, as a consequence of this delegation. The powers thus "delegated" are not the great mass of the powers of government, with exceptions in favor of the States, but they are enumerated, specified, written in the Constitution itself, and defined and limited by it.

### THE GENERAL SCHEME OF THE CONSTITUTION

The scheme of the Constitution was to make us "one people, with one common country, for all the great purposes for which it was established." (See Chief Justice Taney in *Passenger Cases*, 7 How. R. 283.)

These great purposes are expressed in the Constitution itself, in the powers delegated by it to the United States. These powers are plenary and exclusive as to all that concerns the people and States in their relations with foreign powers, both in peace and in war, including the making of treaties, the receiving and sending of ambassadors, ministers, and consuls; making war and concluding peace; intercourse and commerce with them; the protection of our people in foreign countries and outside of the jurisdiction of any State and on the high seas.

Secondly. The Federal powers extend to the regulation of relations between the States themselves and the citizens of each with the citizens of the others and between each of the States and the United States, covering commerce among the States, compacts between two or more of them, the duty of surrendering fugitives from justice and labor, the force and effect in other States of public records and judicial proceedings of each State; "the securing to the citizens of each State the privileges and immunities of the citizens of the several States," when in the jurisdiction of any State of which they are not citizens, leaving, however, to each State to determine and define the rights and privileges of its own citizens, and securing only these same privileges so defined by a State to citizens of other States when they are within its jurisdiction.

Thirdly. The power and duty to guarantee to each State a republican form of government, and to protect it from invasion or, on application of the State, from domestic and foreign violence. These were the great purposes for which the Constitution was formed, and adequate powers to attain them were granted.

All other powers delegated to the United States are either merely auxiliary to these great ends and for the support and maintenance of the common government or they are such as can conveniently and properly be exercised only by a government common to all the States. These auxiliary powers relate to the establishment of a uniform system of bankruptcy and naturalization laws; the power to coin money, to regulate its value, and the value of foreign coins in circulation here; to fix the standard of weights and measures; to grant patents and copyrights; to establish post offices and post roads; the power of taxation; to punish counterfeiting of the current coin and securities of the United States; to punish piracies and felonies on the high seas and offenses against the law of nations; to raise and support armies and support and maintain a navy, and certain powers over the militia.

These powers, in general terms, include all that are delegated to the United States. If we stop and consider them, we will see how few they are—great indeed in importance, unlimited in degree, but very limited in number. If we abstract from these powers all that relate to our intercourse with foreign nations—all that concern the relations of the States with each other, in their character as States, and their relations to the Union; all that relate only to the giving force, efficacy, and support to the United States in their exercise of their other powers—we will see how infinitely small in number are all the remaining powers, which concern only the rights, privileges, and convenience of private persons—private citizens when in the jurisdiction of a State.

These powers are:
(1) The securing to the citizens of the several States the privileges and immunities granted by any State in whose jurisdiction they may be to its own citizens.
(2) Jurisdiction over bankruptcy.
(3) Jurisdiction over naturalization.
(4) Jurisdiction over the currency.
(5) The power to establish post offices and post roads.

We look in vain to any of these powers for the power to enact this bill. But along with these powers come provisions which show the soul and spirit of the Constitution, and without which the Constitution becomes either a lifeless corpse, or, having energy and vitality, is an instrument only of oppression and wrong. These provisions recognize the absolute equality of the States, and secure fairness and impartiality in the exercise of the powers granted by the Constitution. Thus, direct taxes are required to be apportioned among the States according to their population, and all duties, imposts, and excises are required to be uniform throughout the United States; no preference is allowed in any regulation of commerce or revenue to the ports of one State over the ports of another; the levying of a tax on any article exported from any State is also prohibited, whereby the dangerous power of taxing articles mainly produced in one State or section and not in others is denied to the Government.

And then there is the great provision in article 5, which secures absolutely and forever the equal suffrage in the Senate of each State against even an amendment of the Constitution. Under this guarantee of equality Delaware, Rhode Island, and Nevada each have the same voice in this body as the great State of New York, and under it the six New England States, with a population entitling them only to 24 Representatives out of 325 allotted to all, have 12 Senators, whilst all the other States, with a population entitling them to 301 Representatives, have together only 64 Senators. New England has one Senator for a population entitling her to two Representatives, whilst the remainder of the States have one Senator to a population represented by 4.54 Representatives, or more than twice as much per capita of population.

POWERS PROHIBITED TO THE STATES

The scheme of the Constitution embraces not only a division of powers between the several States and the United States by delegation of certain specified powers to the latter, and a reservation of the others to the States, but it includes also the prohibition of certain powers to both. These powers, so far as they relate to persons, were deemed despotic in their nature, unjust in their operation, and contrary to the genius of free government; and hence, whilst prohibiting their exercise by the Federal Government, the States also surrendered them as a pledge of their fidelity to the great principles of republican liberty. Three of these powers related to the lives and liberties of persons, namely, bills of attainder, ex post facto laws, and the suspension of the great writ of habeas corpus; one to property, viz, laws impairing the obligation of contracts; and the other related only to the quality of persons in a free government, namely, the bestowing titles of nobility. These powers were refused to both. The power over contracts, however, was allowed to the Federal Government, indirectly in its power over bankruptcy.

There were some other prohibitions to the States, but they were manifestly introduced for the purpose of preventing a conflict between State powers and Federal powers, which might, but for the prohibition, have been concurrent. In all these there is not a pretense for the claim of the Federal Government to intervene between a State and its citizens for the protection and security of the great fundamental rights of persons and property and the pursuit and acquisition of happiness, all these being left to the care and protection of the States, except only in the four cases of habeas corpus, bills of attainder, ex post facto laws, and laws impairing the obligation of contracts. Of all the civil rights of men, and all the rights of person and property, only these above named, and no more, are entitled to Federal protection in favor of a citizen against his State; and this protection extends only to the prevention of State action in violation of them, as will be shown more fully hereafter. And not one of these rights is secured against State action; even in favor of citizens of another State, except to this extent: That citizens of other States should have from each State the like protection that it affords to its own citizens.

THE FIRST EIGHT AMENDMENTS

What we have said covers in general terms a description of the powers delegated to the United States and of those which were reserved by the States, as they existed under the Constitution when it was framed. It will be noted that whilst the Constitution contained an express grant and a specific enumeration of the powers vested in the Government of the United States, and that it was understood on all sides that no others could be exercised, except only such auxiliary powers as are necessary and proper to carry the enumerated powers into execution, yet it was, out of abundant caution, deemed necessary to insert in the Constitution certain prohibitions on the Federal Government. These prohibitions were deemed necessary lest Congress should claim these prohibited powers as necessary and proper in carrying out the delegated and enumerated powers.

It will be seen that not one of the powers prohibited is of the nature of a substantive and independent power, to be exercised solely to attain some end outside of the enumerated powers—some end which in itself and by itself was an object to be desired. But our forefathers had been familiar with bills or petitions of right in which certain great and fundamental rights were excepted out of the powers of government. It was complained that no such bill of rights was a part of the Federal Constitution. So in the very first Congress assembled under the Constitution, composed largely of the great statesmen who had been members of the Convention which framed the Constitution and of members of the several State conventions which ratified it, certain amendments were proposed. All of them which were ratified, as has been firmly settled, have reference solely to limitations and restrictions on the powers of the United States, the design and intent of all of them being to prevent Congress, in the exercise of its implied powers, from passing any law of the kind prohibited in the amendments.

This view is fully sustained by Mr. Madison's great speech in the House of Representatives advocating these amendments. (See Annals of First Congress, p. 432.) All the propositions of amendment looking to a restriction on the power of the States, including one offered by Mr. Madison securing against State action religious liberty and freedom of the press, and trial by jury, were rejected; thereby again affirming that all the great natural rights of man were to be left solely to the States for their definition and their security and protection.

RIGHTS SECURED AGAINST FEDERAL ACTION BY THESE AMENDMENTS

It will tend greatly to assist in understanding clearly and fully the nature of our system, and to mark the line clearly between State powers and duties on one hand and Federal powers and duties on the other, if we note here in general terms the great and essential rights which were secured against Federal invasion by these amendments, and yet were left wholly at the mercy, the will, and discretion of each of the several States, fixing, as they do, beyond controversy or dispute, the great underlying and fundamental principles of our system, that all civil rights, all rights of person and property, are left solely to the States.

These amendments, whilst leaving to the States unrestricted power, prohibited to the United States any power over and guaranteed the following against Federal action:

Freedom in religious belief and worship; freedom of speech and of the press; the right of petition; the right to bear arms; security against the quartering of soldiers in the people's houses; security against unwarrantable searches and seizures, against general warrant; security against trial for capital or infamous crimes unless on accusation by a grand jury; security against being put twice in

436                CONGRESSIONAL RECORD—SENATE              JANUARY 13

jeopardy for the same offense; security against being compelled to be a witness against oneself; security against being deprived of life, liberty, and property without due process of law; security against the taking of private property for public use without just compensation; the right of trial by jury in civil and criminal cases; the right of the accused in criminal trials to be confronted with the witnesses against him, to have compulsory process for witnesses in his favor, and the assistance of counsel in his defense; security against the requirement of excessive bail, and the imposition of excessive fines, and the infliction of cruel and unusual punishment.

### THESE GREAT RIGHTS ARE NOT PROTECTED AGAINST STATE ACTION

All these great rights are secured by the Constitution of the United States against Federal aggression only. So far as that Constitution and the powers of the Government established by it are concerned, these great rights are left for recognition, protection, and security to the States, which have sole and exclusive jurisdiction over them. They were then, and are now, in fact, protected against the action of the State governments and State agencies in all the States; but this protection and security came from provisions in the constitutions of each State, which the people of that State had of their own will ordained and established, and which that same people could alter and change at their pleasure, and thereby destroy the protection.

### SURVEY OF THE WHOLE SCHEME

And now, if we will take a survey of the whole, we see that this grand scheme of free government for the security of the rights and promotion of the welfare and safety and advancement of the happiness of the people of the United States is, in short, this:

First. A common government of all the States with exclusive jurisdiction and powers as regards foreign nations and all intercourse with them; with jurisdiction over the relations between the States as States and over commerce among the States and between them and foreign nations; over certain very limited powers whose influence and force ordinarily extend beyond State lines and could more conveniently be exercised by the common government; over the securing to the citizens of each State, when in the jurisdiction of another State, the same great fundamental rights which the latter State grants to its own citizens; a denial to the States of certain despotic and arbitrary powers in respect to personal and private rights, which are incompatible with free institutions, and the denial to the common government, in the exercise of its granted powers, the authority to invade certain great rights of private persons, as we have enumerated them; that all the powers of the common government were "delegated" and enumerated and all other governmental powers, not prohibited, were "reserved" to or kept back by the States; that the States—as they then existed, possessing all the power then reserved to them—were essentially the basis of the Federal system, without which it could not have the beginning of life, nor any subsequent existence; that these States were equal in power and dignity, and this equality is the essence of the whole scheme; that each was adjudged to be capable of discharging its Federal functions and of exercising without control or restraint from any quarter its reserved powers.

Second. That in this great mass of reserved powers in the States were embraced not only the protection and security of all the rights of life, liberty, and property, and the pursuit and acquisition of happiness, but also the unrestricted power to define and determine what these rights are, their extent and limit, and all the processes of law for their vindication. And in this mass of reserved powers are also all jurisdiction over the conduct of men, the conservation of morals, and the preservation of the public health. That as to all these the reserved power of each State was and is absolute, without other restriction than it shall itself see proper to impose on its own government, so far as its own citizens are concerned, and the same rule prevails as far as concerned citizens of other States within its jurisdiction, except only that by the Federal Constitution it is so bound that the measure it metes to its own citizens the same shall be meted to them.

This outline of the matters embraced in the reserved powers of the States would ordinarily be sufficient; but in this day, when there exists so great a tendency to belittle and to obscure the powers, duties, dignity, and importance of the States, and to look to the Federal Government to rectify all wrongs, to remedy all evils, to supply prosperity and to check adversity, to bestow wealth and to remove poverty, and to these ends to invoke its powers over interstate commerce and its powers of internal and external taxation, in order to build up one interest at the expense of another, to break down one rival interest for the benefit of another, to take charge of sanitation and inspection in the States, to control all that pertains to the good order and morals of the people, to grant subsidies and bounties from the common treasury or the common property to advance private interests, it may be well to specify in detail some of these great powers of government which under our constitutional system, are reserved exclusively to the States. This we will do at the risk of repeating in detail what has been stated in more general terms.

### SOME OF THE GREAT POWERS RESERVED TO THE STATES

In this grand jurisdiction thus reserved to or kept by the States is the entire power over all contracts; who may make contracts, and who are incapable of making them from want of mature age, or of mental capacity, or of freedom of will; the form in which they must be made; the evidence to establish or defeat them; their nature and obligations; the consequences of default in complying with them, and the sole remedies to enforce them amongst citizens of the same State. The sole power over marriage; who can contract it; the forms to be observed in celebrating it; the relative rights, powers, and duties of husband and wife toward each other and in the community; the causes and manner of its dissolution, and all the relations and mutual duties and powers and rights of parent and child; and superadded is the institution of the family (the unit and basis of our civilization) with the right to acquire and hold against adverse fortune the homestead for its shelter and conservation. The titles and tenures to all property of every kind; the modes and forms of its acquisition and transfer; how the right to it may be lost by neglect or acquiescence in wrong; what are injuries to it and the nature and extent of redress for such injury; by what rule it shall be enjoyed in life, and on the death of the owner how it shall descend and be distributed, and on what failure of blood it shall escheat to the State; the right to dispose of it by will, and by whom and in what forms wills must be made; whether entails or primogeniture shall be allowed, and to what extent property may be held in mortmain by corporations, and what rights, if any, corporations created in other States or in foreign nations shall enjoy in its jurisdiction; the civil status of all its people as to legitimacy or the contrary as affected by their birth, their education in youth, their civil rights, their qualification to vote and hold office, and their conduct in life, and their protection and security in life, liberty, property, and reputation; crimes against property, larceny, robbery, burglary, arson, malicious injuries and trespasses, cheats, embezzlements, forgeries, and the like; crimes against the person, assaults, batteries, mayhems, murder, seductions, false imprisonment, and all others; offenses against reputation and character, slander and libel; offenses against good order, good morals, and the health of the community; the great right of the free exercise of religious worship and freedom of religious belief and freedom of speech and of the press; all these and more of like character are solely within the jurisdiction and power of the States and depend on their laws and Government for preservation and protection. In short, the State authority meets the child at his birth, attends him through infancy; manhood, and old age, and at his death, and is sufficient, if wisely exerted, to secure to him all the blessings which make life desirable in this world, and the opportunity of gaining for himself, in his free exercise of his religious belief, a blissful hereafter.

### THE SUPREME COURT AFFIRMS THIS PRINCIPLE

The Supreme Court, in the *Slaughterhouse Cases* (16 Wall. R. 76), referring to and quoting from the great judgment of Judge Washington in *Corfield v. Coryell* (4 Wash., C. C. R. 371), and speaking of the great and fundamental rights which are left by the Constitution under the sole guardianship and protection of the States, said they are comprehended under the following general heads:

"Protection by the Government, with the right to acquire and possess property of every kind, and pursue happiness and safety, subject, nevertheless, to such restraints as the Government shall prescribe for the general good of the whole."

And the same Court, in the same case, referring to *Ward v. Maryland* (12 Wall. 430), say:

"This definition [above quoted from Judge Washington] was in the main adopted there, and it embraces nearly every civil right for the establishment and protection of which organized government is instituted. They are, in the language of Judge Washington, those rights which are fundamental, and they have always been held to be the class of rights which the State governments were created to establish and secure."

In the same case, the Court, treating of these same rights and exhibiting some impatience that a contrary opinion should be expressed, said:

"It would be the vainest show of learning to attempt to prove by citation of authority that up to the adoption of the recent amendments (thirteenth, fourteenth, and fifteenth) no claim was set up that those rights depended on the Federal Government for their existence or protection beyond the very few express limitations which the Federal Constitution imposed on the States, such, for instance, as the prohibition against ex post facto laws, bills of attainder, and laws impairing the obligation of contracts. But with the exception of these and a few other restrictions, the entire domain of privileges of citizens of the States, as above defined, lay within the constitutional and legislative powers of the States and without that of the Federal Government."

This is authority enough for this great and fundamental principle of the Constitution, which indeed is so patent and clear that the Supreme Court said it needed no authority for its support.

But this bill, sanctioned and recommended by the majority of the Committee on the Judiciary, attacks it—denies it. We will, right here, add another authority, and hereafter many more to support the Constitution against the assaults made on it by the provisions of the bill we are now considering. The authority we now refer to is the judgment of the Supreme Court in *United States v. Cruikshank* (92 U. S. Rep., p. 554). That great tribunal, in denying the validity of the statute of the United States providing for the punishment of a conspiracy to murder and imprison within a State, through Chief Justice Waite, said:

"The rights of life and personal liberty are natural rights of man. 'To secure these rights,' says the Declaration of Independence, 'Governments were established among men, deriving their just powers from the consent of the governed.' The very highest duty of the States, when they entered into the Union under the Constitution, was to protect all persons in their jurisdiction in the enjoyment of these 'inalienable rights with which they are

endowed by their Creator." Sovereignty for this purpose rests alone with the States."

It must be noted that both of these cases were decided after the adoption of the three recent amendments to the Constitution, and the last quotation was a judgment on the meaning of the Constitution as amended by them. But we will pursue that point no further now, our object being, in the regular and orderly discussion of this subject, to ascertain the meaning, force, and effect of the Constitution prior to the amendments, and then to note what changes they made in it.

### DUTY COMES FROM POWER

We have seen what are the powers of the two Governments, State and Federal. It is easy now to see their duties. Power to protect and duty to protect are inseparable, the latter following and deriving its source from the former. For power we must look to the Constitution; when it is found, the duty is also found; but the duty never extends beyond the power. Said Chief Justice Waite in the last case cited: "The duty of a government to afford protection is limited always by the power it possesses for that purpose."

### THAT DUTY COMES FROM POWER REVERSED

So far our way is plain. There are no doubts, no chances for mistake. The line separating the powers and duties of the Federal Government from the powers and duties of the State governments is plainly marked, and it is plain that the power to pass this bill does not lie on the side of the Federal Government.

But in the course of time the great and essential rule for the interpretation of the powers of a government to which we have just adverted, and which received the sanction of the Supreme Court in the language we have just quoted, that the duties of a government were limited by its powers, was in some sections of our country being reversed and the powers of our common Government were derived not from the Constitution and its delegations of power; but men, looking at wrongs and evils, or supposed wrongs and evils, exclusively from the standpoint of their moral nature, their own conception of right and wrong, derived the power to act from what they thus concluded it was their moral duty to do. And in this way, and founded on these principles, there arose a party in this country composed of men whose moral nature rebelled against all human wrong and incited them to aggressive warfare for its removal, and who in their zeal were guided alone by their conviction that wrong, sin, "the sum of all villainies," was tolerated and protected in certain States of the Union in which African slavery existed. They did not stop to inquire whether the Federal Government had the power to interfere. They did not consult the Constitution for Federal power, and, finding it, then deduce the duty to interpose. To them the wrong was patent, their duty clear, and as a consequence the power existed.

### THE CONSTITUTION BINDING IN ALL ITS PARTS

We shall not pursue the slavery agitation further. Suffice it to say that war came. It matters not for the purposes of this argument which side was right. The war ended, and as a consequence of it came the three amendments to the Constitution—thirteenth, fourteenth, and fifteenth. How they were placed there is wholly immaterial. They are there now as a part of the supreme law of the land. They are binding on all of us. Whether they were wisely or justly placed in the Constitution we shall not stop to inquire. Our inquiry is as to their meaning and force, and not into the methods of adoption. What we shall say in opposition to this bill we shall claim under the Constitution as thus amended; and in pleading as we now do for faith in compacts between the people of the States, for obedience to the Constitution in all its parts, and in its every syllable and letter, in the original and in the amendments, we do not propose to disparage it in any respect whatever.

It is to us no "covenant with death," no "agreement with hell," but the supreme law of the land, and as such we obey it in all its parts. We know of no higher law for American Senators, or for American citizens, than the Constitution. We know of no duties of the Federal Government beyond the powers it confers, and we recognize as binding on us, in letter and spirit, every duty imposed by it on the Congress of the United States.

### THE FORCE OF THE THIRTEENTH, FOURTEENTH, AND FIFTEENTH AMENDMENTS

We have now seen what was the nature of our system of government, the relative powers and duties of the Federal and State Governments under the Constitution, as it existed before the three amendments were adopted; and that under it, as it then existed, there was no power to pass this bill. We inquire now, whether the needed power has been conferred by these amendments. The task will be easy, since from this point on our way is marked out clearly by judicial decision. We shall do little more than refer to, quote from, and apply these decisions.

### THE SLAUGHTERHOUSE CASES

Happily for the country the first case in which the construction and meaning of these amendments came before the Supreme Court was one in which southern white men were seeking redress against one of those pernicious statutes then common in the Southern States by which those possessed of the State governments were making traffic and merchandise of their powers for the purpose of enriching themselves and their friends, namely, the *Slaughterhouse Cases* in 16 Wall. R. There was nothing in these cases to excite alarm or prejudice so far as the colored race was concerned and nothing to prevent a calm and careful consideration of the amendments. It is remarkable, too, that a Southern States' rights jurist of unequaled powers and great purity of character appeared before the Court, pressing for a construction of the amendments which, if adopted, would have been the fatal precedent upon which could have been built and would have been built a system of legislation which would have left, in the Southern States at least, no other control over their internal affairs than it should please Congress to give them. It is remarkable, too, that this construction was concurred in by the two Democrats who then held seats on the Supreme Bench, and that the narrower, yet the plainly true, construction of the Constitution was upheld by Republican judges only and vindicated in an opinion of unsurpassed ability.

In this opinion the great judge who drew it up, referring to the tendency created by the war in favor of more enlarged powers of the Federal Government, thought it necessary to say:

"But however pervading this sentiment, and however it may have contributed to the adoption of the amendments, we do not see in those amendments any purpose to destroy the main features of the general system. Under the pressure of all the excited feeling growing out of the war, our statesmen have still believed that the existence of States, with powers for domestic and local government, including the regulation of civil rights, the rights of person and property, was essential to the perfect working of our complex form of government, though they have thought proper to impose additional limitations upon the States and to confer additional powers on that of the Nation."

The fourteenth amendment provides, among other things, that "no State shall make or enforce any law which shall abridge the privileges and immunities of the citizens of the United States." And the main effort in that case by the appellants was to bring within the scope of the Federal Government jurisdiction to protect citizens against the exercise by a State legislature of a power to grant to a corporation an unjust and odious monopoly of the business of slaughtering livestock for food, and of receiving at their landing all livestock shipped to the parishes in which the city of New Orleans is situated—a territory embracing 1,154 square miles. It was urged in their behalf that this law deprived over 1,000 persons of the right to follow their vocation as butchers—a right which they had as citizens of the United States.

The Court, however, denied this claim, holding that there were two citizenships in our system—one of the United States and one of the State in which a citizen of the United States resides—that these two citizenships pertain to all citizens of the United States, who were also residents of any State; that the rights, privileges, and immunities of such a person as a citizen of the United States were separate and distinct from his rights, privileges, and immunities as a citizen of a State; that protection of the former alone was committed to the Federal Government, and of the latter to the State government; that each citizen of a State owed a double allegiance, namely, to the Federal Government, and to the State in which he resided; that he looked to the one for the security and protection of a part of these rights and to the other for protection in all the others; that both governments were parts of a complete whole, and both necessary to the protection and security of the citizen in all his rights, privileges, and immunities.

The Court then proceeds to enumerate the rights which pertain to a citizen in his character of citizen of the United States, and which we will here reproduce, so that by considering the actual examples a clearer insight may be had into their nature than could come from definition and description only.

### RIGHTS OF CITIZENS OF THE UNITED STATES ENUMERATED

They are as follows:

The right to come to the seat of Government to assert any claim he may have upon that Government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions.

The right of free access to its seaports, through which all operations of foreign commerce are conducted; to the subtreasuries, land offices, and courts of justice in the several States.

The right to demand the care and protection of the Federal Government over his life, liberty, and property when on the high seas or within the jurisdiction of a foreign Government.

The right to peacefully assemble and petition (Congress) for a redress of grievances, and to the writ of habeas corpus.

The right to use the navigable waters of the United States however they may penetrate the territory of the several States.

All rights secured to citizens by treaties with foreign nations.

The right to become a citizen of a State by residing in it.

Then, proceeds the court,

"There are rights which pertain to a citizen in his character of citizen of the United States, and are therefore subject to Federal jurisdiction and power, which grow out of prohibitions in the Constitution of the United States on State action; of such is the right to be absolved from all the consequences of bills of attainder, ex post facto laws, and laws impairing the obligation of contracts enacted by the States; and the right secured against prohibited State actions, as expressed in the three new amendments to the Constitution."

The court, on these principles, refused to give relief against the legislation of the State of Louisiana complained of.

### EFFECT OF THE GREAT JUDGMENT IN THE SLAUGHTERHOUSE CASE

This great judgment was the first beacon light that flashed across the gloom and darkness of constitutional exposition produced

438              CONGRESSIONAL RECORD—SENATE             JANUARY 13

by the events of the war. It recalled the great principles on which the Constitution was based, and pointed out the path of safety to be pursued. It is so clear in its argument, so convincing in its reasoning, that men wonder on reading it how they ever entertained any doubt about the true meaning of the Constitution as affected by the amendments.

### POWER CONFERRED BY THE AMENDMENTS RELATES ONLY TO STATE ACTION

This case was followed by others, in which the principles announced in the Slaughterhouse cases were followed to their logical conclusion in strict accord with the terms of these amendments. So far as the present argument is concerned it is only necessary to say that the power conferred on the Federal Government by these amendments was held to be the only power to enforce the prohibitions on State actions contained in them.

These amendments, so far as they relate to the questions now involved, consisted wholly of negations—prohibitions always on State action and sometimes on Federal action.

The language of the fourteenth amendment is:

"No State shall make or enforce any law which shall abridge the privilege and immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

And the fifteenth amendment ordains as follows:

"The right of the citizens of the United States to vote shall not be denied or abridged by the United States, or by any State on account of race, color, or previous condition of servitude."

It is now firmly settled that these provisions are directed solely against State laws and State action, through persons or agents clothed with State authority. It is also settled that the power conferred on Congress to enforce these provisions is a power only to enforce the prohibition against State action. That the rights conferred on persons under them are not positive, original rights, but the right only to exemption from, and protection against, the prohibited State action. And the power of Congress to interfere in any case is purely a power of correction, a power to give redress against a prohibited State action, that the exercise, the actual exercise of efficient power by Congress, under the amendments, presupposes State action of the kind prohibited; and until there be such prohibited State action, the power of Congress is wholly dormant, and without such action really being taken, somewhere or at some time, the power of Congress would sleep forever.

In no case under these amendments, so far as the present controversy is concerned, can the power of Congress be made to reach, either for punishment or correction, or redress in any way, civil or criminal, the acts of private individuals. On this last point the controversy was long between a sectional majority in Congress and the Constitution, but in the end the Constitution triumphed fully, completely. It would be interesting to trace the progress of the decisions of the court from the first to the last case in evolving, as the facts of each case warranted, the true meaning of these amendments. To do this would detain us too long. But it is well here to quote some of the expressions of the judgments in these cases, showing truths of a fundamental character.

### QUOTATIONS FROM THE SUPREME COURT

#### United States v. Cruikshank

Chief Justice Waite, in delivering the opinion of the Supreme Court in *United States* v. *Cruikshank* (92 U. S., p. 555), speaking of the provisions in the fourteenth amendment, prohibiting the States from denying to any persons within their jurisdiction "the equal protection of the laws," said:

"This provision does not, any more than the one which precedes it, and which we have just considered (namely, the provision prohibiting a State from depriving any person of life, liberty, or property, without due process of law), add anything to the rights which one citizen has under the Constitution against another. The equality of the rights of citizens is a principle of republicanism; every republican Government is in duty bound to protect its citizens in the enjoyment of this principle, if within its power. That duty was originally assumed by the States, and it still remains there. The only obligation resting upon the United States is to see that the States do not deny the right. The amendment (the fourteenth) guarantees this, but no more. The power of the National Government is limited to the enforcement of the guaranty."

And on this ground the Supreme Court in that case held that the United States had no power to punish a conspiracy to commit murder, or to falsely imprison a citizen, and none to punish false imprisonment or murder itself. This case was decided in 1875, and was the logical outcome of the principles announced in the Slaughterhouse cases, decided in 1872, and—*Bartemeyer* v. *Iowa* (18 Wall. 130), *Minor* v. *Happersett* (21 Wall. 162), *United States* v. *Reese* (92 U. S.), also decided in 1875.

In the same line was the decision in *Strauder* v. *West Virginia*, decided in 1879.

#### Virginia v. Rives

At the same term was decided *Virginia* v. *Rives* (100 U. S. R., 313), in which the Supreme Court remanded to the State court a criminal case which had been removed to the Federal court upon the ground that the subordinate State officers, in violation of the law of the State, had discriminated against the accused, who was a colored man, in declining to summon on the grand jury which indicted, and on the panel which was to try him, any person of his race. Justice Strong, speaking for the court, and quoting all the provisions of the first section of the fourteenth amendment (except the first clause, which defined citizenship), said:

"They all have reference to State action exclusively, and not to any action of private individuals. It is the State which is prohibited from denying to any person under its jurisdiction the equal protection of the laws, and hence the statute above referred to (secs. 1777 and 1778 of the Revised Statutes) are intended for protection against State infringement of those rights."

#### Ex parte Virginia and Neal v. Delaware

At the same term of the Court it was decided the case of *Ex parte Virginia* (100 U. S.). In this case the Supreme Court affirmed the constitutionality of an act of Congress punishing a subordinate State officer, acting as such, and exercising a State power, conferred on him by State laws, for denying to a colored man the equal protection of the laws, but the Court reaffirmed, in the most explicit language, the doctrine, that the first section of the fourteenth amendment referred alone to State action. On this point the Court repeated:

"The prohibitions of the fourteenth amendment are directed to the States, and they are to a degree restrictions on State power. It is these (restrictions on State power) which Congress is authorized to enforce, and to enforce against State action."

The Court further held that this power of Congress to enforce the prohibitions and restrictions on State action extended to all kinds of State action, "however put forth, whether that action be executive, legislative, or judicial," and therefore it was in the power of Congress to punish State ministerial officers who, clothed with State power, exercise that power in violation of these prohibitions on State action. On this point the Court used this language:

"Whoever, by virtue of public position under a State government, deprives another of life, liberty, or property, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibitions, and as he acts in the name of and for the State, and is clothed with the State's power, his act is that of the State."

*Neal* v. *Delaware* (103 U. S. 370), decided in 1880, follows in the same line.

Up to this point it seems clear enough, in fact, beyond controversy, that the power conferred on Congress by the amendments did not extend to dealing with private persons for their individual acts, in contravention of the rights which followed from the prohibitions in the amendments. But so tenacious is usurped power of its unjust and unconstitutional prerogatives; so strong the sentiment that power comes from supposed or assumed moral duties, and not duties from power granted by the Constitution; so long had the Southern States suffered without successful resistance from unconstitutional dominance in their domestic and internal affairs, reserved to them by the Constitution, that the devilish spirit of intermeddling would not down at these repeated decisions of the Supreme Court. This spirit takes possession of even men of good intentions, if they have associated with it an intense egoism and strong convictions of their own superior personal purity and wisdom and a distrust of the virtue and capacity of others, and it arrogates to itself the guardianship and control of the world. So it became necessary for the Supreme Court to make another decision, reaffirming again and enforcing the true principles of the Constitution, as they had been announced in their former judgments.

#### United States v. Harris

In 1882 the case of *United States* v. *Harris* (106 U. S., p. 629) was decided. That case was an indictment under section 5519, Revised Statutes, which was in the following words:

"If two or more in any State or Territory conspire, and go in disguise upon the highways or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving to all persons within such State or Territory the equal protection of the laws, each of said persons shall be punished by a fine, and so forth."

The indictment charged certain private citizens of Tennessee with taking certain other citizens of the State from the custody of the sheriff who held them for trial on a criminal charge, and with beating, wounding, and maltreating them, and killing one of them, and thereby depriving them of an equal protection of the laws of the State. The Supreme Court, as if wearied by the compulsory reiteration of principles already well settled, delivered a very elaborate and learned opinion, drawn up by Justice Woods, and again confirmed the true construction of the Constitution already fixed by the preceding cases. The Court deemed it necessary again to enforce the old maxim of constitutional construction by quoting from Judge Story that which, up to the war, had never been doubted as a fundamental canon of constitutional law, thus:

"Whenever, therefore, a question concerning the constitutionality of a particular power arises, the first question is whether the power be expressed in the Constitution? If it be, the question is decided. If it be not expressed, the next inquiry would be whether it be properly incident to an express power and necessary to its execution, etc." (Story on the Constitution, sec. 1243).

The Court then, proceeding on this canon of construction, quote and discuss all the various provisions of the Constitution on which this legislation (sec. 5510) and the indictment founded on it could possibly have been based, namely, the thirteenth, fourteenth, and fifteenth amendments, and section 2, article IV, which we have before noticed as guaranteeing to the citizens of the several States

CASE 0:16-cv-02547-SRN-LIB   Document 183   Filed 03/04/19   Page 11 of 19

the privileges of citizens in each State, and find that none of them is a warrant for this legislation. Referring to the first section of the fourteenth amendment (hereinbefore noted as containing the prohibitions to the States), and to the fifth (giving power to Congress to enforce them), the learned judge quotes from the Slaughterhouse cases, as follows:

"If the States do not conform their laws to its requirements (of fourteenth amendment), then by the fifth section of the article of amendment Congress was authorized to enforce it by suitable legislation."

And he quotes and adopts the following expressive language of Mr. Justice Bradley in the Cruikshank case when it was tried in the circuit court (1 Woods, 308):

"It [the fourteenth amendment] is a guaranty against the acts of the State government itself. It is a guaranty against the exercise of arbitrary and unconstitutional power on the part of the government and legislation of the State, not a guaranty against the commission of individual offenses; and the power of Congress, whether express or implied, to legislate for the enforcement of such a guaranty does not extend to the passage of laws for the suppression of crime within the States. The enforcement of the guaranty does not require or authorize Congress to perform the duty that the guaranty itself supposes it to be the duty of the State to perform."

And quoting from the same case when, in the Supreme Court, he again announced the doctrine that "the obligation resting upon the United States is to see that the States do not deny the right. This the amendment guarantees, and no more. The power of the National Government is limited to the guaranty." And he also repeated what was said in *Virginia* v. *Rives*—"that these provisions of the fourteenth amendment had reference to State action exclusively."

And having shown that the fourteenth amendment did not warrant the legislation, the court continues, in the following unanswerable argument, to show that these amendments and the rights secured by them cannot be violated by private persons, and hence congressional action under these amendments cannot be directed against nor operate upon private persons:

"A private person cannot make constitutions or laws, nor can he with authority construe them, nor can he administer or execute them. The only way, therefore, one private person can deprive another of the equal protection of the laws is by the commission of some offense against the laws which protect the rights of persons, as by theft, burglary, arson, libel, assault, or murder. If, therefore, we hold that section 5519 (before quoted) is warranted by the thirteenth amendment, we should, by virtue of that amendment, accord to Congress the power to punish every crime by which the right of any person to life, liberty, property, or reputation is invaded. Thus, under a provision of the Constitution which simply abolished slavery and involuntary servitude we should, with few exceptions, invest Congress with power over the whole catalog of crimes. A construction of the thirteenth amendment which leads to such a result is therefore unsound."

THESE DECISIONS SETTLED THE MEANING OF THE CONSTITUTION

This last decision would seem to close the door against all controversy as to the meaning of the three amendments and the powers of Congress under them. It, in connection with the preceding decisions of the Supreme Court, did settle, if anything can be settled in American constitutional law, that the power and consequent duty of protecting life, liberty, and property, all personal and property rights, the power to punish all invasions of them, all offenses against persons and property, remained exclusively with the States; that so far as power was conferred by the Constitution on the United States to interpose in these matters it was solely a power to prevent or correct State action of the kind prohibited, namely, State action depriving a person of life, liberty, or property without due process of law; that is, without due process of State law, not of Federal law, but of State law; and denying to any person the equal protection of the laws, of the State laws, for there were no other laws which could protect them; and that so far as Congress had the right under the clauses conferring jurisdiction to enforce the amendments to pass laws to operate directly or indirectly, it was a power to restrain and correct State action, performed by State officers and agents clothed with State authority, and to punish such officers and agents for their official and public action done in the name and by the authority of the State, and did not reach the acts and conduct of private individuals.

THE CIVIL RIGHTS LAW AND ITS PROMOTERS

But the spirit of aggression on State authority, where that aggression would operate efficiently and offensively on the Southern States, the temper to intermeddle with the concerns of others, and to badger and insult them in that which related not only to their public conduct but also in their private and social relations, would not acquiesce in the defeat thus received at the hands of that august tribunal. In the year 1875 a law was enacted to enforce in public places, theaters, inns, and railroad cars, and on steamboats, a social equality between the two races.

The law was not obeyed anywhere. The colored people of the South in the main did not approve it; they were not inclined to force an association for which neither race felt any desire; they were content to leave to time, to the regular working of social forces, the regulation of social intercourse and social duties. Yet here and there all over the country were found those of that race—few indeed—mostly of mixed blood, who took advantage of the provisions of the statute. From this it resulted that, in some instances, criminal prosecutions were commenced under the statute; and civil suits for damages instituted for a violation of its provisions.

THE CIVIL RIGHTS CASES

Both classes of these came before the Supreme Court in December, 1883, and are reported under the name of "Civil Rights Cases" (in 109 U. S. R., p. 3). The statute under which these cases arose was passed March 1, 1875 (sec. 18 Stat., p. 335), and is as follows:

"SECTION 1. That all persons within the jurisdiction of the United States shall be entitled to the full and equal enjoyment of the accommodations and advantages, facilities and privileges of inns, public conveyances on land or water, theaters, and other places of public amusement, subject only to the conditions and limitations established by law and applicable alike to citizens of every race and color, regardless of any previous condition of servitude."

Section 2 provided penalties and punishments for any person violating the first section.

The statute was adjudged unconstitutional; this result was reached by an opinion drawn up by Mr. Justice Bradley, distinguished for the clearest analysis, the most unanswerable reasoning. Time will not allow us to set out the substance of the argument of this great judgment; we can only quote from it a few short extracts, which are most directly pertinent to the question before us. The Court quoted from and confirmed the cases which had been decided, holding that the fourteenth amendment applied to State action alone; explained the fourteenth and fifteenth amendments, and in reference to the jurisdiction of Congress to exercise direct and positive power, in contradistinction to power merely corrective of prohibited State action, among other things said:

"It is State action of a peculiar character that is prohibited: individual invasion of individual rights is not the subject matter of the amendment. It has a deeper and broader scope. It nullifies and makes void all State legislation and State action of every kind which impairs the privileges and immunities of citizens of the United States, or which deprives them of life, liberty, or property without due process of law, or which denies to them the equal protection of the laws."

And speaking of the fifth section, which gives Congress the power to enforce this, the Court continues:

"To enforce what? To adopt appropriate legislation for correcting the effect of such prohibited State laws and State action, and thus to render them effectually void and inoperative; this is the legislative power conferred on Congress, and this is the whole of it. It does not invest Congress with power to legislate upon subjects which are within the domain of State legislation, but to provide against State legislation and State action of the kind referred to. It does not authorize Congress to create a code of municipal law for the regulation of private rights, but to provide modes of redress against the operation of State laws and the action of State officers, executive and judicial, when these are subversive of the fundamental rights specified in the amendment. Positive rights and privileges are undoubtedly secured by the fourteenth amendment, but they are secured by way of prohibition against State laws and State proceedings opposing these rights and privileges, and by power given to Congress to legislate for carrying such prohibition into effect, and such legislation by Congress must necessarily be predicated upon such supposed State laws and State proceedings and be directed to the correction of their operation and effect."

This is clear enough, but the court emphasized the decision again in this extract:

"Until some State law has been passed, or some State action, through its officers or agents, been taken adverse to the rights of citizens sought to be protected by the fourteenth amendment, no legislation of the United States under said amendment, nor any proceeding under said amendment, can be called into activity; for the prohibitions of the amendment are against State laws and acts done under State authority."

And again the court, in denying the power of Congress under these amendments to legislate on the subject of the violation by private persons of rights secured by them, use this language:

"Civil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals unsupported by State authority in the shape of laws, customs, or judicial or executive proceedings; the wrongful acts of an individual unsupported by any State authority is simply a personal wrong, or a crime of that individual, an invasion of the rights of the injured party, it is true, whether they affect his person, his property, or his reputation; but if not sanctioned in some way by the State, or not done under State authority, his rights remain in full force, and may presumably be vindicated by a resort to the laws of the State for redress. An individual cannot deprive a man of his right to vote, to hold property, to buy or sell, to sue in the courts, to be a witness or a juror; he may by force or fraud interfere with the right in a particular case; he may commit an assault against the person or commit murder, or use ruffian violence at the polls, or slander the good name of a fellow citizen; but unless protected in these wrongful acts by some shield of State law or State authority, he cannot destroy or injure the right; he will only render himself amenable to satisfaction or punishment, and amenable therefor to the laws of the State where the wrongful acts are committed.

"When the Constitution seeks to protect rights against the discriminative and unjust laws of a State by prohibiting such laws, it is not individual offenses but abrogation and denial of rights

which it denounces and for which it clothes Congress with power to provide a remedy. The abrogation or denial of rights for which the States alone were, or could be responsible, was the great seminal and fundamental wrong which was intended to be remedied; and the remedy to be provided must be predicated upon that wrong. It must assume that in the cases provided for, the evil of the wrong actually committed rests upon State law or State authority for its exercise or perpetration."

### COMMENTS ON THESE CASES

This closes what we have to say on the subject of judicial exposition by the Supreme Court of the powers of Congress, so far as they relate to the subject-matter of this bill. These cases prove beyond controversy that Congress has no direct power or jurisdiction over the main points in the bill. Congress can pass no law upon the subjects of personal conflicts between private individuals of different races and personal wrongs perpetrated by one on the other; or between persons of different political parties; or wrongs done by one party man on another because of opinions which the injured party may entertain or express. We suppose this much is conceded by the authors of the bill, or else they would have provided directly for the redress of the wrongs and the punishment of the offenders.

The authors of this bill have not been backward in asserting power in Congress over subjects cognate to those mentioned in this bill. Independent of any support which they may have given to the many acts of Congress which may have been decided unconstitutional by the Supreme Court in the cases we have referred to (and about which we have made no inquiry and therefore make no assertion), they have introduced bills in this body, contemporaneously with the decisions in the Civil Rights cases, which contained assertions of the extremest power over these subjects. One of these, introduced by the learned chairman of the Judiciary Committee (the Senator from Vermont) on the 4th of December, 1883, and reported back from the committee by the Senator from Massachusetts [Mr. Hoar] on July 20, 1884, indicates no want of faith in the unlimited power of Congress to legislate wherever colored people are concerned; yet this bill was never called up for action, and now sleeps the sleep of death. Whether it was abandoned from a change in the views of its authors as to its constitutionality or not, we are unable to say.

Certainly it was a very extraordinary bill in all its provisions. Its main object was to withdraw from the consideration of the State courts all cases in which was litigated any right for the settlement of which it was necessary to pass upon the race or color or previous condition of servitude of any person whatever. It further contained the degrading provision that authorized a citizen of the State in which the court sat to stop a trial in which he was a party and of his own mere will to remove it to a Federal court if he should be dissatisfied with a decision of any point made against him. A power so degrading to a court was never allowed in a free country to a mere suitor. Long years ago in England the writ of prohibition issuing from a superior court to an inferior was sometimes delivered to the inferior court during the trial, though it was always issued before; and by this proceeding a trial already commenced was stopped and removed to another court. But this was condemned by the English Parliament in the reign of Elizabeth, 300 years ago, and driven in disgrace from practice, and has so remained ever since.

It was left to the bill to which we have already referred to make the attempt for the first time to introduce the practice here, with the superadded wrong of leaving it to the discretion of a party in court to menace and insult the judge by an immediate removal of the case if he should dare to decide a question against him.

### BILL UNCONSTITUTIONAL FOR A MERE INQUEST

It is no defense to the constitutionality of this bill that it assumes no jurisdiction, no power over persons to punish or restrain them; but simply directs the court to make an inquest or inquisition concerning crimes committed in a State and whose trial and punishment are solely in that jurisdiction. The question for our decision is, Have we the power to pass the bill? not whether the bill proposes nothing of effective force; not whether it be a mere impotent abortion, neither securing rights nor preventing wrongs.

It is no excuse in a constitutional point of view, even if it be true, that the bill does not invade effectively the domain of the reserved rights of the States, or is wholly innocuous from mere impotency and want of vigor. We must look to the Constitution for the power. It is certain the power to pass this bill is not among the express powers of the Constitution. No one pretends that. If it be claimed as an incidental power, then its advocates must point out the express power or powers for carrying out which this bill is necessary and proper or appropriate. This cannot be done. We challenge them to do this. Besides, mere impotency—mere inutility—condemns it as an incidental power, for only implied powers are granted by the Constitution, which are useful and effective, or, in constitutional language, "necessary and proper for carrying into execution" the powers expressly granted. So if it be ineffective and useless, for that reason alone it is unconstitutional. But conceding it to have force, as it has, the inquisition proposed in it, so far as it relates to injuries by private individuals, to persons and property (and that is the whole of it), is an inquisition into the conduct of persons, into crimes and offenses exclusively within the jurisdiction of the State. Whatever may be the information obtained by it, however calumnious and unjust to private citizens, to whom it gives no opportunity of defense, it cannot be made the basis of Federal action in the matters which constitute its soul and spirit.

### POWER TO INQUIRE LIMITED BY THE JURISDICTION OVER THE SUBJECT

It was settled at an early day by the action of no less an authority than that of George Washington, that the jurisdiction of the legislative branch of the Government to make official inquiry, under the sanction and force of law, was limited by its power to act on the subject matter concerning which the inquiry was made. The Senate will remember that on March 12 last the Senator from West Virginia, in the debate on the relations between the President and this body, produced a message from George Washington, in which he declined to furnish certain information at the request of the House of Representatives upon the express ground that the House had no power over the subject to which the information related. In that message General Washington stated the grounds of his refusal in these words: "As, therefore, it is perfectly clear to my [his] understanding that the assent of the House of Representatives is not necessary to the validity of a treaty, and as the treaty with Great Britain exhibits in itself all the objects requiring legislative provision, and on these the papers called for throw no light, and as it is essential to the administration of the Government that the boundaries fixed by the Constitution between the different departments should be preserved," and is it not equally as important that the boundaries fixed by the Constitution between the Federal and State governments should be preserved? But we proceed with the quotation, "a just regard to the Constitution and to the duties of my office, under all the circumstances of this case, forbid a compliance with your request." What the Constitution forbids to be answered it equally forbids to be asked; what it forbids to be asked it forbids shall be obtained by force and through irresponsible power.

### THE BILL IS NOT IMPOTENT AND HARMLESS

But the bill is not even entitled to the defense of being entirely impotent and harmless. Impotent it is for all the purposes of good and orderly government, but it has extraordinary vigor for evil. It establishes an unwarranted Federal espionage over matters confided exclusively to the jurisdiction of the States; it invites and encourages irresponsible and discontented persons to subject the conduct of their neighbors, their fellow citizens, to an investigation and scrutiny by a tribunal before which these persons thus slandered, thus maliciously accused, have no opportunity of appearing, either by themselves or counsel, or of summoning witnesses, or cross-examining those who speak against them. It is true the tribunal has no power to render judgment against them which will affect their lives, their liberty, or their property; but it has the power in an ex parte, inquisitorial way of giving official form and body and substance to accusations which there has been no opportunity to meet, to destroy character, and to blacken the names of citizens who are not heard in their own defense; to stamp as genuine and true slanders and libels; to give currency to blackguardism and perjury. It is true it accomplishes nothing in the way of enactments against personal rights, but, like a thief, it stealthily surveys the ground of future operations with the view of taking advantage of a more favorable opportunity for outrage and wrong.

Considering the tendency of this bill, its usurpation of a jurisdiction over private and personal rights, reserved to the States for their security and protection; considering also its capacity as a vehicle of calumny and slander, and its tendency to destroy the respect and confidence of the people in constitutional guaranties and official justice, it may be well to denounce it as no common or insignificant violation of the Constitution.

It destroys the whole scheme of the Constitution; it does not enter the vestibule merely and deface or destroy some slight ornament, but it saps and undermines the foundations of the temple itself.

### THE BILL UNCONSTITUTIONAL IN ITS MEANS AS WELL AS IN ITS ENDS

But the bill is still further objectionable in that it seeks to attain unconstitutional ends by unconstitutional means. It was probably fit that this work of espionage, this inquisition into the conduct of persons over whom we have no jurisdiction, this usurped function to try citizens in their absence, to condemn without hearing, to circulate and give support to slander and calumny, should be prosecuted by a perversion to the work of injustice and wrong of the powers of that department which was more especially dedicated by the Constitution to the administration of right and justice. It would be a terrible but just retribution for our infidelity to the Constitution, that if that great charter, for mere party advantage, is to be destroyed, the rights of the States subverted, the rights of citizens to be trodden down, that the instrument selected for these wicked ends should be that especial organism in our system to whose virtue and intelligence were committed the protection and preservation of all these which this bill appoints it to destroy.

### THE POWER CONFERRED ON THE COURTS IS NOT JUDICIAL

The power committed by this bill to the circuit courts is not a judicial power of the United States, and none but judicial power can be vested in a court of the United States.

The Constitution declares that "the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish." The Constitution in another place authorizes Congress to confer the power of appointing certain inferior officers on the courts

of the United States. Beyond this there is no power to confer on any court of the United States any power but judicial power, nor any judicial power but judicial power of the United States. That power is defined in the Constitution itself, and, so far as it can have any possible relation to this bill, is embraced in the following words:

"The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority."

It must be noted that the language used is "cases," not "questions," arising under the Constitution and laws of the United States. The distinction between "questions" and "cases" is important and well settled. The jurisdiction is in "cases." A case arises only when some question respecting the Constitution and laws "shall assume such form that the judicial power is capable of acting on it. That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law," said Chief Justice Marshall in *Osborn* v. *United States Bank* (9 Wheat. p. 819).

The same great judge, in his argument in the Jonathan Robbins case in the House of Representatives in March 1880, made this matter still more plain. Referring to certain resolutions then before the House, in which it was declared that the judicial power extended to all "questions" arising under the Constitution and laws and treaties, he called attention to the fact that the Constitution used the word "cases," not "questions," and he then said:

"The difference between the Constitution and the resolutions was material and apparent. A 'case in law or equity' was a term well understood and of limited signification; it was a controversy between parties which had taken a shape for judicial decision. * * * By extending this judicial power to all cases in law and equity the Constitution had never been understood to confer on that department any political power whatever. To come under this exception a question must assume a form for forensic litigation and judicial decision. There must be parties to come into court who can be reached by its process and bound by its powers; whose rights admit of ultimate decision by a tribunal to which they are bound to submit." (See Annals of Sixth Congress, p. 606.)

It is clear that this bill is unconstitutional, for not only is there no "case" in which a court can act, but there is not even a "question" arising under the Constitution, or any law or treaty of the United States. The questions are such only as a party majority may ask, and they concern only the conduct of parties which may be supposed to violate some laws of a State, over which the Federal Government has no jurisdiction whatever. Not only does the jurisdiction fail, because there is no case before the court of any kind arising out of a Federal or State law, but because the power conferred by the bill on the circuit courts is not of itself judicial in any sense whatever. Keeping in mind what has already been quoted from Chief Justice Marshall, let us consider some authorities which treat of judicial power, in its essence and nature, whenever and wherever it is exerted.

In *Shultz* v. *McPheters* (79 Ind. R., p. 378) the supreme court of that State say:

"It is the inherent authority not only to decide but to make binding orders and judgments, which constitutes judicial power."

And the Supreme Court of Michigan in *Underwood* v. *McDuffie* (15 Mich. R. 368), said:

"The judicial power, even when used in the widest and least accurate sense, involves the power to hear and determine the matters to be disposed of; and this can only be done by some order or judgment which needs no additional sanction to entitle it to be enforced."

And the court proceeds to condemn in totidem verbis the things which this bill authorizes and requires to be done. Say the court:

"No action, which is merely preparatory to an order or judgment to be rendered by some other body, can be properly termed judicial."

A learned commentator on the Constitution, discussing this subject, says:

"In order to make a case for judicial action, there must be parties to come into court, who can be reached by its process and bound by its powers—parties whose rights admit of ultimate decision by a tribunal to which they are bound to submit; and also that the question to be acted on should be capable of final determination in the judicial department of the Government, without revision or control of either the Executive or Legislature." (Curtis' Com., p. 96.)

And another learned commentator says:

"The kind of authority that is judicial in its nature relates to and acts on rights of person and property not created by this authority, but under existing law. This authority, 'in specific controversies' between parties, determines these rights as they exist, and does so at the instance of a party. These qualities distinguish judicial power from what is simply executive or legislative." (Spear on Const., p. 3.)

Tested by these rules, there can be no doubt that the power attempted to be conferred by this bill on the circuit courts is not of the kind which they are authorized to receive, namely, judicial power. This bill provides only for the summoning of witnesses at the instance of persons claiming no rights and seeking redress for no wrongs, and then for examining them concerning the circumstances of an alleged homicide or serious injury to person or property consummated or threatened.

There is no controversy before the court for its determination; there are no parties over whom it has power, or who, on the one hand, ask for a recovery of rights, or who, on the other, deny or contest rights demanded against them. The court hears nothing, deliberates on nothing, determines nothing; it renders no judgment, it restores or redresses no right and remedies no wrong. The court only hears evidence concerning a matter over which it has no jurisdiction and reports to another department its conclusions as to facts about which the court itself has no right to form a judgment. The sole power of the court is to report to the President its opinion as to the existence of certain facts which it is alleged are criminal by the laws of the State in which they transpired. The sole function of the court is to act as a detective for the Executive, to enter into a sovereign State to inquire into the conduct of its citizens, and to gather from common informers, in some instances, their impressions or beliefs, but in others their calumnies and slanders. These witnesses are not to be confronted by the persons whom they accuse, nor to be cross-examined to test either their accuracy or their sincerity.

That is all of it.

ONLY JUDICIAL POWER CAN BE CONFERRED ON COURTS OF UNITED STATES

It is not a new or doubtful question as to the power of Congress to confer on any of the constitutional courts of the United States—the Supreme Court, the circuit court, or the district court—any authority or function not judicial. The question arose early during the administration of General Washington, under an act of Congress authorizing the circuit courts to inquire into the justice of certain claims for pensions. All the Supreme judges acting on the circuit (except Mr. Justice Johnson, and as to him there is no information) held the act unconstitutional upon the ground that the power was not judicial, inasmuch as the adjudication was not to be final, but was to be reported to the Secretary of the Treasury. Some of the judges, however, concluded they would—acting as commissioners and not as judges in court—perform the duty assigned to them under the act. Congress and the President being informed of the opinion of the judges, the act was repealed, saving in the repeal, however, all rights to pensions founded on "any legal adjudication."

A case, during the next year, came up in the Supreme Court, in which the validity of an adjudication made by the judges, as commissioners, was the only point involved, and that Court unanimously held that the act conferring the power on the circuit courts was unconstitutional, and that, as the power was conferred on the courts, it could not be exercised by the judges as commissioners. (See *Hayburn's Case*, 2 Dall.)

In the bill before us, it must be noticed that the power is conferred on the circuit court, not on the circuit judge. This was done ex industria by the Judiciary Committee, for the bill as originally introduced conferred the power on the judge, and by the Judiciary Committee it was amended as it now appears. The change was made for the purpose, as it was stated, of having a court rather than a mere judge, so that the laws empowering courts to use compulsory process for the attendance of witnesses and punishing them for contumacy might apply.

But if the bill should be amended so as to stand as it originally was, to give this power to the judge acting as a commissioner merely, it would still be liable to the objection of being unconstitutional, notwithstanding the judge might himself waive his objections and consent to act. In that case the bill would mean that every judge of a circuit court in the United States should be thereby appointed a commissioner to discharge the duties mentioned in the act. This would be an appointment to office by Congress, and not, as the Constitution requires, by the President by and with the advice and consent of the Senate. This view received the express sanction of the Supreme Court in *United States* v. *Ferreira* (13 How. 40).

In that case Chief Justice Taney, in a very able and learned opinion, reviewed this whole subject. A law of Congress had committed to the district judge for the district of Florida the power and duty of examining certain claims against the United States for losses sustained by certain Spanish citizens. This law was passed in pursuance of a treaty with Spain. That judge, after examining the witnesses for and against each claim, was required to make his decision and report it to the Secretary of the Treasury, who, on being satisfied that the claim was right and just, was to pay it. On an appeal from a decision so made by the judge, the Supreme Court of the United States held that the power granted was not judicial, it being not final, the award of the judge being subject to revision by the Secretary of the Treasury. The Court, speaking of the powers conferred by the act on the district judge and the Secretary of the Treasury, said:

"They are, it is true, judicial in their nature. For judgment and discretion must be exercised by both of them, but it is nothing more than the power ordinarily given by law to a commissioner appointed to examine claims to land or money under a treaty, or special powers to inquire into or decide any other particular class of controversies in which the public or individuals may be concerned. A power of this description may constitutionally be conferred on a secretary as well as on a commissioner. But it is not judicial in either case in the sense in which judicial power is granted by the Constitution to the courts of the United States."

And having reached the conclusion that the court as a court had no constitutional power under the act, the Supreme Court proceeded to consider the question, whether the power could be exercised by the judge, as a commissioner, without additional

appointment to that particular office by the President, by and with the advice and consent of the Senate, and on this point the Court said:

"The duties to be performed are entirely alien to the legitimate functions of a judge or court of justice and have no analogy to the general or special powers ordinarily and legally conferred on judges or courts to secure the due administration of the laws. And [continues the Supreme Court] if they [the district judges acting as commissioners] are to be regarded as officers, holding offices under the Government, the power of appointment is in the President, by and with the advice and consent of the Senate, and Congress could not by law designate the persons to fill these offices."

This case is absolutely conclusive and settles beyond controversy that the bill is wholly unconstitutional when considered in its aspect of the machinery selected for making this inquest. In Ferreira's case the powers conferred were considered as in their nature judicial, but yet not judicial in the sense of the Constitution. They were powers to determine, to adjust; but because the judgment was not final, but depended for its force on the action of another department, though there were parties before the judge, and there was a real case, a real controversy between them; and in the proper shape for forensic and judicial action, yet for the reason stated—the want of finality—the power was held not judicial and incapable of being conferred on a court. The powers here in this bill are not even in their nature judicial; it is a mere power to inquire, without the power to make a decision or render any judgment, final or otherwise; a power simply to inquire and report to another department.

The principles of this case are fully settled in our jurisprudence, and have been since the year 1792, when Hayburn's case was decided. There is no break in the continuity of the opinions of the Supreme Court sustaining this view. It received the sanction of the Supreme Court in Gordon v. United States (2 Wall.). No opinion was delivered in that case, but one was drawn up by Chief Justice Taney before his death and is published as an appendix to volume 117, United States Reports. We call the attention of the Senate to it as the last great work of that great man. It will add to his fame by the soundness and force of its reasoning and by its unanswerable exposition of the true position of the United States courts in our system.

With this we submit the constitutional questions involved in this bill to the judgment of the Senate, in the confidence that it has been shown, both on reason and authority, that the bill, if enacted, would be a serious infraction of the Constitution, and mischievous and unjust in its enforcement.

J. L. PUGH.
RICH'D COKE.
GEO. G. VEST.
J. Z. GEORGE.

A bill to provide for inquests under national authority

Be it enacted, etc., That whenever any three citizens of the United States shall, under oath, present to any judge of a circuit court, either in term time or vacation, their petition setting forth that within the circuit for which such judge has jurisdiction, and within the State of which the petitioners are residents, any person has been killed, or has sustained serious bodily injury, or serious injury in his estate, or been threatened with injury in person or estate, because of the race or color of such person so killed, injured, or threatened, or because of any political opinion which such person so killed, injured, or threatened may have held in regard to matters affecting the general welfare of the United States, or with design to prevent such person so killed, injured, or threatened, or others, from expressing freely such opinion, or from voting as he or they may see fit at any election of officers whose election is required or provided for by the Constitution or laws of the United States, or to influence or affect the votes of such persons or others at such elections, it shall be the duty of such judge, as soon as may be, to open a special session of such circuit court at such place within said circuit as he may appoint, and the duty of such court to hold an inquest into the circumstances of such killing, injury, or threatening, and to cause to be summoned and examined all such witnesses as the court may think proper.

SEC. 2. That said judge shall forthwith report the evidence by him taken, and his conclusions of fact thereon, to the President of the United States, to be by him laid before Congress.

SEC. 3. That the judge may require any district attorney of the United States within his circuit to attend such inquest and to aid in preparing for and conducting the same, or he may, in his discretion, appoint any other counselor at law to prepare and conduct such inquest.

SEC. 4. That the expenses of such inquest shall be certified by the judge to the Department of Justice and paid out of the appropriation made for the expenses of the courts of the United States.

Mrs. CARAWAY. Mr. President, I wish to thank the Senate for granting unanimous consent that the clerk read the document which has just been read. If it had not been read at the desk, I myself should have read it, and it would have taken very much longer. The arguments presented are so pertinent to the bill under consideration that I thought it would be well to have the entire report in the RECORD. I hope those Senators who were not present during the reading will read the report as throwing light on the bill we have before us for discussion.

I wish to say further that I should like to reiterate the statement I made in closing my remarks when I asked that the document be read. If this bill shall pass I feel there will be a far greater crime committed against our Government and especially against the South than the crime for which the measure is claimed to be a cure.

Mr. McKELLAR. Mr. President, a day or two ago an editorial published in the Washington Post was read into the RECORD, and perhaps other editorials were read. In today's issue of the Washington Evening Star there appears an article by Mr. Mark Sullivan. Ordinarily, I would merely ask that the article be printed in the RECORD, but, because of Mr. Sullivan's long service as a newspaper correspondent and writer, because of his great ability, and because of his learning and thoughtfulness as an author—and he has written a number of books, and most readable books they are, most instructive books they are; I do not know of any books written on recent politics that are more interesting or more instructive—because of these considerations, I want to read Mr. Sullivan's article, and I desire to call the attention of every Senator to the reasoning of Mr. Sullivan, which should appeal to every right-thinking and fair-minded man on either side of the Chamber.

Mr. CONNALLY. Mr. President, will the Senator yield?
Mr. McKELLAR. I yield.
Mr. CONNALLY. I regret that the majority leader, the Senator from Kentucky [Mr. BARKLEY], and the Senator from New York [Mr. WAGNER], who are pushing this bill, are not present to hear the wise remarks made by Mr. Sullivan.

Mr. LEWIS. Mr. President, I must again announce to my able friend that the Senator from New York [Mr. WAGNER] is confined to his room on the orders of his physician. I do not know the reason for the absence of our leader.

Mr. McKELLAR. I am glad to see present some Senators who are still of the opinion that the bill ought to be passed, and perhaps it will do them some good to listen to the reading.

This article, appearing in this afternoon's Star, has a headline as follows:

Why pass lynch bill?

And then there is a subhead, which reads:

Way might be opened for those who desire authoritarian government.

By Mark Sullivan——

Mr. LEWIS. Mr. President, with the consent of the Senator from Tennessee, let me suggest to my eminent friend from Texas that the leader of the majority, the Senator from Kentucky [Mr. BARKLEY], has taken his seat and is now present in the Chamber.

Mr. McKELLAR. I am glad to hear that announcement.

Mr. BARKLEY. Mr. President, I inquire is it true that reference has been made to the fact that I was temporarily called from the Chamber?

Mr. LEWIS. It was pleasantly thought that the eminence of my able friend from Kentucky had so increased the attention which should be given to him that his very absence was a definite infliction on the Senate, and the able Senator from Texas made allusion to it, I dare say, as a substantial loss to himself.

Mr. BARKLEY. I appreciate that. It makes me very happy to know that my presence is missed so greatly by my friend from Texas that he must call attention to my absence. I did not know that my presence was so important, but it fills me with pride to know that the Senator from Texas feels that way about it.

Mr. CONNALLY. I was only expressing regret that the Senator from Kentucky was not here to listen to the contribution made by the Senator from Tennessee. Knowing they are deskmates, I am sure the Senator from Kentucky will want to hear anything the Senator from Tennessee says.

Mr. McKELLAR. If I may be permitted to make a suggestion, I do not mind whether the Senator from Kentucky

CASE 0:16-cv-02547-SRN-LIB   Document 183   Filed 03/04/19   Page 15 of 19

or any other Senator listens to what I have to say, but I want to ask every Senator, including the Senator from Kentucky, of course, to listen to this article by Mr. Mark Sullivan, who I cannot believe has any other interest in this matter except what he believes is the good of the American people and of the Government.

Mr. BARKLEY. Mr. President, will the Senator yield?

Mr. McKELLAR. Yes.

Mr. BARKLEY. There is no Member of the Senate to whom I listen with greater pleasure, and usually greater profit, than the Senator from Tennessee. The Senator realizes, of course, that any of us are likely to be called temporarily from the Chamber at any time during the session, and if we are to enter upon a contest of bookkeeping with respect to one another as to which one shall be called out the most frequently and remain out the longest while this bill is under consideration, then it might be well for the Senate to employ an expert accountant so that he might take note of the absence of all Members when they are called out for any purpose whatever.

Mr. McKELLAR. I hope the Senator understands that I made no suggestion about his absence.

Mr. BARKLEY. I understand the Senator did not and would not.

Mr. McKELLAR. I sit next to my distinguished friend and have the highest admiration and esteem for him:

However, I wish to read this article, and I do not want anything to interfere with the Senate hearing what Mr. Sullivan has to say. I shall now go ahead, as suggested by the Senator from Oregon [Mr. McNARY]. The article reads:

The Senators opposing the so-called antilynching bill are so far a minority. Yet they have the psychological advantage. They have the psychological advantage because by their attitude they ask a question. It is a question that can hardly be answered convincingly. The question is, Why pass this bill?

Why pass this bill?—

Because nobody answers that question convincingly, the Senators opposing are justified in keeping the question before the Senate long enough for public attention to be centered on it. What conditions are there that justify the passage of this bill? The crime with which this bill purports to deal has become today the rarest crime in the United States. In 1937 only eight lynchings occurred, in 1936 only nine. And the number of cases to which this bill would apply is smaller yet. For the measure deals only with those cases in which local, State, or county officials failed to use—I quote the bill—"all due diligence" in preventing a lynching or apprehending the lynchers.

How many such cases there were last year or the year before I do not know. It would be useful to have an inquiry by impartial, judicial-minded persons to determine in just how many cases did local officials fail to practice due diligence. If the inquiry were completely unbiased, the number arrived at, we can safely surmise, would be extremely small. It is the clearest of facts that the public officials and the public opinion of the South are determined to end lynching. They have been successful in reducing it to a point where the crime has almost passed as far into history as the vigilante movements that were once frequent in the West.

FIVE-YEAR TERM POSSIBLE

The progress the South has made through its own public officials and public opinion is now rewarded by seeing a bill introduced in Congress which would have Federal officials pass judgment on southern State and county officials, and, where the Federal officials see fit, hale the local officials into court charged with a felony, punishable by a jail term as high as 5 years.

Lynching in the South is far less frequent than gang murders in northern cities. Prevention and punishment of lynching by the law officials of the South is more effective than prevention and punishment of gang murders by corresponding officials in the North.

To deal with this rarest of crimes a bill is introduced in Congress. It is not an ordinary bill which would make lynching, or failure to prevent or punish lynching, a Federal crime as well as a State one. That double jurisdiction existed when we had national prohibition, and it had unfortunate results, as everybody knows. But this bill now before Congress goes much further. It would have the Federal courts supplant the State courts. Federal officials would proceed through the Federal courts to try, and if successful, jail State officials—

"Jail State officials!"—

for whatever some Federal official might deem to be lack of "all due diligence." "All due diligence" is an elastic and therefore dangerous phrase.

GOVERNMENT FORM THREATENED

To deal with this rarest of crimes, a bill is introduced in Congress which, in the belief of Senator BORAH and other competent judges, would "destroy the last vestige of State rights," and by doing that would change our form of government. To deal with this rarest of crimes, more than a week of the time of the Senate is consumed and a program of important public legislation is held up. It is said that it is the opponents of the measure who are causing delay. If they are consciously practicing delay, they are justified by the importance of the issue. But is it the opponents of the bill who are causing the delay? Is not the delay rather to be charged to those who insist on keeping the measure before the Senate? It is these who should answer why. Why must this bill be kept before the Senate? Why must it be passed now? The number who really press the bill is not large.

I digress here long enough to say that not a Senator has spoken for the bill, though it has been before the Senate not merely a week but nearly a month.

Mr. GEORGE. Mr. President——

The PRESIDING OFFICER (Mr. RUSSELL in the chair). Does the Senator from Tennessee yield to the Senator from Georgia?

Mr. McKELLAR. I do.

Mr. GEORGE. Would it interfere with the distinguished Senator from Tennessee for me to make an inquiry at that point?

Mr. McKELLAR. Not at all.

Mr. GEORGE. The Senator has said no Senator has spoken for the bill. Has anyone submitted any authority here, either by way of brief or otherwise, tending to support the validity or constitutionality of the bill?

Mr. McKELLAR. No, Mr. President; no brief has been submitted, no authority has been submitted, and when a brief has been asked for, when an argument has been requested by those of us who oppose the bill, its proponents say, "We will reach it in due time."

Mr. GEORGE. The Senator from Tennessee must know, of course, as all Senators know, that the validity of this bill has been under question uniformly for a great number of years. The best legal minds in this country at least, and I dare say practically all the legal minds of first rank, have either doubted the validity of the bill or openly condemned it as being without authority so far as the Federal Government is concerned. Yet does it not strike the Senator that it is a most unusual proceeding that since the 6th day of this month, when this bill was formally taken up by the Senate, no Senator has spoken in behalf of it, and no Senator has submitted a brief or memorandum or list of authorities or suggested an argument on which the validity of the bill could be sustained?

Mr. McKELLAR. All that the Senator states is absolutely true.

Mr. Sullivan says:

Many who will vote for the bill when the roll call comes would in their hearts prefer that the bill be dropped.

The objections to the measure go to the heart of two matters which now are of the highest importance. First, the bill, if passed and sustained by the Supreme Court, would open a gate through which the Federal Government could take over—I quote a competent constitutional student—practically any function of the State it chooses. The bill would thus make the way broad and clear for those who wish to bring about in America a centralized authoritarian government.

RULE BY PRESSURE GROUPS

Second, passage of the bill would give enormous momentum to what is recognized as one of the most serious of our political evils. Passage of the bill would be another example of government by small "pressure groups." The number of voters to whom this bill is supposed to appeal is probably less than a million—the Negro voters in northern cities. Senator BYRNES, of South Carolina, made a statement which no advocate of the measure challenged: "One Negro * * * Walter White, secretary of the Association for the Advancement of the Colored People, has ordered this bill to pass * * *. If Walter White, who from day to day sits in the gallery, should consent to have this bill laid aside its advocates would desert it as quickly as football players unscramble when the whistle of the referee is heard. * * * For years * * * White has worked for this bill. Now that he has secured the balance of the voting power in so many States, he can order its passage."

It is not a happy condition when such a statement as that can be made—whether the man in the gallery be of one race or another, whether the number of voters he represents be a million or two million or any other small fraction of the total electorate. For the next step, and the likely step, would be that a man in the gallery might demand and get a measure that would take us further toward that authoritarian type of government recently

developed in Europe, which it is America's greatest present concern to avoid.

Mr. President, after reading that article, I wish to thank Mr. Sullivan for his splendid contribution to constitutional government, to actual government; his contribution in behalf of those State authorities who today are doing their duty to the best of their ability, who have entirely done away with white lynching, and only eight lynchings of colored persons took place last year. I wish to say that if those who advocate the bill will let the State authorities alone, and let them continue to decrease this crime, all of us who abhor and are opposed to the crime will have the satisfaction within 3 or 4 years, in my judgment, and perhaps in less time, of reading in the records that there has not been a single lynching in the United States during the year.

### FEDERAL TRADE COMMISSION

Mr. WHEELER. Mr. President——

Mr. McKELLAR. I yield to the Senator from Montana.

Mr. WHEELER. I ask the Chair to lay before the Senate the amendment of the House of Representatives to Senate bill 1077.

The PRESIDING OFFICER laid before the Senate the amendment of the House of Representatives to the bill (S. 1077) to amend the act creating the Federal Trade Commission, to define its powers and duties, and for other purposes, which was to strike out all after the enacting clause and to insert:

That section 5 of the act entitled "An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes," approved September 26, 1914 (U. S. C., 1934 ed., title 15, sec. 45), is hereby amended to read as follows:

"SEC. 5. (a) Unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are hereby declared unlawful.

"The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, common carriers subject to the acts to regulate commerce, and persons, partnerships, or corporations subject to the Packers and Stockyards Act, 1921, except as provided in said act, from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce.

"(b) Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least 30 days after the service of said complaint. The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the Commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. Any person, partnership, or corporation may make application, and upon good cause shown may be allowed by the Commission to intervene and appear in said proceeding by counsel or in person. The testimony in any such proceeding shall be reduced to writing and filed in the office of the Commission. If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by this act, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice. Until the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, or, if a petition for review has been filed within such time, then until the transcript of the record in the proceeding has been filed in a circuit court of appeals of the United States, as hereinafter provided, the Commission may at any time, upon such notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any report or any order made or issued by it under this section. After the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, the Commission may at any time, with the consent of the person, partnership, or corporation required by the order to cease and desist, modify, or set aside, in whole or in part, the report or order made or issued by it under this section.

"(c) Any person, partnership, or corporation required by an order of the Commission to cease and desist from using any method of competition or act or practice may obtain a review of such order in the circuit court of appeals of the United States, within any circuit where the method of competition or the act or practice in question was used or where such person, partnership, or corporation resides or carries on business, by filing in the court, within 60 days from the date of the service of such order, a written petition praying that the order of the Commission be set aside. A copy of such petition shall be forthwith served upon the Commission, and thereupon the Commission forthwith shall certify and file in the court a transcript of the entire record in the proceeding, including all the evidence taken and the report and order of the Commission. Upon such filing of the petition and transcript the court shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to make and enter upon the pleadings, evidence, and proceedings set forth in such transcript a decree affirming, modifying, or setting aside the order of the Commission, and enforcing the same to the extent that such order is affirmed, and to issue such writs as are ancillary to its jurisdiction or are necessary in its judgment to prevent injury to the public or to competitors pendente lite. The findings of the Commission as to the facts, if supported by evidence, shall be conclusive. To the extent that the order of the Commission is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts, or make new findings, by reason of the additional evidence so taken, and it shall file such modified or new findings, which, if supported by evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of its original order, with the return of such additional evidence. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari, as provided in section 240 of the Judicial Code.

"(d) The jurisdiction of the Circuit Court of Appeals of the United States to affirm, enforce, modify, or set aside orders of the Commission shall be exclusive.

"(e) Such proceedings in the circuit court of appeals shall be given precedence over other cases pending therein, and shall be in every way expedited. No order of the Commission or judgment of court to enforce the same shall in anywise relieve or absolve any person, partnership, or corporation from any liability under the Antitrust Acts.

"(f) Complaints, orders, and other processes of the Commission under this section may be served by anyone duly authorized by the Commission, either (a) by delivering a copy thereof to the person to be served, or to a member of the partnership to be served, or to the president, secretary, or other executive officer or a director of the corporation to be served; or (b) by leaving a copy thereof at the residence or the principal office or place of business of such person, partnership, or corporation; or (c) by registering and mailing a copy thereof addressed to such person, partnership, or corporation at his or its residence or principal office or place of business. The verified return by the person so serving said complaint, order, or other process setting forth the manner of said service shall be proof of the same, and the return post office receipt for said complaint, order, or other process registered and mailed as aforesaid shall be proof of the service of the same.

"(g) An order of the Commission to cease and desist shall become final—

"(1) Upon the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time; but the commission may thereafter modify or set aside its order to the extent provided in the last sentence of subsection (b); or

"(2) Upon the expiration of the time allowed for filing a petition for certiorari, if the order of the Commission has been affirmed or the petition for review dismissed by the circuit court of appeals, and no petition for certiorari has been duly filed; or

"(3) Upon the denial of a petition for certiorari, if the order of the Commission has been affirmed or the petition for review dismissed by the circuit court of appeals; or

"(4) Upon the expiration of 30 days from the date of issuance of the mandate of the Supreme Court, if such Court directs that the order of the Commission be affirmed or the petition for review dismissed.

"(h) If the Supreme Court directs that the order of the Commission be modified or set aside, the order of the Commission rendered in accordance with the mandate of the Supreme Court shall become final upon the expiration of 30 days from the time it was rendered, unless within such 30 days either party has instituted proceedings to have such order corrected to accord with the mandate, in which event the order of the Commission shall become final when so corrected.

"(i) If the order of the Commission is modified or set aside by the circuit court of appeals, and if (1) the time allowed for filing a petition for certiorari has expired and no such petition has been duly filed, or (2) the petition for certiorari has been denied, or (3) the decision of the court has been affirmed by the Supreme Court, then the order of the Commission rendered in accordance with the mandate of the circuit court of appeals shall become final on the expiration of 30 days from the time such order of the Commission was rendered, unless within such 30

days either party has instituted proceedings to have such order corrected so that it will accord with the mandate, in which event the order of the Commission shall become final when so corrected.

"(j) If the Supreme Court orders a rehearing; or if the case is remanded by the circuit court of appeals to the Commission for a rehearing, and if (1) the time allowed for filing a petition for certiorari has expired, and no such petition has been duly filed, or (2) the petition for certiorari has been denied, or (3) the decision of the court has been affirmed by the Supreme Court, then the order of the Commission rendered upon such rehearing shall become final in the same manner as though no prior order of the Commission had been rendered.

"(k) As used in this section the term 'mandate', in case a mandate has been recalled prior to the expiration of 30 days from the date of issuance thereof, means the final mandate.

"(l) Any person, partnership, or corporation who violates an order of the Commission to cease and desist after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States."

SEC. 2. Such act is further amended by adding at the end thereof new sections to read as follows:

"SEC. 12. (a) It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—

"(1) By United States mails, or in commerce by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase of food, drugs, devices, or cosmetics; or

"(2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in commerce of food, drugs, devices, or cosmetics.

"(b) The dissemination or the causing to be disseminated of any false advertisement within the provisions of subsection (a) of this section shall be an unfair or deceptive act or practice in commerce within the meaning of section 5.

"SEC. 13. (a) Whenever the Commission has reason to believe—

"(1) that any person, partnership, or corporation is engaged in, or is about to engage in, the dissemination or the causing of the dissemination of any advertisement in violation of section 12, and

"(2) that the enjoining thereof pending the issuance of a complaint by the Commission under section 5, and until such complaint is dismissed by the Commission or set aside by the court on review, or the order of the Commission to cease and desist made thereon has become final within the meaning of section 5, would be to the interest of the Public,

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States or in the United States court of any Territory, to enjoin the dissemination or the causing of the dissemination of such advertisement. Upon proper showing a temporary injunction or restraining order shall be granted without bond. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.

"(b) Whenever it appears to the satisfaction of the court in the case of a newspaper, magazine, periodical, or other publication, published at regular intervals—

"(1) that restraining the dissemination of a false advertisement in any particular issue of such publication would delay the delivery of such issue after the regular time therefor, and

"(2) that such delay would be due to the method by which the manufacture and distribution of such publication is customarily conducted by the publisher in accordance with sound business practice, and not to any method or device adopted for the evasion of this section or to prevent or delay the issuance of an injunction or restraining order with respect to such false advertisement or any other advertisement,

the court shall exclude such issue from the operation of the restraining order or injunction.

"SEC. 14. (a) Any person, partnership, or corporation who violates any provision of section 12 shall, if the use of the commodity advertised may be injurious to health because of results from such use, or if such violation is with intent to defraud or mislead, be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not more than $5,000 or by imprisonment for not more than 6 months, or by both such fine and imprisonment; except that if the conviction is for a violation committed after a first conviction of such person, partnership, or corporation, for any violation of such section, punishment shall be by a fine of not more than $10,000 or by imprisonment for not more than 1 year, or by both such fine and imprisonment: Provided, That this section shall not apply to products duly marked and labeled in accordance with rules and regulations issued under the Meat Inspection Act, approved March 4, 1907, as amended.

"(b) No publisher, radio broadcast licensee, or agency or medium for the dissemination of advertising, except the manufacturer, packer, distributor, or seller of the commodity to which the false advertisement relates, shall be liable under this section by reason of the dissemination by him of any false advertisement, unless he has refused, on the request of the Commission, to furnish the Commission the name and post-office address of the manufacturer, packer, distributor, seller, or advertising agency, residing in the United States, who caused him to disseminate such advertisement. No advertising agency shall be liable under this section by reason of the causing by it of the dissemination of any false advertisement, unless it has refused, on the request of the Commission, to furnish the Commission the name and post-office address of the manufacturer, packer, distributor, or seller, residing in the United States, who caused it to cause the dissemination of such advertisement.

"SEC. 15. For the purposes of sections 12, 13, and 14—

"(a) The term 'false advertisement' means an advertisement, other than labeling, which is misleading in a material respect; and in determining whether any advertisement is misleading, there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, sound, or any combination thereof, but also the extent to which the advertisement fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the commodity to which the advertisement relates; but if, at the time of the dissemination of the advertisement, there exists a substantial difference of opinion, among experts qualified by scientific training and experience, as to the truth of a representation, the advertisement shall not be considered misleading on account of such representation, if it states clearly and prominently the fact of such difference of opinion. Nothing in this paragraph shall be construed as requiring the making of such statement as to difference of opinion; and failure to so state the fact of such difference of opinion shall not relieve the Government of the burden of establishing the misleading character of the representation. No advertisement of a drug shall be deemed to be false if it is disseminated only to members of the medical profession, contains no false representation of a material fact, and includes, or is accompanied in each instance by truthful disclosure of, the formula showing quantitatively each ingredient of such drug.

"(b) The term 'food' means (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article.

"(c) The term 'drug' means (1) articles recognized in the official United States Pharmacopœia, official Homœopathic Pharmacopœia of the United States, or official National Formulary, or any supplement to any of them; and (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (3) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (4) articles intended for use as a component of any article specified in clause (1), (2), or (3); but does not include devices or their components, parts, or accessories.

"(d) The term 'device' (except when used in subsection (a) of this section) means instruments, apparatus, and contrivances, including their parts and accessories, intended (1) for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; or (2) to affect the structure or any function of the body of man or other animals.

"(e) The term 'cosmetic' means (1) articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance, and (2) articles intended for use as a component of any such article; except that such term shall not include soap.

"SEC. 16. Whenever the Federal Trade Commission has reason to believe that any person, partnership, or corporation is liable to a penalty under section 14 or under subsection (l) of section 5, it shall certify the facts to the Attorney General, whose duty it shall be to cause appropriate proceedings to be brought for the enforcement of the provisions of such section or subsection.

"SEC. 17. If any provision of this act, or the application thereof to any person, partnership, corporation, or circumstance, is held invalid, the remainder of the act and the application of such provision to any other person, partnership, corporation, or circumstance, shall not be affected thereby.

"SEC. 18. This act may be cited as the 'Federal Trade Commission Act.'"

SEC. 3. (a) In case of an order by the Federal Trade Commission to cease and desist, served on or before the date of the enactment of this act, the 60-day period referred to in section 5 (c) of the Federal Trade Commission Act, as amended by this act, shall begin on the date of the enactment of this act.

(b) Section 14 of the Federal Trade Commission Act, added to such act by section 2 of this act, shall take effect on the expiration of 60 days after the date of the enactment of this act.

Mr. McKELLAR. Will this matter lead to any argument?

Mr. WHEELER. I do not know; but if it does I shall withdraw it.

Mr. McKELLAR. It will not take me more than a few minutes to finish. If the Senator will wait for a few minutes, I shall be through.

Mr. WHEELER. I ask unanimous consent at this time to move to concur in the amendment of the House of Representatives.

Mr. COPELAND. Mr. President, I must object to that.

Mr. McNARY. Mr. President, is this a House bill?

Mr. WHEELER. It is a Senate bill which was discussed here, and passed the Senate during the regular session, and went to the House. The House has made some minor

amendments. I have consulted the members of the Federal Trade Commission with reference to the amendments, and they all state that the amendments are satisfactory to them.

Mr. McNARY. That may be; but I am not at all familiar with the bill. What is the bill about?

Mr. WHEELER. It is a bill with reference to unfair practices in commerce. We discussed it on the floor of the Senate at the regular session.

Mr. McKELLAR. Am I to understand that the Senator from New York objects?

Mr. COPELAND. Yes, Mr. President.

Mr. BARKLEY. Mr. President, if the Senator will yield, this is a matter which can be disposed of very quickly at any time; and the Senator from Montana will have ample opportunity to do it either later in the day or tomorrow, rather than in the middle of the speech of the Senator from Tennessee.

Mr. WHEELER. I thought probably there would be no objection to the action of the House, and we could dispose of it.

Mr. BARKLEY. There will be none on my part.

The VICE PRESIDENT. The Chair does not know who has the floor.

Mr. McKELLAR. I have the floor, and yielded to the Senator from Montana.

The VICE PRESIDENT. The Chair is informed that the Senator from Tennessee has the floor, and that a privileged matter has been laid before the Senate.

Mr. McKELLAR. Yes, Mr. President.

The VICE PRESIDENT. The Chair is further informed that the Senator from Montana moves that the Senate concur in the amendment of the House of Representatives.

Mr. WHEELER. That is correct.

The VICE PRESIDENT. The question before the Senate is, Will the Senate concur in the amendment of the bill by the House of Representatives? That brings up the whole question. The Senator from Tennessee has yielded for that purpose.

Mr. McKELLAR. I have yielded for that purpose.

Mr. COPELAND. Mr. President, I suppose this matter can come up properly at this time.

The VICE PRESIDENT. The Chair is informed by the Parliamentarian that it is a privileged matter, being an amendment to a Senate bill by the House of Representatives.

Mr. BARKLEY. Mr. President, in that connection I desire to propound a parliamentary inquiry. While it is a privileged matter, is it not true that it does not enjoy such privileged status as to take the Senator from Tennessee from the floor unless he yields?

The VICE PRESIDENT. That is the point. The Senator from Tennessee has yielded, and the question now before the Senate is whether or not the Senate will agree to the motion of the Senator from Montana to concur in the amendment of the House.

Mr. CONNALLY. Mr. President, a parliamentary inquiry.

The VICE PRESIDENT. The Senator from Texas will state it.

Mr. CONNALLY. Even though this be a privileged matter, if it is acted upon at this time will it not have the effect of displacing the pending bill?

The VICE PRESIDENT. It will not.

Mr. COPELAND. Mr. President, I appeal to the Senator from Montana to let this matter go over for a few days. He will recall that a few months ago we passed a food and drug bill with the inclusion of a provision about advertising, placing the advertising where personally I think it belongs, under the control of the Food and Drug Administration of the Department of Agriculture. The particular provision to which I have referred comes from the House as an amendment to a measure which passed this body some months ago, relating to the functions of the Federal Trade Commission.

I am not here to say that my final judgment personally is that I should always resist placing the advertising under the control of the Federal Trade Commission; but the action of the House brings about a very critical situation with regard to the legislation relating to food and drugs. As I understand the matter from conversation with the chairman of the House committee, the food and drug bill is likely to come up in the House next week; and, if I am any prophet as to what the House will do, it will either include in that bill a provision to place the advertising under the Federal Trade Commission, or it will omit the matter entirely, depending upon the hope that the bill now before us may be enacted.

I will say to the Senator from Montana that as a matter of parliamentary procedure it would be very embarrassing to me to have the Senate in effect repudiate what it did twice in the last Congress, and did again in this Congress. The matter is so important that it ought not to be disposed of in this offhand manner.

Mr. WHEELER. Let me say to the Senator that there is nothing new in this bill. The matter has been thrashed out on the floor of the Senate time and time again. This bill passed the Senate. It went over to the House, and has now passed the House with some slight amendments which the Federal Trade Commission inform me are satisfactory to them and are satisfactory, so far as I know, to everybody else. This bill does not conflict in any way, shape, or form with the Food and Drug Act which heretofore passed the Senate. Ordinarily I should not ask to take it up now; but I am compelled to leave town and be gone for several days, and consequently I should like to have the matter taken up and acted upon at this time.

The VICE PRESIDENT. The amendment of the House is before the Senate, and the Senator from New York has the floor.

If the Senator from New York, the Senator from Texas, and the Senator from Kentucky will permit the Chair to do so, the Chair desires to read the last section of rule VII, so that the Senate may have it in mind, because during the debate on the so-called antilynching bill it may come up again and again:

> The Presiding Officer may at any time lay, and it shall be in order at any time for a Senator to move to lay, before the Senate any bill or other matter sent to the Senate by the President or the House of Representatives, and any question pending at that time shall be suspended for this purpose. Any motion so made shall be determined without debate.

That is, the motion to lay the matter before the Senate. This matter has been laid before the Senate, and therefore it is subject to debate.

The Chair has read the rule for the benefit of the Senator from Texas and the Senator from Kentucky, because other matters like this may be brought up. A message from the President of the United States or a message from the House of Representatives may be laid before the Senate at any time.

Mr. COPELAND. Mr. President, I regret that the Senator from Montana has not read the CONGRESSIONAL RECORD this morning. The debate in the House clearly indicates that this amendment, which was made in the House, was adopted for the purpose of putting the control of advertising in the Federal Trade Commission. If I could convince the Senator from Montana of that fact I know that he would accede to my request that the matter go over, because he assured me on the floor of the Senate when the bill was before us originally that nothing in the bill had to do with the functions of the Food and Drug Administration.

Mr. WHEELER. I still assure the Senator of that fact; it has nothing to do with the Food and Drug Administration. There are two separate jurisdictions, and they would work concurrently.

Of course, if a bill of this kind were enacted it might be that to some slight extent there would be conflict in jurisdiction between the Federal Trade Commission and the Department of Agriculture. But there is a chance of conflict in the case of pretty nearly any piece of legislation. It is a matter to be worked out between the two jurisdictions as to which would enforce the particular provision. But if there were taken out of the bill what the Senator wants stricken

**1938**  CONGRESSIONAL RECORD—SENATE  **447**

and the function were turned over to the Food and Drug Administration, it would leave the administration of the Federal Trade Commission in a sad way, so that they could not enforce the law against bad practices with reference to other industries which ought to be regulated.

Mr. COPELAND. The Senator from Montana is so uniformly right that I hesitate to call attention to the fact that he is wrong this time, just as wrong as a man can be, because the function of the Federal Trade Commission is to deal with unfair practices.

Mr. WHEELER. If the Senator will permit me to interrupt him, I will bring an end to the controversy. I have just talked with the leader on this side and he has suggested that I withdraw the motion for the present and take it up at a later time. I ask unanimous consent that I may withdraw the motion at this time.

The VICE PRESIDENT. The Senator from Montana asks unanimous consent to withdraw his motion for the concurrence of the Senate in the amendment of the House to Senate bill 1077.

Mr. COPELAND. Mr. President, I should like to have it understood that this matter will not be brought up in my absence and that I may be here when it is called up for consideration by the Senate.

Mr. WHEELER. Mr. President, I am not going to give any assurance. I will try to get in touch with the Senator and attempt to see that he is here. I am withdrawing the motion at the suggestion of the Senator from New York, and I do not want to do it on any condition as to when I may bring the matter up again.

Mr. COPELAND. So far as I am concerned, I am willing to have the Senate go on with it, and have it determined now.

Mr. WHEELER. The Senator asked to have it go over.

Mr. COPELAND. If the Senator will put it over for a week, I shall be satisfied.

Mr. WHEELER. I am asking that I be allowed to withdraw the motion, and I will take it up in about a week.

Mr. COPELAND. That is satisfactory. I have no objection.

The VICE PRESIDENT. Is there objection to the request of the Senator from Montana? The Chair hears none, and the motion is withdrawn.

PREVENTION OF AND PUNISHMENT FOR LYNCHING

The Senate resumed consideration of the bill (H. R. 1507) to assure to persons within the jurisdiction of every State the equal protection of the laws and to punish the crime of lynching.

Mr. McKELLAR resumed the floor.

Mr. BARKLEY. Mr. President, will the Senator from Tennessee yield?

Mr. McKELLAR. I yield.

Mr. BARKLEY. I am compelled to go to the telephone in the cloakroom in order to call the Treasury on official business, and I should like to ask the schoolmaster from Texas if I may go out. [Laughter.]

Mr. CONNALLY. I should be very glad to have the Senator absent himself to go to the telephone, or to any other place he desires to visit or the promptings of his mind may suggest. [Laughter.]

Mr. BARKLEY. I merely wish to use the telephone.

Mr. McKELLAR. Mr. President, I did not even know the State from which Mr. Sullivan hailed, but upon inquiry I find that he was born at Avondale, Chester County, Pa., so the article to which I have been referring was written by a Pennsylvanian. I think it ought to be convincing to any fair-minded man, and I desire to call the attention of every Senator to it.

Mr. CONNALLY. Mr. President—

The VICE PRESIDENT. Does the Senator from Tennessee yield to the Senator from Texas?

Mr. McKELLAR. I yield.

Mr. CONNALLY. I suggest the absence of a quorum.

The VICE PRESIDENT. The clerk will call the roll.

The legislative clerk called the roll, and the following Senators answered to their names:

| | | | |
|---|---|---|---|
| Andrews | Gibson | Lonergan | Sheppard |
| Bailey | Guffey | McCarran | Smathers |
| Barkley | Hale | McGill | Thomas, Utah |
| Berry | Harrison | McKellar | Townsend |
| Bulkley | Hayden | McNary | Vandenberg |
| Bulow | Hill | Miller | Van Nuys |
| Chavez | Hitchcock | Neely | Wheeler |
| Clark | Johnson, Calif. | Nye | |
| Connally | Lewis | Pittman | |
| Copeland | Logan | Russell | |

The PRESIDING OFFICER (Mr. BULOW in the chair). Thirty-seven Senators having answered to their names, there is not a quorum present. The clerk will call the names of the absent Senators.

The legislative clerk called the names of the absent Senators, and Mr. ADAMS, Mr. ASHURST, Mr. BANKHEAD, Mr. BILBO, Mr. BONE, Mr. BORAH, Mr. BRIDGES, Mr. BROWN of Michigan, Mr. BROWN of New Hampshire, Mr. BURKE, Mr. BYRD, Mr. BYRNES, Mr. CAPPER, Mrs. CARAWAY, Mr. DAVIS, Mr. DIETERICH, Mr. DONAHEY, Mr. DUFFY, Mr. ELLENDER, Mr. FRAZIER, Mr. GEORGE, Mr. GERRY, Mr. GILLETTE, Mr. GLASS, Mr. HATCH, Mr. HERRING, Mr. HOLT, Mr. JOHNSON of Colorado, Mr. KING, Mr. LA FOLLETTE, Mr. LODGE, Mr. LUNDEEN, Mr. MALONEY, Mr. McADOO, Mr. MINTON, Mr. MURRAY, Mr. NORRIS, Mr. OVERTON, Mr. PEPPER, Mr. POPE, Mr. RADCLIFFE, Mr. REYNOLDS, Mr. SCHWARTZ, Mr. SCHWELLENBACH, Mr. SMITH, Mr. STEIWER, Mr. THOMAS of Oklahoma, Mr. TRUMAN, Mr. TYDINGS, and Mr. WALSH answered to their names when called.

Mr. CONNALLY. Mr. President, a parliamentary inquiry.

The PRESIDING OFFICER (Mr. NEELY in the chair). The Senator will state it.

Mr. CONNALLY. Is a quorum present?

The PRESIDING OFFICER. The Chair will inform the Senator in just one moment.

Eighty-seven Senators have answered to their names. A quorum is present.

Mr. McKELLAR. Mr. President, the purpose of the pending bill of course is to turn over to Federal authority the jurisdiction and powers of the States to deal with the crime of lynching, or, as Mr. Mark Sullivan, says—

To deal with this rarest of crimes the bill is introduced in Congress.

This bill has been debated, I believe, in the short extra session and in the present session for approximately 3 or 4 weeks. In the District of Columbia, of course, crimes are handled entirely by the Federal Government. Mr. Sullivan says—and we all know it is the truth—that the "rarest crime" in this country today is the crime of lynching; it is the most infrequent crime. There is but one lynching to something over 16,000,000 inhabitants; and now, with the marvelous progress which has been made in reducing the number of lynchings from 231 down to 8, it is sought to turn jurisdiction over such crimes to the Federal authorities.

In that connection, I wish to read from an article published in the city of Washington concerning crime as it is combatted and handled by Federal authority. In the first column of the first page of one of Washington's daily newspapers, the Times, is the following headline:

BROWN CALLS AIDES TO MAP CRIME CHECK—SITUATION ALARMS POLICE OFFICIALS

(By William E. Ring)

The article is, as follows:

With Washington in the grip of the most widespread crime wave of recent years, the high command of the Metropolitan Police Department gathered today to map ways of breaking the criminals' grasp.

Meanwhile, at the District Building, Commissioner Melvin C. Hazen issued orders that every effort be exerted by the Department to abate the wave.

TO ASK MORE POLICE

I wish Senators who are combining and confederating, if I may use that expression in an inoffensive sense, to take away the jurisdiction and power of the States over lynching